XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
NIMROD P. ELIAS
ANNA RICH, State Bar No. 230195
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone: 510-879-0296
  Fax: 510-622-2270
  E-mail:  Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California, by and
through Attorney General Xavier Becerra*

*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, BY AND THROUGH ATTORNEY GENERAL XAVIER BECERRA; STATE OF CONNECTICUT; STATE OF OREGON AND GOVERNOR KATE BROWN; COMMONWEALTH OF MASSACHUSETTS; AND STATE OF WASHINGTON;** | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | Administrative Procedure Act Case |
| v. | Date:<br>Time:<br>Dept:<br>Judge:<br>Trial Date:<br>Action Filed: |
| **ALEX M. AZAR II, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,** | |
| Defendants. | |

1

# INTRODUCTION

1.      Plaintiffs the States of California, Connecticut, Oregon and its Governor Kate Brown, Massachusetts, and Washington (collectively, "the States"), bring this action to protect the integrity of their Medicaid home and community-based services programs against Defendants the Department of Health and Human Services (HHS) and Secretary Alex M. Azar, II (collectively, Defendants), who have unlawfully attempted to reinterpret the Medicaid Act in service of anti-union objectives that bear no relationship to the purpose of that Act.  In doing so, Defendants seek to upend careful arrangements created by States to allow older adults and individuals with disabilities to maximize their autonomy and independence by directing their own care, with support from state and local governments relating to the financial logistics of paying care providers.

2.      Each of the States has chosen to include consumer-directed home and community-based personal care services (referred to hereafter generally as "homecare") as an element of their Medicaid programs, in order to provide assistance that eligible individuals who are aged, blind and have disabilities need to live safely in their own homes and communities, and avoid unnecessary institutionalization.  The type of assistance depends on each states' unique program design and individuals' needs, but generally includes services like paramedical services, accompaniment to medical appointments, bowel and bladder care, bathing, meal preparation, housecleaning, laundry, grocery shopping, and protective supervision.

3.      Consumer direction allows eligible Medicaid beneficiaries to hire, fire, and supervise their own care providers.  State or local government entities are generally responsible (with state-to-state variations) for assisting beneficiaries by setting wages and benefits for providers and authorizing payments for hours of service and/or types of services.  Collectively, the States' Medicaid programs serve more than 700,000 individuals in need of in-home assistance through consumer-directed programs.

4.      Each of the States has sought to improve the quality and stability of Medicaid homecare by extending state laws that authorize public-sector bargaining to the homecare workforce and permitting voluntary payroll deductions and/or benefit contributions.  Historically,

1   homecare workers have engaged in difficult, often physically-demanding work and faced low

2   wages, few benefits, frequent injuries, and unpredictable hours, with no means to collectively

3   address working conditions.  Since States' authorization of collective bargaining, homecare

4   workers have collectively chosen union representation.  Federal and state laws authorize the

5   direct deduction of voluntary union dues and other benefits customary for employees, such as

6   health insurance premiums or retirement contributions, from providers' paychecks, or

7   contributions to benefit trusts on behalf of providers.

8        5.      On May 6, 2019, HHS issued a Final Rule that purports to reinterpret the Medicaid

9   Act in a manner that would prohibit States from directly withholding these ordinary, voluntary

10  deductions from homecare workers' paychecks.  In doing so, the Rule abruptly and without any

11  sound rationale or conversations with affected states rescinded a federal Medicaid regulation

12  confirming the established practice of direct deductions.  Defendants' purported basis for this rule

13  change is a 47-year-old provision of the federal Medicaid Act, 42 U.S.C. Section 1396a(a)(32)

14  (hereinafter Section (a)(32)), that prohibits assignment of rights to collect payment for Medicaid

15  services to third parties.  Congress enacted that provision to prohibit a fraudulent medical-

16  financing scheme that bears no relationship whatsoever to legal payroll deductions such as union

17  dues or other worker benefits.  Neither the language of the statute, legislative history, long-

18  standing judicial construction of Section (a)(32), nor Defendants' own recent rulemaking supports

19  this new interpretation of the law.  Indeed, Congress had not even contemplated the Medicaid

20  authorities primarily used by the States today to provide consumer-directed homecare services.

21  The regulation the Secretary seeks to eliminate was not necessary to establish the lawfulness of

22  payroll deductions to pay for items such as union membership dues or health benefits, because the

23  anti-reassignment statute did not prohibit them even without the regulation.  The Final Rule

24  announces CMS's intent to enforce its reading of the Medicaid Act and to require States to cease

25  authorizing payroll deductions, under circumstances set forth in the rule, for union dues and other

26  workplace benefits.

27       6.      If implemented in accordance with the Secretary's reinterpretation of the Medicaid

28  Act, the Final Rule would undermine laws and agreements that have improved the provision of

homecare to the States' residents.  It would disrupt well-established collective bargaining relationships and weaken an organized workforce infrastructure that the States have authorized as a result of provider self-organization and in order to channel labor relations in a productive and cooperative manner that contributes to the building, training, and mobilization of Medicaid home-care workforces.  While the States could, in theory, avoid risking this disruption by foregoing federal Medicaid funding for personal care services, doing so would forfeit more than $6.5 billion in federal dollars, causing devastating harm to state healthcare budgets and eroding the States' capacity to provide needed homecare for seniors and persons with disabilities.  Defendants' Final Rule adds a condition to Medicaid funding that is not authorized by statute and is intended to improperly force the States to choose between including these services in their Medicaid programs and upholding state laws and contractual obligations that promote a more stable, effective, and skilled homecare workforce.

7.     The States seek injunctive and declaratory relief on the grounds that the manner and substance of Defendants' new policy guidance violates the Administrative Procedure Act (APA).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) and 5 U.S.C. §§ 701-706 (APA).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

9.     Defendants' issuance of the new rule on May 6, 2019, constitutes a final agency action and is therefore judicially reviewable within the meaning of the APA.  5 U.S.C. §§ 704, 706.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is a judicial district in which Plaintiff the State of California resides and this action seeks relief against federal agencies and officials acting in their official capacities.

**INTRADISTRICT ASSIGNMENT**

11.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court.

**PARTIES**

12.     Plaintiff, the State of California, by and through its Attorney General Xavier Becerra, brings this action.  As California's Chief Law Officer, the Attorney General has the authority to file civil actions in order to protect public rights and interests and promote the health and welfare of Californians.  Cal. Const., art. V, § 13.  This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.  *See Pierce v. Super. Ct.*, 1 Cal.2d 759, 761-62 (1934) (holding that the Attorney General "has the power to file any civil action or proceeding directly involving the rights and interest of the state […] and the protection of public rights and interests").

13.     Plaintiffs, the State of Oregon and its Governor Kate Brown, are represented by the Attorney General of Oregon, Ellen Rosenblum.  Attorney General Rosenblum is the chief law officer of Oregon and is empowered to bring this action on behalf of the State of Oregon and its affected agencies under Oregon Revised Statutes §§ 180.060, 180.210, and 180.220.

14.     Plaintiff, the State of Washington is represented by its Attorney General, who is the State's chief legal adviser.  The powers and duties of the Attorney General include acting in federal court on matters of public concern to the State.

15.     Plaintiff, the State of Connecticut, is represented by the Attorney General of Connecticut, William Tong.  Attorney General Tong is the chief legal officer of the State of Connecticut and has the authority to file civil actions to protect Connecticut's rights and interests.  Conn. Const., art. IV, § 4; Conn. Gen. Stat. §§ 3-124, *et seq*.  Attorney General Tong is authorized to bring this action on behalf of the State of Connecticut and its agencies under Conn. Gen. Stat. § 3-125.

16.     Plaintiff, the Commonwealth of Massachusetts, is represented by Attorney General Maura Healey, as its chief law officer, who is granted traditional common law duties to represent

1    the Commonwealth and broad statutory authority to act in the public interest.   Mass. Gen. Laws.

2    c. 12, § 3; *Feeney v. Commonwealth*, 373 Mass. 359, 366, 366 N.E.2d 1262, 1266 (1977).

3          17.    The States have an interest in ensuring the stability and quality of their Medicaid

4    home and community-based service programs.  Protection of health and welfare is one of the

5    traditional police powers of the States.  The States rely on Defendants' compliance with the

6    procedural and substantive requirements of the APA in order to obtain timely and accurate

7    information about activities that may have significant adverse impacts on their administration of

8    their Medicaid programs, and to participate meaningfully in an impartial and public decision-

9    making process that is consistent with the Medicaid Act's purpose of furnishing medical

10   assistance and rehabilitative services to those in need.

11         18.    Each State is aggrieved by the actions of Defendants and has standing to bring this

12   action because of the injury to its state sovereignty caused by Defendants' issuance of the illegal

13   rule, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and

14   proprietary contract interests.  In particular, the States will suffer concrete and substantial harm

15   because the Final Rule frustrates the States' public health interests by attempting to disrupt the

16   collective-bargaining process that the States have established with respect to independent

17   Medicaid homecare providers.  If CMS enforces the new interpretation set forth in the Final Rule,

18   it will undermine state laws and contracts that further these interests.

19         19.    Defendant Alex M. Azar II is Secretary of HHS and is sued in his official capacity.

20   Secretary Azar has responsibility for implementing and fulfilling HHS's duties under the

21   Constitution, the Medicaid Act, and the APA.

22         20.    Defendant HHS is an agency of the United States government and bears

23   responsibility, in whole or in part, for the acts complained of in this Complaint.  The Centers for

24   Medicare and Medicaid Services (CMS) is an entity within HHS.

25

26

27

28

Complaint for Declaratory and Injunctive Relief (Case No. TBD)

**STATUTORY BACKGROUND**

**I.    THE MEDICAID ACT**

**A.    Medicaid Generally**

21.    Title XIX of the Social Security Act establishes Medicaid as a joint federal-state medical assistance program.  *See* 42 U.S.C. §§ 1396 to 1396w-5.  All states participate in Medicaid, and the states' participation is critical to their ability to provide for the health and welfare of their residents.  All participating states must submit a state Medicaid plan describing their programs and affirming compliance with the requirements of the Medicaid Act and its implementing regulations.  42 U.S.C. § 1396a.

22.    Medicaid was enacted for the purpose of "enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396-1.

23.    The Medicaid Act requires the Secretary to "provide such safeguards as may be necessary to assure that […] care and services will be provided, in a manner consistent with […] the best interests of the recipients."  42 U.S.C. § 1396a(a)(19).  Apart from federal safeguards and subject to specific state waiver agreements, however, states have a great deal of discretion in administering their individual Medicaid programs according to state interests and priorities.

24.    Consumer-directed personal care services that provide in-home assistance with activities of daily living for eligible residents are optional services that States may choose to cover within their Medicaid programs.  Each of the plaintiff States has elected to offer such services in its Medicaid plan. These services may be covered under a number of different federal Medicaid authorities, including state plan options, one or more waivers approved by CMS, or both.  *See*, *e.g*., 42 U.S.C. § 1396d(a)(24) (state plan option); 42 U.S.C. §§ 1396n(c) (waiver authority for home and community-based services), 1396n(i) (state plan home and community-based services), 1396n(j) (self-directed personal care services), and 1396n(k) (Community First

Choice state plan option).  The States also provide federally mandated personal care services when they are medically necessary for children eligible for early and periodic screening, diagnostic, and treatment (EPSDT) services.

25.     Many states provide Medicaid homecare services through private agencies that employ homecare workers.  Some states, including Plaintiffs, also use consumer direction, sometimes also referred to as the "individual provider model" or "individual provider mode," whereby eligible Medicaid beneficiaries hire, fire, and supervise their own homecare providers, but the state finances the services through Medicaid, and state or local government entities set wages and benefits for providers and authorize hours of service and types of services.

26.     State and federal governments share responsibility for funding Medicaid.  Federal dollars provide at least fifty percent of the funding for the States' Medicaid personal care services benefits.

**B.     The Medicaid Act's Anti-Reassignment Provision**

27.     The portion of the Medicaid Act at issue in this case provides, in relevant part, that "no payment … for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise […]."  42 U.S.C. § 1396a(a)(32).

28.     Originally enacted in 1972, Section (a)(32) was intended to address problems associated with "factoring" in the Medicaid system, a practice where healthcare providers sold Medicaid receivables at a discount to third parties, who in turn submitted the assigned claims to the government in their own names.  *See* H.R. Rep. 92-231 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 4989, 5090.  According to the 1971 United States House of Representatives Report, "[s]uch reassignments have been a source of incorrect and inflated claims for service and have created administrative problems with respect to determinations of reasonable charges and recovery of overpayments."  *Id*.  Section (a)(32) was adopted to prevent such abuses of the Medicaid system.

29.     The anti-reassignment provision was amended in 1977, to add language expanding the prohibition on assignment of Medicaid claims to include payment made under "power of

attorney or otherwise," and to add exceptions to the prohibition.  P.L. 95-142, 91 Stat. 1175 (1977).  Congress intended "to preclude the use of a power of attorney as a device to circumvent the existing ban on the use of 'factoring' arrangements in connection with the payment of claims."  H.R. Rep. No. 95-393, 95th Cong., 1st Sess., 48 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 3039, 3051.  The legislative history notes Congress' concern that "[a]lthough factoring was outlawed under the Social Security Amendments of 1972, factoring firms have evaded statutory intent by working under a power of attorney arrangement."  *Id*. at 3048.  The amendment thus "clarifie[d] existing law to insure that a power of attorney cannot be used to circumvent the prohibition in existing law against the use of 'factoring' arrangements in connection with the payment of provider claims by the medicare and medicaid [sic] programs."  *Id*. at 3045.

30.     The anti-reassignment statute sets forth a number of exceptions.  For example, Medicaid providers may assign payments to a governmental agency and may appoint an agent for billing purposes, provided that the agent is not paid based on the amount of Medicaid payments recovered.  42 U.S.C. § 1396a(a)(32)(B).

31.     Nowhere does the anti-reassignment statute speak to ordinary payroll deductions and contributions for items like voluntary health insurance or union dues that are not in themselves claims to a "payment for any care or service provided to an individual" Medicaid beneficiary.

32.     Section (a)(32) has never been construed to apply to practices that do not implicate Congress' concerns regarding fraud and abuse.  Despite long-standing state laws and practices authorizing direct payroll deductions and contributions for voluntary worker benefits and union dues, until issuance of the May 6, 2019 Rule, neither Congress nor HHS had ever taken any action to prohibit routine, authorized deductions from the paychecks of Medicaid providers.

**II.     ADMINISTRATIVE PROCEDURE ACT**

33.     Pursuant to the APA, a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

34.     The APA defines "agency action" to include "the whole or a part of an agency *rule*, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  *Id*. § 551(13) (emphasis added); *see id*. § 551(4) (defining "rule" to mean "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy").

## FACTUAL AND PROCEDURAL BACKGROUND

**I.     BACKGROUND ON MEDICAID HOMECARE**

35.     Homecare is difficult and often physically demanding work.  Homecare workers, most of whom are women, have historically faced low wages, few benefits, frequent injuries, and unpredictable hours, with no means to collectively address such challenges in their interactions with their individual clients.  In part for these reasons, the homecare workforce has typically had a high rate of turnover, which has a negative impact on Medicaid homecare beneficiaries and makes it more difficult to develop a well-trained workforce.

36.     Collective bargaining is one of the tools that States have chosen to employ in order to improve the quality and stability of the Medicaid homecare workforce.  Workers represented by unions generally enjoy higher wages, benefits, and access to training.

37.     Only homecare providers who elect to join the union pay dues to the union. Medicaid home-care providers are not required to pay "fair share" or "agency" fees to cover the costs of collective bargaining if they decline to join the union.  *Harris v. Quinn*, 573 U.S. 616 (2014).  In all of the States, therefore, direct deductions of union dues are authorized by workers' voluntary agreement.  These agreements do not "assign" any payment or rights to payment to the

union or any other entity.  Union dues are a voluntary payroll deduction, just like common voluntary payroll deductions for health, dental, and vision insurance.

38.    Workers who provide consumer-directed Medicaid homecare are employed by the individual person with a disability in need of these services.  This allows Medicaid consumers (or their guardians) to direct their own care through the hiring, firing, and day-to-day supervision of homecare providers.

39.    Meanwhile, either the States or local authorities assume responsibilities for general conditions related to Medicaid homecare providers' employment.  Each of the States has permitted collective bargaining as a key component of these responsibilities.  The States or local authorities negotiate with unions with respect to issues such as determining training requirements, referral programs, and optimizing wage and benefit packages to allow the States and local authorities to recruit and better retain a talented pool of homecare workers.

40.    Paragraphs 42 to 80 below demonstrate some of the ways that the States have used the collective bargaining process to build, train and stabilize their homecare workforces by cooperatively addressing working conditions identified as particularly important to homecare workers within each state.  This process relies in part on cooperation between state or local agencies and professionally staffed workforce representatives to address overarching issues and find innovative solutions to the problems faced by workers who are often dispersed and isolated.

41.    As homecare providers have formed unions and advocated for themselves and their profession, this has had positive effects for both Medicaid beneficiaries and workers.  For example, in some instances unionized homecare workers are more likely to have health insurance than those without representation.  Unions also help reduce worker turnover, a critical factor in providing high quality care.

**A.    California's Medicaid In-Home Supportive Services Program**

42.    California's Medicaid consumer-directed personal care services program, known as In-Home Supportive Services (IHSS), provides in-home assistance to eligible individuals who are aged, blind and disabled as an alternative to out-of-home care, in order to enable those persons to "safely remain in their homes or abodes of their own choosing."  Cal. Welf. & Inst.

Code § 12300(a).  The IHSS program provides in-home assistance with certain basic tasks of daily living, such as bathing, dressing, meal preparation and clean up, eating, bowel and bladder care, and taking necessary medications. Cal. Welf. & Inst. Code §§ 12300(b) & (c); 14132.95(d)(1), (2); 14132.951(c).  California has chosen to make a substantial investment in these services in part to allow recipients to avoid unnecessary and costly institutionalization, and to protect the rights of Californians with disabilities under the Americans with Disabilities Act and the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999).

43.     California's Medicaid personal care services program is the nation's largest, serving more than 594,000 Californians statewide, with over 500,000 workers providing care.

44.     California was the first state in the nation to seek to improve the quality and stability of the IHSS provider workforce by extending its public sector bargaining laws to include these workers.  In the early 1990s, the California Legislature authorized and funded the establishment of county-level public authorities that were able to negotiate contracts with the workers' democratically-designated union representatives and coordinate the delivery of IHSS services across the state.  1992 Cal. Stat. Ch. 722, § 54; 1993 Cal. Stat. Ch. 69, § 55.  Building on the success of this change, the Legislature later required all counties that had not yet done so to establish public authorities or adopt one of a number of specified alternative methods for managing the homecare workforce.  1999 Cal. Stat. Ch. 90, § 4; Cal. Welf. & Inst. Code § 12302.25.

45.     Homecare workers across California's counties have joined unions and voted in favor of union representation.  These Medicaid providers are primarily represented by two unions, SEIU Local 2015 and AFSCME United Domestic Workers.  Statewide, more than half of California's IHSS workers elect to join the union and to pay their union dues through payroll deduction.

46.     Although the content of collective-bargaining agreements in California varies by county, all provide wages and benefits that exceed those available to IHSS workers prior to the introduction of collective bargaining.

47.     Some union-negotiated contracts provide benefits such as additional free training for workers on first aid; stipends for trainings arranged by the county public authority; and reimbursements for training materials.  Some contracts provide for free, job-related supplies, such as gloves, masks, slide boards, or gait belts for ambulation and transfer.

48.     Collective-bargaining agreements in thirty California counties (including the most populous counties where a majority of IHSS providers reside) provide health, dental and vision benefits for homecare workers.  IHSS providers who elect to receive such benefits in some cases can pay their employee contributions for the benefits through payroll deduction.  As of June 2017, almost 88,000 active IHSS workers had elected a deduction for health care benefits pursuant to a collective bargaining agreement.

49.     Collective-bargaining agreements in California often contain provisions establishing statutorily required referral registries, i.e. databases of available homecare providers, and setting guidelines for how referrals will be made.

50.     IHSS workforce representatives frequently participate on behalf of their members in stakeholder bodies or other policy fora that address access, service delivery, and quality of care issues within the IHSS program.  For example, IHSS provider representatives have played a role in refining the IHSS provider orientation curriculum; implementing new regulations under the Fair Labor Standards Act; and developing California's uniform statewide protocols for program integrity activities.

51.     Paychecks for IHSS providers are issued by the State of California.  State law requires that the State of California Controller "shall make any deductions from the wages of in-home supportive services personnel … that are agreed to by that public authority in collective bargaining with the designated representative of the in-home supportive services personnel … and transfer the deducted funds as directed in that agreement."  Cal. Gov't Code § 12301.6(i)(2). Pursuant to this statutory authority, the Controller deducts agreed-upon costs from IHSS providers' paychecks.

52.     These payroll deductions include union dues for all providers who voluntarily join the union, and, in some counties, payments for health insurance, dental and vision insurance, and

retirement plans for providers who elect those benefits.  Such deductions have been made from at least some California providers' paychecks since at least the 1990s.

53.     Although the vast majority of California's IHSS providers are employed via the Individual Provider or consumer-directed mode, a very small number of IHSS providers (about 1,000) are employed only by privately-run agencies.  In those cases, the agency is paid through Medicaid and it is the agency that issues paychecks and deducts any costs for voluntary union dues or other employee benefits.

## B.     State of Oregon's Medicaid Homecare Program

54.     Oregon is a joint employer of its direct homecare workforce paid with Medicaid funds.  The State of Oregon, along with the individual Medicaid clients, jointly employ approximately 30,000 direct homecare workers providing services to over 20,000 Medicaid recipients each month.  Homecare workers provide in-home assistance to individuals with disabilities and older Oregonians.  They assist with basic tasks of daily living, such as bathing, dressing, meal preparation and clean up, eating, bowel and bladder care, and assistance with taking medications.

55.     In 2000, Oregon voters amended the Oregon Constitution to create the Oregon Home Care Commission and to give homecare workers "the right to form, join and participate in labor organizations for collective bargaining" with the State.  Or. Const. art. XV, § 11(3)(f).  Acting on that authority, in 2001, a majority of Oregon homecare workers elected Services Employees International Union Local 503 as their exclusive bargaining representative.  Since then, the union and State have negotiated collective-bargaining agreements, improving benefits and increasing salaries for all homecare workers.  Statewide, the majority of Oregon's homecare workers have elected to join the union and to pay their union dues through payroll deductions.

56.     As homecare providers have formed unions and advocated for themselves and their profession, Oregon has experienced a higher quality and more stable homecare workforce.  Tremendous federal and state Medicaid cost-savings result from the expansion of these services.  Additionally, turnover has decreased significantly since homecare workers formed unions.  All of

this has promoted greater quality of care and patient safety, to the benefit of Oregon's Medicaid program.

57.     The collective-bargaining agreement provides wages and benefits that exceed those which were available to homecare workers prior to the introduction of collective bargaining.  Benefits available to homecare workers in Oregon include health, vision, and dental insurance, paid time off through the Oregon Homecare Workers Benefit Trust and the Oregon Homecare Workers Supplement Trust, as well as training, supplies, career development opportunities, and an on-line registry that matches individuals needing in-home services with homecare workers qualified to provide routine, emergency and respite care.  The Oregon Homecare Workers Benefit Trust and the Oregon Homecare Workers Supplement Trust provide benefits to eligible homecare and personal-support workers covered by the SEIU Local 503 bargaining unit. The Benefit Trust provides dental, vision, and employee assistance program benefits and PTO benefits to eligible participants.  The Supplemental Trust provides assistance with paying for certain medical premium and out-of-pocket expenses relating to claims covered under the participant's Trust-Approved Qualified Health Plan or Medicare Plan.

58.     Paychecks to homecare providers are issued by the State of Oregon.  State law requires the state to deduct from the salary or wages of homecare providers the amount of money authorized for payment to the designated labor organization.  *See* Or. Rev. Stat. § 292.055. Pursuant to this statutory authority, the Oregon Department of Human Services deducts agreed-upon costs from homecare providers' paychecks, including voluntary union dues and other authorized deductions.  Deductions for union dues have been made from Oregon homecare providers' paychecks for close to two decades.

**C.     State of Washington's Medicaid Personal Care Services Program**

59.     Washington's Medicaid personal care services program, which began as a 1915(c) waiver in 1983 and expanded as a state plan entitlement in 1989, provides in-home assistance as an alternative to institutionalization to eligible individuals who are functionally disabled.  The program provides in-home assistance with activities of daily living, such as bathing, dressing, meal preparation and clean up, eating, incontinence care, and taking necessary medications.  In

15

1   1993, the Washington legislature directed the Department of Social and Health Services to

2   expand home and community based long-term care options to provide additional opportunities for

3   beneficiaries to receive care in settings other than nursing homes.  Wash. Rev. Code

4   §§ 74.39A.007, .030.  One of the options Washington developed was to build on the existing

5   state-funded and Medicaid state plan and waiver programs, which support consumers who chose

6   to self-direct the provision of in-home personal care provided by individual providers.

7          60.     Washington has made a substantial investment in this program and has been

8   successful in reducing the proportion of individuals served in nursing homes.  In 1992, there were

9   36,649 individuals receiving long-term care — 47% received care in nursing homes and 53%

10  received care in the community.  In 2017, there were 65,336 people receiving long-term care —

11  only 15% received care in a nursing home and 85% received care in their homes or another

12  community setting.  In part because of Washington's success in providing long-term care in

13  community-based settings, the AARP ranked Washington's long-term care system first in the

14  nation in its 2017 report.  In its previous two reports, issued in 2011 and 2014, the AARP ranked

15  Washington second.

16         61.     A large part of this success has been the ability to invest in individual provider

17  wages, benefits, and the attainment of new skills to meet the changing needs of the beneficiaries

18  served in their own homes.  Washington has partnered with the federal government on funding

19  these critical investments to ensure an accessible and available workforce since 1995 when the

20  state began paying for health insurance and training for in-home workers.

21         62.     At any given point in time, about 37,000 Medicaid beneficiaries in Washington

22  have chosen to receive personal care in their homes from a workforce of around 45,000 providers.

23  The average monthly in-home personal care benefit is 101 hours.  Altogether, it adds up to around

24  50,000,000 hours of in-home personal care services provided by individual providers per year.

25  Washington will expend about two billion dollars for federal fiscal year 2018 to provide long-

26  term care services to some of its most vulnerable citizens.  Of that total, about one billion dollars

27  is for the services of individual providers, of which the federal financial participation amounts to

28  almost $618,000,000.

Complaint for Declaratory and Injunctive Relief (Case No. TBD)

63.     In 2001, the people of Washington passed Initiative 775, which granted collective-bargaining rights to individual providers.  Wash. Rev. Code § 74.39A.270.  Individual providers are public employees for the purposes of collective bargaining.  *Id.*  In August 2002, 84% of the individual provider bargaining unit members who participated in the election voted for union representation with a bargaining unit of 25,500 homecare workers at the time.  These Medicaid providers are represented by SEIU 775.  Of the group of individual providers paid between August 2018 and January 30, 2019, 78% (over 40,000) have chosen to join the union and have dues deducted from their payments.

64.     In 2011, the people of Washington passed Initiative 1163, which requires additional training and certification requirements for individual providers.  Washington has worked closely with its state and federal partners, including the union, to develop and retain a well-trained long-term care workforce.  The union has played a significant role in achieving this goal by successfully advocating and collectively bargaining for individual providers to have access to healthcare, training, and retirement benefits.  The compensation and benefits package for individual providers also helps beneficiaries who receive personal care services by supporting a well-trained workforce and attracting new providers to the workforce.

65.     Washington negotiated and implemented training and healthcare benefits for individual providers in 2009 and added retirement benefits in 2015.  Pursuant to its collective bargaining agreement with SEIU 775, Washington contributes to trusts to provide these benefits to the individual providers, and its trust contributions are included as part of the individual provider Medicaid rate approved by CMS.  Washington has operated these programs with CMS approval and reimbursement since implementation in 2009, including the approximately five-year period prior to the promulgation of 42 CFR §447.10(g)(4).  As CMS has continually allowed the state's payment methodology for individual providers over the past decade, Washington has made significant investments in the individual provider benefits package and the infrastructure necessary to operate the individual provider system.

66.     If Washington is prohibited from making these contributions, it could have a devastating impact on the state's ability to recruit and retain a well-trained individual provider

1    workforce.  This could cause some of the state's most vulnerable citizens to lose access to critical

2    in-home services, leaving them at risk or forcing them into institutional settings which will

3    increase costs to both the state and federal government.

4         67.    Individual providers submit their hours to the state and receive payment twice a

5    month.  Washington deducts federal taxes.  Pursuant to state law and the collective bargaining

6    agreement, Washington also deducts voluntary union dues and a $25 per month healthcare benefit

7    premium when authorized by the individual provider, and other voluntary deductions as

8    authorized by the provider.  In February 2019, 13,964 individual providers opted to have health

9    benefits premium deducted from their payments.  As noted earlier, a substantial majority of

10   individual providers have also voluntarily elected to have union dues deducted from their

11   payments.

12        **D.    State of Connecticut's Medicaid Personal Care Services Program**

13        68.    Connecticut's Medicaid personal care services program provides in-home

14   assistance to the elderly and disabled.  The program provides in-home assistance with homemaker

15   services, companion services, meals on wheels, adult day care, transportation, mental health

16   counseling, care management, occupational therapy, elderly foster care, minor home

17   modifications, and assisted living services provided in state-funded congregate housing and in

18   other assisted living pilot or demonstration projects established under state law.  Conn. Gen. Stat.

19   §§ 17b-342, 17b-370, 17b-605a.

20        69.    Connecticut's Medicaid personal care services program has approximately 4,300

21   direct homecare workers providing services to about 15,000 Medicaid recipients each month.

22        70.    In 2012, Connecticut enacted legislation creating the Personal Care Attendants

23   Workforce Council and giving home personal care attendants the right to form labor

24   organizations for collective bargaining with the State.  Conn. Gen. Stat. §§ 17b-706a, 17b-706b.

25   Connecticut personal care attendants chose New England Healthcare Employees Union, Local

26   1199, Service Employees International Union as their exclusive bargaining representative, and

27   collective-bargaining agreements increasing wages and benefits for all personal care attendants

28

18

have been negotiated.  Statewide, the majority of Connecticut's home personal care attendants have elected to join the union and pay their union dues through payroll deductions.

71.     The current collective bargaining agreement provides wages and benefits exceeding those available to personal care attendants prior to the introduction of collective bargaining.  Benefits include workers' compensation, overtime pay for holidays and a training fund.

72.     Connecticut law specifically provides for deductions of union dues from the wages of personal care attendants pursuant to collective bargaining agreements, by a fiscal intermediary of the State.  Conn. Gen. Stat. § 17b-706b(b)(3).

**E.     Massachusetts' Consumer-Directed Personal Care Attendant Program**

73.     Massachusetts has elected to make self-directed personal care attendant services available to its MassHealth members through the Massachusetts Personal Care Attendant program.  130 Mass. Code Regs. §§ 422.00 *et seq.* Under this program, the MassHealth member– or consumer–is the statutory "employer" of the Personal Care Attendant ("PCA"), and is fully responsible for recruiting, hiring, scheduling, training, time-keeping, and terminating PCAs.  130 Mass. Code Regs. § 422.420.

74.     PCAs in Massachusetts provide a range of services to over 40,000 consumers living at home.  These critical services are medically necessary and may include help with bathing and grooming, dressing, exercises, eating, and toileting.  Section 422.410(A).  PCAs also assist consumers with daily household tasks, such as laundry, shopping, cooking, and housekeeping, and they may accompany consumers to medical appointments.  Section 422.410(B).  MassHealth consumers rely on these personal care services in order to continue to live safely and with dignity in their own homes.  There are currently over 40,820 MassHealth members receiving such PCA services.

75.     Since 2006, Massachusetts PCAs are deemed "public employees" for collective bargaining purposes under General Laws of Massachusetts chapter 150E and for purposes of employee-authorized payroll deductions.  *See* Mass. Gen. Laws. ch. 118E, § 73(b) (added by St. 2012, ch. 224, § 131, formerly St. 2006, ch. 268).  At the same time, the Massachusetts Personal

Care Attendant Quality Home Care Workforce Council ("the Council") was established within the Executive Office of Health and Human Services, General Laws of Massachusetts ch. 118E, §§ 71-75 (added by St. 2012, ch. 224, § 131, formerly St. 2006, ch. 268) "to ensure the quality of long-term, in home, personal care by recruiting, training and stabilizing the work force of personal care attendants."  Mass. Gen. Laws. ch. 118E, § 71(a).  Among other things, the Council acts on behalf of MassHealth consumers, as the employers' representative, to collectively bargain with Massachusetts PCAs.

76.     In 2007, PCAs in Massachusetts voted to elect 1199 SEIU United Healthcare Workers East to be their exclusive bargaining representative.  Their Agreement requires that union dues be deducted from wages, when PCAs choose to join the union and authorize such deductions.  Such voluntary deductions for union dues have been in place since 2008.

77.     Consumers are assisted by fiscal intermediaries, who perform certain employer required tasks for the Consumers.  130 Mass. Code Regs. § 422.419.  MassHealth pays fiscal intermediaries for these services.  *Id*. § 422.411(C).

78.     The fiscal intermediary is responsible for "issuing checks to PCAs equal to the PCA wage component of the PCA rate, with appropriate taxes withheld and other applicable required withholdings," Section 422.419(B)(12), and for "paying unemployment insurance taxes, purchasing worker's compensation insurance, and preparing the PCA payroll," Section 422.402 (Employer-required Tasks).

79.     Workers' compensation coverage for Massachusetts PCAs is obtained through policies issued by private insurers in the name of each consumer as the employer.

80.     Every employer in Massachusetts must purchase and maintain workers' compensation insurance coverage to promote the health, safety and welfare of workers who are injured regardless of fault.  Mass. Gen. Laws. ch. 152, §§ 25A and 25C.  Those who fail to maintain such coverage as required are subject to the imposition of stop work orders and criminal enforcement action.  Mass. Gen. Laws. ch. 152, § 25C(1)-(2) and (5).  Workers' compensation insurance coverage provides a vitally important social safety net, created in response to strong

1   public sentiment that the remedies afforded at common law were inadequate to protect workers.

2   *CNA Ins. Cos. v. Sliski*, 433 Mass. 491, 493, 744 N.E. 2d 634, 636 (2001).

3       **F.   Federal Regulations**

4         81.    In 2014, CMS issued added an additional subsection to regulations implementing

5   Section (a)(32) that provided that "[i]n the class of practitioners for which the Medicaid program

6   is the primary source of service revenue, payment may be made to a third party on behalf of the

7   individual practitioner for benefits such as health insurance, skills training and other benefits

8   customary for employees."  42 C.F.R. § 447.10(g)(4).  In issuing this regulation, CMS stated that

9   deductions used to pay "costs customary for employees" fall within the scope of this addition.

10  *See* 79 Fed. Reg. 2948-1, 3001 (Jan. 16, 2014).  Union dues are never mentioned in the

11  regulation, nor were they addressed specifically by CMS at any point in the rulemaking process.

12        82.    In its notice of final rulemaking, CMS reiterated that the purpose of

13  Section (a)(32) "was to prohibit factoring arrangements, and not to preclude a Medicaid program

14  that is functioning as the practitioner's primary source of revenue from fulfilling the basic

15  responsibilities that are associated with that role."  79 Fed. Reg. 2948-01, 2949 (Jan. 16, 2014);

16  77 Fed. Reg. 26362, 26381 (May 3, 2012) (proposing rule and noting that purpose of

17  Section (a)(32) was to prohibit factoring).  According to CMS, direct payments of customary

18  employee benefits, remitted to third parties on behalf of the Medicaid practitioner for a stated

19  purpose, was "not contemplated" under the Medicaid Act.  79 Fed. Reg. at 2949.

20        83.    The homecare workers described in paragraphs 42-80 are a class of Medicaid

21  practitioners whose primary source of service revenue is the Medicaid program.

22  **II.   DEFENDANTS' 2019 ILLEGAL RULE CHANGE**

23        84.    On July 12, 2018, Defendants proposed a new rule, "Reassignment of Medicaid

24  Provider Claims," 83 Fed. Reg. 32252, rescinding subsection 447.10(g)(4).  The proposed rule

25  provided a thirty-day public comment period, rather than the more typical sixty-day period for

26  public comment.  Notwithstanding the absence of any mention of unions or union dues in the

27  2014 regulation or the statute, Defendants suggested that the impact of the proposed rule would

28

1    be to prohibit states from "reassigning homecare workers' dues to unions." 83 Fed. Reg. at

2    32254.

3         85.   Shortly after release of this proposed rule, Plaintiffs wrote to Defendants

4    expressing deep concern about the proposed rule. They explained that a sixty-day comment

5    period was needed "in order to allow affected parties to weigh in and provide information to HHS

6    on the many aspects where the agency says it lacks information." Defendants effectively denied

7    these requests. In the following weeks, thousands of interested parties submitted comments

8    opposing the proposed rule.

9         86.   On May 6, 2019, Defendants published the final Rule. "Medicaid Program;

10   Reassignment of Medicaid Provider Claims," RIN 0938-AT61. 84 Fed. Reg. 19718.

11        87.   The Rule itself does nothing more than rescind subsection 447.10(g)(4). The

12   preamble makes clear, however, that Defendants have fashioned a novel interpretation of

13   Section (a)(32) in order to try to prohibit states from making ordinary payroll deductions or

14   contributions on behalf of Medicaid providers, including those who provide homecare.

15        88.   The Rule offers no coherent explanation why Section (a)(32)'s rule that payments

16   "for any care or service provided to an individual shall [not] be made to anyone other than such

17   individual or the person or institution providing such care or service, under an assignment or

18   power of attorney or otherwise" should suddenly be interpreted to apply to ordinary, voluntary

19   payroll deductions and contributions.

20        89.   Defendants concede, as they must, that Congress' purpose in enacting

21   Section (a)(32) was to prohibit factoring and similar fraudulent practice, yet suggest, without

22   citation to the legislative history or other relevant evidence, that "we do not believe that this was

23   necessarily Congress' only concern." 84 Fed. Reg. at 19723. They offer no evidence that

24   Congress was concerned about state payments of ordinary payroll deductions, or that such

25   payments are in anyway similar to factoring or other practices with a potential for abuse.

26        90.   The Rule relies on the phrase "or otherwise" to suggest that Congress intended the

27   statute to be broadly applied to "situations that did not involve factoring." *Id*. Because that

28   phrase comes after more specific words ("under an assignment or power of attorney"), however,

1    established canons of statutory interpretation dictate that the more general "or otherwise" should

2    be construed to embrace concepts similar to those described in the more specific preceding list.

3        91.    At the time when Congress amended Section (a)(32) in 1977, the statutory

4    authorities for consumer-directed Medicaid home and community-based services had not yet been

5    enacted.

6        92.    Instead of explaining why Congress would have decided to shoehorn a ban on

7    states making ordinary payroll deductions and contributions into an anti-fraud statute using a

8    phrase like "or otherwise," or making clear why this legal interpretation was recognized only

9    many decades later, Defendants focus on Section (a)(32)'s enumerated exceptions (e.g.,

10   permitting Medicaid providers to assign payments to a governmental agency or to appoint an

11   agent for billing purposes), arguing that the fact that these exceptions speak to certain employer-

12   employee relationships, but not to ordinary payroll deductions, is evidence that Congress intended

13   to disallow such deductions.  This focus is a red herring, because exceptions are irrelevant if

14   Section (a)(32) does not apply in the first place.

15       93.    Even so, the Rule's analysis of Section (a)(32)'s exceptions is deeply flawed.  On

16   the one hand, Defendants seek to strictly limit interpretation of Section (a)(32)'s exceptions to

17   those expressly stated by Congress, in order to claim that Congress has spoken "to 'the precise

18   question at issue'" and prohibited state withholding of ordinary payroll deductions.  84 Fed. Reg.

19   at 19719 (quoting *Chevron, U.S.A., Inc., v. National Resources Defense Council, Inc.*, 467 U.S.

20   837, 842-43 (1984)).  Yet Defendants conclude, again with no explicit textual support or other

21   evidence, that "[b]ecause Congress recognized the employer-employee relationship in its list of

22   exceptions," they will not interpret Section (a)(32) to prohibit "employee payroll deductions that

23   are made by a bona fide employer."  *Id*. at 19720.  The Rule does not explain or define the term

24   "bona fide employer."  And Defendant simply ignore the existence of other non-enumerated

25   exceptions to Section (a)(32) that similarly would seem to fall outside the anti-reassignment

26   statute.  *See id.* (concluding, without analysis, that CMS' prior recognition of an implied

27   exception for payments to health maintenance organizations is "outside the scope of this

28   rulemaking").

23

94.     A much more plausible—indeed, the only plausible—interpretation of Section (a)(32) is that ordinary payroll deductions "were not contemplated" under the Medicaid Act's anti-reassignment statute, as HHS concluded in 2014.  79 Fed. Reg. 2948-01, 2949 (Jan. 16, 2014).

95.     Defendants do not explain what, exactly, motivated the rule change, apart from unnamed stakeholders and the agency "engaging in a review of the statutory support."  84 Fed. Reg. at 19719.  Some of the materials cited in the Rule may provide insight into Defendants' motives.  For example, the so-called "Dues Skimming FAQ," *id.* at 19726, n.2, urges HHS "through administrative action" to "stop the deduction of dues from Medicaid" payments, indicating that the Rule may be motivated by false characterizations of union dues deductions as fraudulent "skimming" of Medicaid funds.

96.     The Rule disclaims any serious attempt at fact-finding or weighing of the advantages or disadvantages for Medicaid beneficiaries or other stakeholders.  Instead, the "new policy rests upon […] solely a new legal analysis."  *Id.* at 19720.

97.     Nevertheless, the Rule throughout displays a lack of understanding of the programs it purports to regulate as well as the agency's responsibilities under the Administrative Procedure Act to engage in reasoned decision-making.

98.     The Rule displays a lack of understanding of the complicated and varied joint or shared relationships that exist between states or counties, Medicaid beneficiaries, and workers in the context of consumer-directed Medicaid homecare programs, despite many commenters' focus on those programs in their objections to the Rule.  For example, the Rule asserts that "home health workers […] are not employees of the state.  As non-employees, such practitioners do not receive salaries and wages from the state."  *Id.* at 19721 (emphasis omitted).  This summary fails to grasp complex, carefully crafted relationships in which workers are the employee of an individual Medicaid beneficiary; sometimes, for specified purposes, jointly employed by the Medicaid recipient and the state or a local governmental entity; and paid wages by States or their fiscal intermediaries.  (The exact specifics vary by jurisdiction and are described in paragraphs 42-80 above.)  The Rule's suggestion that subsection 447.10(g)(4) "was specifically applicable to

24

Medicaid enrolled individual practitioners who provided services on a contractual basis," *id*. at 19723, is similarly off base.

99. To the extent that the Rule contemplates that Medicaid beneficiaries with disabilities who are the employers of Medicaid homecare workers are just like any other "employers" who "may withhold taxes and other voluntary deductions for benefits like health insurance through the payroll process" to remain outside the scope of Section (a)(32), *see, e.g.*, *id*. at 19720, Defendants likewise show a lack of understanding of Plaintiffs' programs and their participants. Medicaid beneficiaries who receive homecare in the Medicaid programs at issue are allowed to direct their own care, but they have been relieved of responsibility for processing payroll and/or establishing many of the terms and conditions of employment, including negotiating wages.[1] And for good reason—managing payroll, withholding taxes and voluntary deductions, and negotiating wages would require Medicaid recipients to shoulder additional burdens that would be onerous and unreasonable for most.

100. The Rule suggests that an individual provider who is harmed by an inability to pay for items like health insurance through payroll deductions can "seek employment with home health agencies or other employers that offer benefit packages." *Id*. at 19722. This ignores the strong public policy reasons that federal and state governments have for creating consumer-directed programs as an alternative to agency-based health care.

101. The preamble states that the Rule "will not impact a state's ability to perform Financial Management Services (FMS) or secure FMS through a vendor arrangement." *Id*. at 19719. Yet the definition of FMS functions listed do not include either negotiating wages, deducting voluntary employee deductions like health insurance or union dues, or making contributions to benefit trusts on behalf of the providers. *Id*.; *see also id*. at 19724 (stating that state agencies are "not permitted to 'pass through' Medicaid reimbursement for healthcare services to third parties not recognized under the Medicaid statute"). Many of Plaintiffs' programs provide payroll support for Medicaid beneficiary-employers yet do not otherwise fit the

---

[1] There are some Medicaid homecare programs that do give beneficiaries this type of budgetary authority, but they are relatively small and are not the subject of Plaintiffs' comments or complaint.

1   FMS description.  The Rule makes no effort to apply its reasoning to any of the actual state

2   programs that were described in public comments.

3          102.    The Rule dismisses any reliance interests as "not serious."  *Id*. at 19720.  In doing

4   so, the Rule ignores substantial evidence of serious reliance interests articulated by numerous

5   States and stakeholders, including by representatives of some of the hundreds of thousands of

6   Medicaid homecare beneficiaries.  *See, e.g*., Aug. 13, 2019 Letter from Justice in Aging,

7   Disability Rights Education & Defense Fund, and Disability Rights California (noting that the

8   proposed rule "harms consumers and providers without offering any countervailing benefits").

9          103.    Defendants incorrectly attribute Plaintiffs' reliance interests to subsection

10   447.10(g)(4), promulgated in 2014.  But Plaintiffs' reliance interests stretch back at least to the

11   early 1990s, when California started authorizing direct deduction of union dues and other

12   voluntary benefits, and thus cannot be pegged to the 2014 regulations.  Prior to 2014, CMS for

13   years approved state plans, conducted audits and reviews, conducted discussions with states and

14   stakeholders, and approved invoices and payments that reflected state-level deductions for union

15   dues (and other items).

16          104.    At various points in the Rule, Defendants claim that they cannot make factual

17   findings or provide an impact analysis of the Rule because the thousands of comments received

18   during rulemaking lacked "substantive analysis" or "documentation."  84 Fed. Reg. at 19724-26.

19   Yet it was Defendants who failed to reach out to states for more information prior or after to

20   promulgating the proposed rule, and who ignored Plaintiffs' requests to extend the comment

21   period.  Moreover, Defendants largely ignore the substantial comments that they did receive,

22   relying instead on a few newspaper articles and websites for basic information about the scope of

23   the Medicaid programs that they administer.

24          105.    Most egregiously, Defendants complain that commentators failed to "explain how

25   or why […] alleged harms would occur," *id*. at 19721, and come to the conclusory finding that

26   elimination of payroll deductions "in no way prevents health care workers from purchasing health

27   insurance, enrolling in trainings, or paying dues to a union," *id*., and thus there is no reason to be

28   concerned about the impact of the Rule on access to or quality of care.  *Id*. at 19724.  Yet as

1  Plaintiffs' and other stakeholders' comments laid out in detail, there is as a direct relationship

2  between maintaining adequate wages and benefits and the ability to attract and retain a qualified

3  workforce.  *See, e.g.*, Aug. 9, 2018 Letter from U.C. Berkeley Center for Labor Research and

4  Education (describing research regarding the benefits of strong unions in the context the home

5  and community services workforce and concluding that "making it more difficult for homecare

6  workers to voluntarily contribute to their union […] could result in lower worker wages, higher

7  worker turnover, greater worker shortages, poorer quality of care, and an increase in the overall

8  cost of long-term care); Aug. 13, 2018 Letter from SEIU (explaining that ending members' ability

9  to "conveniently and securely" contribute to a union "threatens both the progress made in

10  improving workforce standards as well as the ability of these workers to make further gains in the

11  future"); Aug. 13, 2018 Letter from the State of California (citing research showing that worker

12  organization "has led to increased retention and training among workers, helping to create a more

13  stable, efficient and high quality provider workforce").

14      106.    And Defendants disregarded comments from administrators of health and

15  retirement programs indicating that there is no adequate substitute for direct payroll deductions

16  and contributions, especially for this population of workers.  Defendants' conclusion that

17  individual Medicaid homecare providers "remain free to purchase health insurance" and other

18  benefits after receiving payment, 84 Fed. Reg. at 19721, thus fails to address an important aspect

19  of the problem.  *See, e.g.*, Aug. 13, 2018 Letter from Health Care Employees/Employer Dental &

20  Medical Trust ("[w]ithout the automatic deduction through payroll, many workers would find it

21  difficult to maintain the payments for coverage[.]"); Aug. 13, 2018 Letter from Healthy San

22  Francisco (noting that elimination of a payroll deduction option would cause health plan to incur

23  extra costs for mailing and billing as well as an increase in uninsured workers that would in turn

24  cause a "steep rise in administrative costs" to the plan).

25      107.    The Rule also incorrectly concludes that the costs of payments for those with bank

26  accounts or debit cards are "negligible since deductions can be set up through financial

27  institutions and can often easily be set up online."  84 Fed. Reg. at 19726.  This ignores abundant

28  evidence in the record that bank account debits are not an adequate replacement for payroll

1   deductions and contributions, especially for low-wage workers.  Indeed, despite a multi-year

2   effort, California has direct deposit only for approximately 40 percent of all providers.  The

3   suggestion that workers should simply buy stamps and envelopes to mail their contributions for

4   voluntary health, retirement, and union dues on a monthly basis is unreasonable; no other type of

5   worker is expected to go without the convenience and reliability of direct payroll debits.

6        108.    Moreover, while the Rule appears to suggest that assignments would be

7   permissible if "made to a governmental agency or entity," 85 Fed. Reg. at 19720, and addresses

8   permissible assignments for "withholding Federal, state, and local tax and making tax payments

9   to appropriate tax authorities," *id.* at 19719, there is no reference to similar assignments for

10   workers' compensation insurance coverage.  The Rule, instead, creates ambiguity by stating that

11   "whether a particular assignment is permitted […] will depend on the particular facts of the

12   arrangement."  *Id.* at 19720.

13        109.    The Rule constitutes a final agency action for purposes of judicial review.

14   5 U.S.C. § 704.

15   **III.    THE FINAL RULE AND ITS IMPLEMENTATION BY DEFENDANTS HARM THE
          INTERESTS OF PLAINTIFF STATES AND THEIR RESIDENTS**

16

17        **A.    The Final Rule Undermines Collective Bargaining Relationships and
               Harms State Medicaid Programs and Beneficiaries**

18        110.    The Secretary's restriction on the withholding of union dues and other benefits

19   from provider paychecks would harm the integrity of the States' Medicaid programs and millions

20   of state Medicaid beneficiaries and workers.

21        111.    The States have each decided to authorize direct payroll deductions for the purpose

22   of enabling workers' payment of voluntary union dues.  Direct payroll deductions are a reliable

23   and well-established method for making these payments, especially for a diffuse workforce.

24   Direct payroll deductions avoid the unnecessary hardships that may be caused by direct debits

25   from the bank accounts of homecare workers who have such accounts, as well as the unnecessary

26   administrative challenges involved in payment by check or cash.

27        112.    Overall, automatic payroll deductions and trust contributions on behalf of workers

28   have facilitated the emergence of stable collective bargaining relationships that have improved

the quality of the provider workforce and reduced provider turnover.  The Final Rule, as Defendants intend to implement it, would weaken those relationships and make it harder for the States to maintain an adequate homecare workforce in an already challenging labor market.

113.    The States have a strong interest in permitting union members' payment of their voluntary dues through payroll deduction.  Unreliable payments of union dues would reduce the strength and stability of funding available for workforce representation, impairing unions' ability to serve their members.  Unions would likely have to reduce the technical advice and training they provide to homecare workers, as well as curtail participation in stakeholder activities.  The States have sovereign interests in the public policy-making process, and that process is improved when official representatives of the Medicaid personal care workforce have necessary resources to participate in a range of stakeholder activities.

114.    Implementation of the Final Rule and Defendants' new interpretation of the Medicaid Act would disrupt a myriad of reliance interests embodied in existing collective bargaining agreements, all of which assume the availability of direct deductions and contributions as a way to pay for union dues and other voluntary, bargained-for benefits.

115.    Defendants' implementation of the Final Rule will allow Medicaid providers who work for homecare agencies—but not providers hired directly by Medicaid beneficiaries via the Independent Provider mode to do identical work—to avail themselves of payroll deductions and contributions for union dues and other voluntary, bargained-for benefits.   This unfairly burdens beneficiaries who prefer to hire providers directly.

116.    Finally, any changes to the States' Medicaid personal care services program that reduce the quality or stability of providers create real human costs for the beneficiaries of those programs, as well as undermine their *Olmstead* rights to receive services in the most integrated setting.  Individuals who are aged, blind and disabled and need assistance to perform activities of daily living are better served by consistent and well-trained caregivers.

117.    Alternatively, if the States choose to forego federal matching funds for these programs in order to avoid Defendants' Final Rule and new interpretation of the Medicaid Act, that decision would cause other serious harms to the States.  Because federal funds provide more

than half of all funding for Medicaid consumer-directed personal care services, loss of these dollars would have devastating budgetary impacts on the States' ability to provide Medicaid services to seniors and persons with disabilities.  The Final Rule and Defendants' new interpretation of the Medicaid Act would force States into a choice between limiting access to these vital services, harming both Medicaid recipients and workers, or risk foregoing all of the interests that the States have determined are furthered by their authorization of payroll deductions for homecare worker dues and contributions for other benefits.

**B.     The Final Rule and Its Implementation by Defendants Impose Unnecessary and Burdensome Costs Upon States**

118.    Implementation of the Final Rule in the manner Defendants have indicated would unnecessarily increase the administrative burdens on and costs to State agencies and broader health care delivery systems.

119.    For example, many counties in California offer Medicaid homecare providers the option to enroll in local healthcare coverage through community-based, not-for-profit health plans.  To the extent that the Final Rule purports to prohibit providers from electing to have their premiums paid through their paycheck, health plans will have to establish a significant new administrative structure to bill, account manage enrollment for thousands of individuals on a monthly basis.  And Washington has negotiated with SEIU 775 to contribute to a health benefits trust which provides health care to eligible individual providers who choose to enroll and authorize deduction of health care premiums.  The Final Rule arbitrarily removes a convenience that is enjoyed by the vast majority of Americans with employer-based health insurance.

120.    By increasing the likelihood that providers in many instances could lose health insurance due to failure to pay required monthly contributions, the Rule places the health insurance of providers at risk and undermines the overall financial health and stability of such benefit programs, and of providers themselves.

**C.    The Final Rule and Its Implementation by Defendants Impermissibly
Intrude Upon State Sovereign Interests**

121.    As described above, the Medicaid Act provides no authority for Defendants to impose their new interpretation of the Medicaid Act to prohibit deductions and contributions of voluntary union dues and other benefits.

122.    In addition to harms to the States' personal care services programs, beneficiaries and workers, the Final Rule interferes with the States' exercise of their inherent, traditional police powers, including their ability to regulate employment relationships.

123.    When Congress enacted Section (a)(32) of the Medicaid Act, it did not intend to interfere with state labor laws, let alone make its intent to do so "unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)).

124.    Defendants' change in interpretation of the Medicaid Act further interferes with the States' authority to enact and enforce laws that promote the health and safety of their residents, especially the States' most vulnerable residents.  If States do not accept such conditions for their federal Medicaid programs, or if Defendants withhold funding from States on the basis of these requirements, the States could collectively lose $6 billion in critical funds that would otherwise go to healthcare services for State residents.

125.    Defendants' new interpretation and enforcement of Section (a)(32) will require the States to change their state laws and policies in order to comply.  84 Fed. Reg. at 19723 ("if state law(s) and/or regulation(s) conflict […] the state Medicaid agency will need to take corrective action to comply").  This would involve unnecessary changes to an approach to service delivery that States have found to be an effective tool to deliver needed services to seniors and persons with disabilities through a stable, trained workforce.  It would also compromise States' and localities' abilities to adhere to collective bargaining agreements that provide for direct debits and contributions on behalf of individual providers of union dues and other negotiated benefits.

126.    The States should not be faced with the Hobson's choice of agreeing to an unlawful new requirement for their Medicaid home and community-based services programs, or

foregoing Medicaid funds and losing critical public healthcare dollars that could result in the elimination of these optional services from the States' Medicaid programs, all to the detriment of the States' residents.

**FIRST CAUSE OF ACTION**

**(Violation of APA; 5 U.S.C. § 706—Not in Accordance With Law)**

127.    Paragraphs 1 through 126 are realleged and incorporated herein by reference.

128.    Defendants' interpretation of the Medicaid Act, on which the Final Rule is premised, is not in accordance with law.  Section (a)(32) of the Medicaid Act does not prohibit the voluntary deduction of union dues from personal care services provider paychecks.  These type of deductions clearly do not involve payments "under an assignment or power of attorney or otherwise"; automatic deductions and contributions are simply a convenient means for paying voluntary union dues and other customary benefits such as health, dental, and vision insurance.

129.    Because Defendants' new Rule is not in accordance with the Medicaid Act, the Rule is invalid**.**

**SECOND CAUSE OF ACTION**

**(Violation of APA; 5 U.S.C. § 706-Arbitrary and Capricious)**

130.    Paragraphs 1 through 129 are realleged and incorporated herein by reference.

131.    By promulgating this new Rule, Defendants have acted arbitrarily and capriciously and abused their discretion.  Defendants have relied on factors that Congress did not intend them to consider, failed to consider important aspects of the program the agency is addressing, and have offered no explanation for the new Rule that is consistent with the evidence before the agency.  *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

132.    Moreover, CMS failed to consider serious reliance interests engendered by decades of practice permissible under the governing statute, without any sufficient explanation for its novel interpretation of a 1970s-era prohibition on assignment of provider claims.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (declining to defer to agency provided

32

insufficiently reasoned explanation for "why it deemed it necessary to overrule its previous position").

133.    Because Defendants' new Rule is arbitrary, capricious, and an abuse of discretion, the Rule is invalid.

## THIRD CAUSE OF ACTION

### (Violation of APA; 5 U.S.C. § 706-Exceeds Statutory Authority)

134.    Paragraphs 1 through 133 are realleged and incorporated herein by reference.

135.    Article I, Section I of the United States Constitution enumerates that "[a]ll legislative Powers herein granted shall be vested in [the] Congress."

136.    Defendants' Rule is unconstitutional because Defendants overstepped their powers by exercising lawmaking authority that is solely reserved for Congress under Article I, Section I of the U.S. Constitution.

137.    Article I, Section VIII of the United States Constitution vests exclusively in Congress the spending power to "provide for … the General Welfare of the United States."

138.    Defendants have exceeded congressional authority by purporting to add substantive new requirements to state Medicaid programs that are not authorized by the Medicaid Act or any other federal law.  The Rule therefore unlawfully exceeds the Executive Branch's powers and intrudes upon the powers of Congress.

139.    For the reasons herein, the Rule is unlawful, unconstitutional, and should be set aside under 28 U.S.C. § 2201.

## PRAYER FOR RELIEF

WHEREFORE, the States respectfully request that this Court:

1. Issue a declaratory judgment that the Rule, including Defendants' new interpretation of Section (a)(32), is arbitrary and capricious, not in accordance with law, and Defendants acted in excess of statutory authority in promulgating it;

2.  Issue a declaratory judgment that the Rule, including Defendants' new interpretation of Section (a)(32), is unconstitutional and invalid;

3.  Issue an injunction prohibiting the implementation of the Rule, including Defendants' enforcement of its new interpretation of Section (a)(32);

4.  Postpone the effective date and/or set aside the Rule, including Defendants' new interpretation of Section (a)(32), pursuant to 5 U.S.C. § 705, 706(2);

4.  Award the States' costs, expenses, and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412; and,

5.  Award such other relief as the Court deems just and proper.

Dated:  May 13, 2019

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
KATHLEEN BOERGERS
Supervising Deputy Attorney General
NIMROD P. ELIAS

_/s/ Anna Rich_____
ANNA RICH
Deputy Attorneys General
*Attorneys for Plaintiff the State of California*

WILLIAM TONG
Attorney General of Connecticut

_/s/ Margaret Q. Chapple_____
MARGARET Q. CHAPPLE (*pro hac vice
forthcoming*)
Deputy Attorney General
55 Elm Street
Hartford, CT 06106
Telephone: (860) 808-5316
Margaret.chapple@ct.gov
*Attorneys for Plaintiff State of Connecticut*

MAURA HEALEY
Attorney General for the Commonwealth of
Massachusetts

_/s/ Cynthia Mark_____
CYNTHIA MARK (*pro hac vice forthcoming*)
Chief, Fair Labor Division
Massachusetts Office of the Attorney
General
One Ashburton Place
Boston, MA 02108
(617) 963-2626
Cynthia.Mark@mass.gov
*Attorneys for the Commonwealth of
Massachusetts*

ELLEN F. ROSENBLUM
Attorney General for the State of Oregon

_/s/ J. Nicole DeFever_____
J. NICOLE DEFEVER SBN #191525
Senior Assistance Attorney General
Oregon Department of Justice
Tel (971) 673-1880
Fax (971) 673-5000

35

1

Nicole.DeFever@doj.state.or.us
*Attorneys for the State of Oregon and*

2

*Governor Kate Brown*

3

ROBERT W. FERGUSON

4

Attorney General of Washington

5

*/s/ Alicia O. Young*

ALICIA O. YOUNG, WSBA No. 35553

6

Senior Counsel
J. PAUL DESJARDIEN, WSBA No. 31614

7

Assistant Attorney General
PO Box 40111

8

Olympia, WA 98504-0111
(360) 709-6470

9

Alicia.Young@atg.wa.gov
Paul.DesJardien@atg.wa.gov

10

*Attorneys for Plaintiff State of Washington*
*Pro Hac Vice Forthcoming*

11

12

13

14

SA2018100401

15

13728696.docx

16

17

## **FILER'S ATTESTATION**

18

Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, I hereby attest that

19

concurrence in the filing of this document has been obtained from all signatories above.

20

Dated:  May 13, 2019          */s/ Anna Rich*

ANNA RICH

21

22

23

24

25

26

27

28