XAVIER BECERRA
Attorney General of California
KATHLEEN BOERGERS
Supervising Deputy Attorney General
NIMROD P. ELIAS
ANNA RICH, State Bar No. 230195
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone: 510-879-0296
  Fax: 510-622-2270
  E-mail:  Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California, by and
through Attorney General Xavier Becerra*

*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, BY AND THROUGH ATTORNEY GENERAL XAVIER BECERRA; STATE OF CONNECTICUT; STATE OF ILLINOIS; STATE OF OREGON AND GOVERNOR KATE BROWN; COMMONWEALTH OF MASSACHUSETTS; AND STATE OF WASHINGTON;<br><br>                                     Plaintiffs,<br><br>                    v.<br><br>ALEX M. AZAR II, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>                                     Defendants. | 3:19-cv-02552-VC<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Administrative Procedure Act Case<br><br>Judge:        The Honorable Vince Chhabria<br>Trial Date:    TBD<br>Action Filed:  May 13, 2019 |

1

1

2

## INTRODUCTION

3      1.      Plaintiffs the States of California, Connecticut, Illinois, Oregon and Governor Kate

4   Brown, Massachusetts, and Washington (collectively, "the States"), bring this action to protect

5   the integrity of their Medicaid home and community-based services programs against Defendants

6   the Department of Health and Human Services (HHS) and Secretary Alex M. Azar II

7   (collectively, Defendants), who have unlawfully attempted to reinterpret the Medicaid Act in

8   service of anti-union objectives that bear no relationship to the purpose of that Act.  In doing so,

9   Defendants seek to upend careful arrangements created by States to allow older adults and

10   individuals with disabilities to maximize their autonomy and independence by directing their own

11   care, with support from state and local governments relating to the financial logistics of paying

12   care providers.

13      2.      Each of the States has chosen to include consumer-directed home and community-

14   based personal care services (referred to hereafter as "homecare") as an element of their Medicaid

15   programs, in order to provide assistance that eligible individuals who are aged, blind and have

16   disabilities need to live safely in their own homes and communities, and avoid unnecessary

17   institutionalization.  The type of assistance depends on each states' unique program design and

18   individuals' needs, but generally includes services like paramedical services, accompaniment to

19   medical appointments, bowel and bladder care, bathing, meal preparation, housecleaning,

20   laundry, grocery shopping, and protective supervision.

21      3.      Consumer direction allows eligible Medicaid beneficiaries to hire, fire, and

22   supervise their own care providers.  State or local government entities are generally responsible

23   (with state-to-state variations) for assisting beneficiaries by setting wages and benefits for

24   providers and authorizing payments for hours of service and/or types of services.  Collectively,

25   the States' Medicaid programs serve more than 700,000 individuals in need of in-home assistance

26   through consumer-directed programs.

27      4.      Each of the States has sought to improve the quality and stability of Medicaid

28   homecare by extending state laws that authorize public-sector bargaining to the homecare

workforce and permitting voluntary payroll deductions and/or benefit contributions.   Historically, homecare workers have engaged in difficult, often physically-demanding work and faced low wages, few benefits, frequent injuries, and unpredictable hours, with no means to collectively address working conditions.  Since States' authorization of collective bargaining, homecare workers have collectively chosen union representation.  Federal and state laws authorize the direct deduction of voluntary union dues and other benefits customary for employees, such as health insurance premiums or retirement contributions, from providers' paychecks, or contributions to benefit trusts on behalf of providers.

5.     On May 6, 2019, HHS issued a Final Rule that purports to reinterpret the Medicaid Act in a manner that would prohibit States from directly withholding these ordinary, voluntary deductions from homecare workers' paychecks.  In doing so, the Rule abruptly and without any sound rationale or conversations with affected states rescinded a federal Medicaid regulation confirming the established practice of direct deductions.  Defendants' purported basis for this rule change is a 47-year-old provision of the federal Medicaid Act, 42 U.S.C. Section 1396a(a)(32) (hereinafter Section (a)(32)), that prohibits assignment of rights to collect payment for Medicaid services to third parties.  Congress enacted that provision to prohibit a fraudulent medical-financing scheme that bears no relationship whatsoever to legal payroll deductions such as union dues or other worker benefits.  Neither the language of the statute, legislative history, long-standing judicial construction of Section (a)(32), nor Defendants' own recent rulemaking supports this new interpretation of the law.  Indeed, Congress had not even contemplated the Medicaid authorities primarily used by the States today to provide consumer-directed homecare services.  The regulation the Secretary seeks to eliminate was not necessary to establish the lawfulness of payroll deductions to pay for items such as union membership dues or health benefits, because the anti-reassignment statute did not prohibit them even without the regulation.  The Final Rule announces CMS's intent to enforce its reading of the Medicaid Act and to require States to cease authorizing payroll deductions, under circumstances set forth in the rule, for union dues and other workplace benefits.

6.      If implemented in accordance with the Secretary's reinterpretation of the Medicaid Act, the Final Rule would undermine laws and agreements that have improved the provision of homecare to the States' residents.  It would disrupt well-established collective bargaining relationships and weaken an organized workforce infrastructure that the States have authorized as a result of provider self-organization and in order to channel labor relations in a productive and cooperative manner that contributes to the building, training, and mobilization of Medicaid home-care workforces.  While the States could, in theory, avoid this disruption by foregoing federal Medicaid funding for personal care services, doing so would forfeit more than $6.5 billion in federal dollars, causing devastating harm to state healthcare budgets and eroding the States' capacity to provide needed homecare for seniors and persons with disabilities.  Defendants' Final Rule adds a condition to Medicaid funding that is not authorized by statute and is intended to improperly force the States to choose between including these services in their Medicaid programs and upholding state laws and contractual obligations that promote a more stable, effective, and skilled homecare workforce.

7.      The States seek injunctive and declaratory relief on the grounds that the manner and substance of Defendants' new policy guidance violates the Administrative Procedure Act (APA).

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

9.      Defendants' issuance of the new rule on May 6, 2019, constitutes a final agency action and is therefore judicially reviewable within the meaning of the Administrative Procedure Act.  5 U.S.C. §§ 704, 706.

3

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is a judicial district in which Plaintiff the State of California resides and this action seeks relief against federal agencies and officials acting in their official capacities.

## INTRADISTRICT ASSIGNMENT

11.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court.

## PARTIES

12.     Plaintiff, the State of California, by and through its Attorney General Xavier Becerra, brings this action.  The Attorney General has the authority to file civil actions in order to protect public rights and interests and promote the health and welfare of Californians.  Cal. Const., art. V, § 13.  This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.  *See Pierce v. Super. Ct*., 1 Cal.2d 759, 761-62 (1934) (the Attorney General "has the power to file any civil action or proceeding directly involving the rights and interest of the state … and the protection of public rights and interests.").  As California's Chief Law Officer, the Attorney General is responsible for ensuring that the laws of the State are enforced.  Cal. Const., art. V, § 13. Defendants' Rule undermines California's statutes.

13.     Plaintiffs, the State of Oregon and Governor Kate Brown, are represented by the Attorney General of Oregon, Ellen Rosenblum.  Attorney General Rosenblum is the chief law officer of Oregon and is empowered to bring this action on behalf of the State of Oregon and its affected agencies under ORS 180.060, ORS 180.210, and ORS 180.220.

14.     Plaintiff, the State of Washington is represented by its Attorney General, who is the State's chief legal adviser. The powers and duties of the Attorney General include acting in federal court on matters of public concern to the State.

15.     Plaintiff, the State of Connecticut, is represented by the Attorney General of Connecticut, William Tong.  Attorney General Tong is the chief legal officer of the State of Connecticut and has the authority to file civil actions to protect Connecticut's rights and interests.

4

Conn. Const., art. IV, § 4; Conn. Gen. Stat. §§ 3-124, *et seq*.  Attorney General Tong is authorized to bring this action on behalf of the State of Connecticut and its agencies under Conn. Gen. Stat. § 3-125.

16.     Plaintiff, the State of Massachusetts, is represented by Attorney General Maura Healey, as its chief law officer, who is granted traditional common law duties to represent the Commonwealth and broad statutory authority to act in the public interest.   M.G.L. c. 12, § 3; *Feeney v. Commonwealth*, 373 Mass. 359, 366, 366 N.E. 2d 1262, 1266 (1977).

17.     Plaintiff, the State of Illinois, is represented by its Attorney General Kwame Raoul as its chief law enforcement officer.  Ill. Constit. Art. V, § 15.  Attorney General Raoul has broad statutory and common law authority to act in the interests of the State of Illinois and its citizens and to enforce the proper application of funds appropriated to Illinois's agencies.  15 ILCS 205/4.

18.     The States have an interest in ensuring the stability and quality of their Medicaid home and community-based service programs.  Protection of health and welfare is one of the traditional police powers of the States.  The States rely on Defendants' compliance with the procedural and substantive requirements of the APA in order to obtain timely and accurate information about activities that may have significant adverse impacts on their administration of their Medicaid programs, and to participate meaningfully in an impartial and public decision-making process that is consistent with the Medicaid Act's purpose of furnishing medical assistance and rehabilitative services to those in need.

19.     Each State is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its state sovereignty caused by Defendants' issuance of the illegal rule, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary contract interests.  In particular, the States will suffer concrete and substantial harm because the Final Rule frustrates the States' public health interests by attempting to disrupt the collective-bargaining process that the States have established with respect to independent Medicaid homecare providers.  If CMS enforces the new interpretation set forth in the Final Rule, it will undermine state laws and contracts that further these interests.

20.     Defendant Alex M. Azar II is Secretary of HHS and is sued in his official capacity. Secretary Azar has responsibility for implementing and fulfilling HHS's duties under the Constitution, the Medicaid Act, and the APA.

21.     Defendant HHS is an agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Amended Complaint.  The Centers for Medicare and Medicaid Services (CMS) is an entity within HHS.

## STATUTORY BACKGROUND

### I.    THE MEDICAID ACT

#### A.    Medicaid Generally

22.     Title XIX of the Social Security Act establishes Medicaid as a joint federal-state medical assistance program. *See* 42 U.S.C. §§ 1396 to 1396w-5.  All states participate in Medicaid, and the states' participation is critical to their ability to provide for the health and welfare of their residents.  All participating states must submit a state Medicaid plan describing their programs and affirming compliance with the requirements of the Medicaid Act and its implementing regulations.  42 U.S.C. § 1396a *et seq*.

23.     Medicaid was enacted for the purpose of "enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care."  42 U.S.C. § 1396-1.

24.     The Medicaid Act requires the Secretary to "provide such safeguards as may be necessary to assure that […] care and services will be provided, in a manner consistent with […] the best interests of the recipients."  42 U.S.C. § 1396a(a)(19).  Apart from federal safeguards and subject to specific state waiver agreements, however, states have a great deal of discretion in administering their individual Medicaid programs according to state interests and priorities.

25.     Consumer-directed personal care services that provide in-home assistance with activities of daily living for residents are optional services that States may choose to cover within

6

their Medicaid programs.  Each of the plaintiff States has elected to offer such services in its

Medicaid plan. These services may be covered under a number of different federal Medicaid

authorities, including state plan options, one or more waivers approved by CMS, or both.  *See*,

*e.g*., 42 U.S.C. § 1396d(24) (state plan option); 42 U.S.C. §§ 1396b(c) (waiver authority for home

and community-based services), 1396n(i) (state plan home and community-based services),

1396n(j) (self-directed personal care services), and 1396n(k) (Community First Choice state plan

option).  The States also provide federally mandated personal care services when they are

medically necessary for children eligible for early and periodic screening, diagnostic, and

treatment (EPSDT) services.

26.     Many states provide Medicaid homecare services through private agencies that

employ homecare workers.  Some states, including Plaintiffs, also use consumer direction,

sometimes also referred to as the "individual provider model" or "individual provider mode,"

whereby eligible Medicaid beneficiaries hire, fire, and supervise their own homecare providers,

but the state finances the services through Medicaid, and state or local government entities set

wages and benefits for providers and authorize hours of service and types of services.

27.     State and federal governments share responsibility for funding Medicaid.  Federal

dollars provide at least fifty percent of the funding for the States' Medicaid personal care services

benefits.

**B.     The Medicaid Act's Anti-Reassignment Provision**

28.     The portion of the Medicaid Act at issue in this case provides, in relevant part, that

"no payment … for any care or service provided to an individual shall be made to anyone other

than such individual or the person or institution providing such care or service, under an

assignment or power of attorney or otherwise […]." 42 U.S.C. §1396a(a)(32).

29.     Originally enacted in 1972, Section (a)(32) was intended to address problems

associated with "factoring" in the Medicaid system, a practice where healthcare providers sold

Medicaid receivables at a discount to third parties, who in turn submitted the assigned claims to

the government in their own names.  *See* H.R. Rep. 92-231 (1971), *reprinted in* 1972

U.S.C.C.A.N. 4989, 5090.  According to a 1971 United States House of Representatives report,

7

1    "[s]uch reassignments have been a source of incorrect and inflated claims for service and have

2    created administrative problems with respect to determinations of reasonable charges and

3    recovery of overpayments."  H.R. Rep. 92-231, *reprinted in* 1972 U.S.C.C.A.N. 4989, 5090.

4    Section (a)(32) was adopted to prevent such abuses of the Medicaid system.

5            30.     The anti-reassignment provision was amended in 1977, to add language expanding

6    the prohibition on assignment of Medicaid claims to include payment made under "power of

7    attorney or otherwise," and to add exceptions to the prohibition.  P.L. 95-142, 91 Stat. 1175

8    (1977).  Congress' intent was "to preclude the use of a power of attorney as a device to

9    circumvent the existing ban on the use of 'factoring' arrangements in connection with the

10   payment of claims."  H.R. Rep. No. 95-393, 95th Cong., 1st Sess., 48 (1977), *reprinted in* 1977

11   U.S.C.C.A.N. 3039, 3051.  The legislative history notes Congress' concern that "[a]lthough

12   factoring was outlawed under the Social Security Amendments of 1972, factoring firms have

13   evaded statutory intent by working under a power of attorney arrangement."  *Id*. at 3048.  The

14   amendment thus "clarifie[d] existing law to insure that a power of attorney cannot be used to

15   circumvent the prohibition in existing law against the use of 'factoring' arrangements in

16   connection with the payment of provider claims by the medicare and medicaid [sic] programs."

17   *Id*. at 3045.

18           31.     The anti-reassignment statute sets forth a number of exceptions.  For example,

19   Medicaid providers may assign payments to a governmental agency and may appoint an agent for

20   billing purposes, provided that the agent is not paid based on the amount of Medicaid payments

21   recovered.  42 U.S.C. § 1396a(a)(32)(B).

22           32.     Nowhere does the anti-reassignment statute speak to ordinary payroll deductions

23   and contributions for items like voluntary health insurance or union dues that are not in

24   themselves claims to a "payment for any care or service provided to an individual" Medicaid

25   beneficiary.

26           33.     Section (a)(32) has never been construed to apply to practices that do not implicate

27   Congress' concerns regarding fraud and abuse.  Despite long-standing state laws and practices

28   authorizing direct payroll deductions and contributions for voluntary worker benefits and union

8

dues, until issuance of the May 6, 2019 Rule, neither Congress nor HHS had ever taken any action to prohibit routine, authorized deductions from the paychecks of Medicaid providers.

## II.   ADMINISTRATIVE PROCEDURE ACT

34.     Pursuant to the APA, 5 U.S.C. § 551 *et seq*., a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

35.     The APA defines "agency action" to include "the whole or a part of an agency rule, *order*, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  *Id*. § 551(13) (emphasis added); *see id*. § 551(6) (defining "order" to mean "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing").

## FACTUAL AND PROCEDURAL BACKGROUND

## I.   BACKGROUND ON MEDICAID HOMECARE

36.     Homecare is difficult and often physically demanding work.  Homecare workers, most of whom are women, have historically faced low wages, few benefits, frequent injuries, and unpredictable hours, with no means to collectively address such challenges in their interactions with their individual clients.  In part for these reasons, the homecare workforce has typically had a high rate of turnover, which has a negative impact on Medicaid homecare beneficiaries and makes it more difficult to develop a well-trained workforce.

37.     Collective bargaining is one of the tools that States have chosen to employ in order to improve the quality and stability of the Medicaid homecare workforce.  Workers represented by unions generally enjoy higher wages, benefits, and access to training.

38.     Only homecare providers who elect to join the union pay dues to the union. Medicaid home-care providers are not required to pay "fair share" or "agency" fees to cover the costs of collective bargaining if they decline to join the union.  *Harris v. Quinn*, 134 S.Ct. 2618

9

(2014).  In all of the States, therefore, direct deductions of union dues are authorized by workers' voluntary agreement.  These agreements do not "assign" any payment or rights to payment to the union or any other entity.  Union dues are a voluntary payroll deduction, just like common voluntary payroll deductions for health, dental, and vision insurance.

39.     Workers who provide consumer-directed Medicaid homecare are employed by the individual person with a disability in need of these services.  This allows Medicaid consumers (or their guardians) to direct their own care through the hiring, firing, and day-to-day supervision of homecare providers.

40.     Meanwhile, either the States or local authorities assume responsibilities for general conditions related to Medicaid homecare providers' employment.  Each of the States has permitted collective bargaining as a key component of these responsibilities.  The States or local authorities negotiate with unions with respect to issues such as determining training requirements, referral programs, and optimizing wage and benefit packages to allow the States and local authorities to recruit and better retain a talented pool of homecare workers.

41.     Paragraphs 42 to 90 below demonstrate some of the ways that the States have used the collective bargaining process to build, train and stabilize their homecare workforces by cooperatively addressing working conditions identified as particularly important to homecare workers within each state.  This process relies in part on cooperation between state or local agencies and professionally staffed workforce representatives to address overarching issues and find innovative solutions to the problems faced by workers who are often dispersed and isolated.

42.     As homecare providers have formed unions and advocated for themselves and their profession, this has had positive effects for both Medicaid beneficiaries and workers.  For example, in some instances unionized homecare workers are more likely to have health insurance than those without representation.  Unions also help reduce worker turnover, a critical factor in providing high quality care.

**A.     California's Medicaid In-Home Supportive Services Program**

43.     California's Medicaid consumer-directed personal care services program, known as In-Home Supportive Services (IHSS), provides in-home assistance to eligible individuals who

are aged, blind and disabled as an alternative to out-of-home care, in order "to enable the aged, blind or disabled poor to avoid institutionalization by remaining in their homes with proper supportive services." Cal. Welf. & Inst. Code § 12300(a).  The IHSS program provides in-home assistance with certain basic tasks of daily living, such as bathing, dressing, meal preparation and clean up, eating, bowel and bladder care, and taking necessary medications. Cal. Welf. & Inst. Code §§ 12300(b) & (c); 14132.95(d)(1), (2); 14132.951(c).  California has chosen to make a substantial investment in these services in part to allow recipients to avoid unnecessary and costly institutionalization, and to protect the rights of Californians with disabilities under the Americans ith Disabilities Act and the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999).

44.     California's Medicaid personal care services program is the nation's largest, serving more than 594,000 Californians statewide, with over 500,000 workers providing care.

45.     California was the first state in the nation to seek to improve the quality and stability of the IHSS provider workforce by extending its public sector bargaining laws to include these workers.  In the early 1990s, the California Legislature authorized and funded the establishment of county-level public authorities that were able to negotiate contracts with the workers' democratically-designated union representatives and coordinate the delivery of IHSS services across the state.  1992 Cal. Stat. Ch. 722, § 54; 1993 Cal. Stat. Ch. 69, § 55.  Building on the success of this change, the Legislature later required all counties that had not yet done so to establish public authorities or adopt one of a number of specified alternative methods for managing the homecare workforce.  1999 Cal. Stat. Ch. 90, § 4; Cal. Welf. & Inst. Code § 12302.25.

46.     Homecare workers across California's counties have joined unions and voted in favor of union representation.  These Medicaid providers are primarily represented by two unions, SEIU Local 2015 and AFSCME United Domestic Workers.  Statewide, more than half of California's IHSS workers elect to join the union and to pay their union dues through payroll deduction.

47.     Although the content of collective-bargaining agreements in California varies by county, all provide wages and benefits that exceed those available to IHSS workers prior to the introduction of collective bargaining.

48.     Some union-negotiated contracts provide benefits such as additional free training for workers on first aid; stipends for trainings arranged by the county public authority; and reimbursements for training materials.  Some contracts provide for free, job-related supplies, such as gloves, masks, slide boards, or gait belts for ambulation and transfer.

49.     Collective-bargaining agreements in thirty California counties (including the most populous counties where a majority of IHSS providers reside) provide health, dental and vision benefits for homecare workers.  IHSS providers who elect to receive such benefits in some cases can pay their employee contributions for the benefits through payroll deduction.  As of June 2017, almost 88,000 active IHSS workers had elected a deduction for health care benefits pursuant to a collective bargaining agreement.

50.     Collective-bargaining agreements in California often contain provisions establishing statutorily required referral registries, i.e. databases of available homecare providers, and setting guidelines for how referrals will be made.

51.     IHSS workforce representatives frequently participate on behalf of their members in stakeholder bodies or other policy fora that address access, service delivery, and quality of care issues within the IHSS program.  For example, IHSS provider representatives have played a role in refining the IHSS provider orientation curriculum; implementing new regulations under the Fair Labor Standards Act; and developing California's uniform statewide protocols for program integrity activities.

52.     Paychecks for IHSS providers are issued by the State of California.  State law requires that the State of California Controller "shall make any deductions from the wages of in-home supportive services personnel, who are employees of a public authority … that are agreed to by that public authority in collective bargaining with the designated representative of the in-home supportive services personnel … and transfer the deducted funds as directed in that

agreement." Cal. Gov't Code §12301.6(i)(2).  Pursuant to this statutory authority, the Controller deducts agreed-upon costs from IHSS providers' paychecks.

53.     These payroll deductions include union dues for all providers who voluntarily join the union, and, in some counties, payments for health insurance, dental and vision insurance, and retirement plans for providers who elect those benefits.  Such deductions have been made from at least some California providers' paychecks since the 1990s.

54.     Although the vast majority of California's IHSS providers are employed via the Individual Provider or consumer-directed mode, a very small number of IHSS providers (about 1,000) are employed only by privately-run agencies.  In those cases, the agency is paid through Medicaid and it is the agency that issues paychecks and deducts any costs for voluntary union dues or other employee benefits.

**B.     State of Oregon's Medicaid Homecare Program**

55.     Oregon is a joint employer of its direct homecare workforce paid with Medicaid funds.  The State of Oregon, along with the individual Medicaid clients, jointly employ approximately 30,000 direct homecare workers providing services to over 20,000 Medicaid recipients each month.  Homecare workers provide in-home assistance to individuals with disabilities and older Oregonians.  They assist with basic tasks of daily living, such as bathing, dressing, meal preparation and clean up, eating, bowel and bladder care, and assistance with taking medications.

56.     In 2000, Oregon voters amended the Oregon Constitution to create the Oregon Home Care Commission and to give homecare workers "the right to form, join and participate in labor organizations for collective bargaining with the State. Or. Const. art. XV, § 11(3)(f). Acting on that authority, in 2001, a majority of Oregon homecare workers elected Services Employees International Union Local 503 as their exclusive bargaining representative.  Since then, the union and State have negotiated collective-bargaining agreements, improving benefits and increasing salaries for all homecare workers.  Statewide, the majority of Oregon's homecare workers have elected to join the union and to pay their union dues through payroll deductions.

13

57.     As homecare providers have formed unions and advocated for themselves and their profession, Oregon has experienced a higher quality and more stable homecare workforce. Tremendous federal and state Medicaid cost-savings result from the expansion of these services. Additionally, turnover has decreased significantly since homecare workers formed unions.  All of this has promoted greater quality of care and patient safety, to the benefit of Oregon's Medicaid program.

58.     The collective-bargaining agreement provides wages and benefits that exceed those which were available to homecare workers prior to the introduction of collective bargaining.  Benefits available to homecare workers in Oregon include health, vision, and dental insurance, paid time off through the Oregon Homecare Workers Benefit Trust and the Oregon Homecare Workers Supplement Trust, as well as training, supplies, career development opportunities, and an on-line registry that matches individuals needing in-home services with homecare workers qualified to provide routine, emergency and respite care.  The Oregon Homecare Workers Benefit Trust and the Oregon Homecare Workers Supplement Trust provide benefits to eligible homecare and personal-support workers covered by the SEIU Local 503 bargaining unit. The Benefit Trust provides dental, vision, and employee assistance program benefits and PTO benefits to eligible participants.  The Supplemental Trust provides assistance with paying for certain medical premium and out-of-pocket expenses relating to claims covered under the participant's Trust-Approved Qualified Health Plan or Medicare Plan.

59.     Paychecks to homecare providers are issued by the State of Oregon.  State law requires the state to deduct from the salary or wages of homecare providers the amount of money authorized for payment to the designated labor organization.  *See* Or. Rev. Stat. § 292.055. Pursuant to this statutory authority, the Oregon Department of Human Services deducts agreed-upon costs from homecare providers' paychecks, including voluntary union dues.  Deductions for union dues have been made from Oregon homecare providers' paychecks for close to two decades.

///

///

14

**C.     State of Washington's Medicaid Personal Care Services Program**

60.     Washington's Medicaid personal care services program, which began as a 1915(c) waiver in 1983 and expanded as a state plan entitlement in 1989, provides in-home assistance as an alternative to institutionalization to eligible individuals who are functionally disabled.  The program provides in-home assistance with activities of daily living, such as bathing, dressing, meal preparation and clean up, eating, incontinence care, and taking necessary medications.  In 1993, the Washington legislature directed the Department of Social and Health Services to expand home and community based long-term care options to provide additional opportunities for beneficiaries to receive care in settings other than nursing homes.  Wash. Rev. Code §§ 74.39A.007, .030.  One of the options Washington developed was to build on the existing state-funded and Medicaid state plan and waiver programs, which support consumers who chose to self-direct the provision of in-home personal care provided by individual providers.

61.     Washington has made a substantial investment in this program and has been successful in reducing the proportion of individuals served in nursing homes.  In 1992, there were 36,649 individuals receiving long-term care — 47% received care in nursing homes and 53% received care in the community.  In 2017, there were 65,336 people receiving long-term care — only 15% received care in a nursing home and 85% received care in their homes or another community setting.  In part because of Washington's success in providing long-term care in community-based settings, the AARP ranked Washington's long-term care system first in the nation in its 2017 report.  In its previous two reports, issued in 2011 and 2014, the AARP ranked Washington second.

62.     A large part of this success has been the ability to invest in individual provider wages, benefits, and the attainment of new skills to meet the changing needs of the beneficiaries served in their own homes.  Washington has partnered with the federal government on funding these critical investments to ensure an accessible and available workforce since 1995 when the state began paying for health insurance and training for in-home workers.

63.     At any given point in time, about 37,000 Medicaid beneficiaries in Washington have chosen to receive personal care in their homes from a workforce of around 45,000 providers.

15

1   The average monthly in-home personal care benefit is 101 hours.  Altogether, it adds up to around

2   50,000,000 hours of in-home personal care services provided by individual providers per year.

3   Washington will expend about two billion dollars for federal fiscal year 2018 to provide long-

4   term care services to some of its most vulnerable citizens.  Of that total, about one billion dollars

5   is for the services of individual providers, of which the federal financial participation amounts to

6   almost $618,000,000.

7       64.    In 2001, the people of Washington passed Initiative 775, which granted collective-

8   bargaining rights to individual providers.  Wash. Rev. Code § 74.39A.270.  Individual providers

9   are public employees solely for the purposes of collective bargaining.  *Id.*  In August 2002, 84%

10  of the individual provider bargaining unit members who participated in the election voted for

11  union representation with a bargaining unit of 25,500 homecare workers at the time.  These

12  Medicaid providers are represented by SEIU 775.  Of the group of individual providers paid

13  between August 2018 and January 30, 2019, 78% (over 40,000) have chosen to join the

14  union and have dues deducted from their payments.

15      65.    In 2011, the people of Washington passed Initiative 1163, which requires

16  additional training and certification requirements for individual providers.  Pursuant to its

17  collective bargaining agreement with SEIU 775, Washington contributes to trusts to provide these

18  benefits to the individual providers, and its trust contributions are included as part of the

19  individual provider Medicaid rate approved by CMS.  Washington has worked closely with its

20  state and federal partners, including the union, to develop and retain a well-trained long-term care

21  workforce.  The union has played a significant role in achieving this goal by successfully

22  advocating and collectively bargaining for individual providers to have access to healthcare,

23  training, and retirement benefits.  The compensation and benefits package for individual

24  providers also helps beneficiaries who receive personal care services by supporting a well-trained

25  workforce and attracting new providers to the workforce.

26      66.    Washington negotiated and implemented healthcare benefits for individual

27  providers in 2005, training benefits in 2009, and retirement benefits in 2015.  Washington has

28  operated these programs with CMS approval and reimbursement since implementation in 2005,

1  including the approximately nine-year period prior to the promulgation of 42 CFR §447.10(g)(4).

2  As CMS has continually allowed the state's payment methodology for individual providers over

3  the past decade, Washington has made significant investments in the individual provider benefits

4  package and the infrastructure necessary to operate the individual provider system.

5       67.    If Washington is prohibited from making these contributions, it could have a

6  devastating impact on the state's ability to recruit and retain a well-trained individual provider

7  workforce.  This could cause some of the state's most vulnerable citizens to lose access to critical

8  in-home services, leaving them at risk or forcing them into institutional settings which will

9  increase costs to both the state and federal government.

10       68.    Individual providers submit their hours to the state and receive payment twice a

11  month.  Washington deducts federal taxes.  Pursuant to state law and the collective bargaining

12  agreement, Washington also deducts voluntary union dues and a $25 per month healthcare benefit

13  premium when authorized by the individual provider, and other voluntary deductions as

14  authorized by the provider.  In February 2019, 13,964 individual providers opted to have health

15  benefits premium deducted from their payments.  As noted earlier, a substantial majority of

16  individual providers have also voluntarily elected to have union dues deducted from their

17  payments.

18  **D.    State of Connecticut's Medicaid Personal Care Services Program**

19       69.    Connecticut's Medicaid personal care services program provides in-home

20  assistance to the elderly and disabled.  The program provides in-home assistance with homemaker

21  services, companion services, meals on wheels, adult day care, transportation, mental health

22  counseling, care management, occupational therapy, elderly foster care, minor home

23  modifications, and assisted living services provided in state-funded congregate housing and in

24  other assisted living pilot or demonstration projects established under state law.  Conn. Gen. Stat.

25  §§ 17b-342, 17b-370, 17b-605a.

26       70.    Connecticut's Medicaid personal care services program has approximately 4,300

27  direct homecare workers providing services to about 15,000 Medicaid recipients each month.

28

71.     In 2012, Connecticut enacted legislation creating the Personal Care Attendants Workforce Council and giving home personal care attendants the right to form labor organizations for collective bargaining with the State.  Conn. Gen. Stat. §§ 17b-706a, 17b-706b. Connecticut personal care attendants chose New England Healthcare Employees Union, Local 1199, Service Employees International Union as their exclusive bargaining representative, and collective-bargaining agreements increasing wages and benefits for all personal care attendants have been negotiated.  Statewide, the majority of Connecticut's home personal care attendants have elected to join the union and pay their union dues through payroll deductions.

72.     The current collective bargaining agreement provides wages and benefits exceeding those available to personal care attendants prior to the introduction of collective bargaining.  Benefits include workers' compensation, overtime pay for holidays and a training fund.

73.     Connecticut law specifically provides for deductions of union dues from the wages of personal care attendants pursuant to collective bargaining agreements, by a fiscal intermediary of the State.  Conn. Gen. Stat. § 17b-706b(a)(3).

**E.     Massachusetts' Consumer-Directed Personal Care Attendant Program**

74.     Massachusetts has elected to make self-directed personal care attendant services available to its MassHealth members through the Massachusetts Personal Care Attendant program.  130 C.M.R. §§ 422.00 *et seq.* Under this program, the MassHealth member–or consumer–is the statutory "employer" of the Personal Care Attendant ("PCA"), and is fully responsible for recruiting, hiring, scheduling, training, time-keeping, and terminating PCAs.  130 C.M.R. § 422.420.

75.     PCAs in Massachusetts provide a range of services to over 40,000 consumers living at home.  These critical services are medically necessary and may include help with bathing and grooming, dressing, exercises, eating, and toileting.  Section 422.410(A).  PCAs also assist consumers with daily household tasks, such as laundry, shopping, cooking, and housekeeping, and they may accompany consumers to medical appointments.  Section 422.410(B).  MassHealth consumers rely on these personal care services in order to continue to

live safely and with dignity in their own homes.  There are currently over 40,820 MassHealth members receiving such PCA services.

76.    Since 2006, Massachusetts PCAs are deemed "public employees" for collective bargaining purposes under M.G.L. c. 150E and for purposes of employee-authorized payroll deductions.  *See* M.G.L. c. 118E, § 73(b) (added by St. 2012, c. 224, § 131, formerly St. 2006, c. 268).  At the same time, the Massachusetts Personal Care Attendant Quality Home Care Workforce Council ("the Council") was established within the Executive Office of Health and Human Services, M.G.L. c. 118E, §§ 71-75 (added by St. 2012, c. 224, § 131, formerly St. 2006, c. 268) "to ensure the quality of long-term, in home, personal care by recruiting, training and stabilizing the work force of personal care attendants." M.G.L. c. 118E, § 71(a).  Among other things, the Council acts on behalf of MassHealth consumers, as the employers' representative, to collectively bargain with Massachusetts PCAs.

77.    In 2007, PCAs in Massachusetts voted to elect 1199 SEIU United Healthcare Workers East to be their exclusive bargaining representative.  Their Agreement requires that union dues be deducted from wages, when PCAs choose to join the union and authorize such deductions.  Such voluntary deductions for union dues have been in place since 2008.

78.    Consumers are assisted by fiscal intermediaries, who perform certain employer required tasks for the Consumers.  Section 422.419.  MassHealth pays fiscal intermediaries for these services.  Section 422.411(C).

79.    The fiscal intermediary is responsible for "issuing checks to PCAs equal to the PCA wage component of the PCA rate, with appropriate taxes withheld and other applicable required withholdings," Section 422.419(B)(12), and for "paying unemployment insurance taxes, purchasing worker's compensation insurance, and preparing the PCA payroll," Section 422.402 (Employer-required Tasks).

80.    Workers' compensation coverage for Massachusetts PCAs is obtained through policies issued by private insurers in the name of each consumer as the employer.

81.    Every employer in Massachusetts must purchase and maintain workers' compensation insurance coverage to promote the health, safety and welfare of workers who are

19

1    injured regardless of fault.  M.G.L. c. 152, §§ 25A and 25C.  Those who fail to maintain such

2    coverage as required are subject to the imposition of stop work orders and criminal enforcement

3    action.  M.G.L. c. 152, § 25C(1)-(2) and (5).  Workers' compensation insurance coverage

4    provides a vitally important social safety net, created in response to strong public sentiment that

5    the remedies afforded at common law were inadequate to protect workers.  *CNA Ins. Cos. v.*

6    *Sliski*, 433 Mass. 491, 493, 744 N.E. 2d 634, 636 (2001).

7         **F.    Illinois's Home Services Program**

8         82.    Illinois utilizes individual providers (called "personal assistants") in its Home

9    Services Program (HSP), which is administered through the Illinois Department of Human

10   Services.

11        83.    By statute, HSP provides in-home care to Illinois residents that are under the age

12   of 60 to prevent the unnecessary institutionalization of persons in need of long term care and who

13   meet the criteria for blindness or disability as defined in the Social Security Act.  20 ILCS

14   2405/3(f).  Such services include personal assistant services, homemaker services, home-

15   delivered meals, adult day care services, respite care, and home modification services. *Id.*

16        84.    For purposes of the Medicaid statute (42 U.S.C. § 1396a(a)(32)(A), and its

17   implementing regulations, 42 C.F.R. § 447.10), the State of Illinois is the employer of the

18   personal assistants.

19              a.  First, the Illinois Public Labor Relations Act identifies the State as a "public

20                  employer," and a "public employee" is defined to include personal assistants

21                  and home health workers who work for HSP.  *See* 5 ILCS 315/3(n), (o).

22                  Accordingly, personal assistants are authorized to unionize and to bargain

23                  collectively. 5 ILCS 315/6.

24              b.  Second, the Rehabilitation of Persons with Disabilities Act denotes that

25                  home health workers that provide services pursuant to HSP are considered

26                  public employees for purposes of the Illinois Public Labor Relations Act and

27                  permits collective bargaining.  20 ILCS 2405/3(f).

28

Amended Complaint for Declaratory and Injunctive Relief (Case No. 3:19-cv-02552-VC)

85.     In 2003, HSP personal assistants selected SEIU HCII as their majority representative; later that year, the Illinois General Assembly amended the Illinois Public Labor Relations Act to permit HSP personal assistants to designate an exclusive representative for purposes of collective bargaining.  5 ILCS 315/3(f), (n), & (o).  In addition, the Illinois Rehabilitation of Persons with Disabilities Act, which established HSP, contemplates that individual providers will be compensated at a rate negotiated between the Department of Human Services and the exclusive representative of the personal assistants under a collective bargaining agreement.  20 ILCS 2405/3(f).

86.     Currently, SEIU represents unionized personal assistants in Illinois. Since 2013, the union has negotiated a wage increase, as well as health care benefits and paid training that ranges from basic care to more advanced expertise and certifications like first aid and CPR and nutrition, exercise, and mental health programs to provide to patients.  Personal assistants also have an accidental death and dismemberment policy, a voluntary dental, vision, and pharmaceutical benefit, and a number of discount programs.

87.     Personal assistants that have chosen to join the union do so voluntarily. Their union dues are paid only "upon an employee's written authorization."  5 ILCS 315/6(f).  Further, the State of Illinois is directed to honor these requests for salary deductions "for payment to any labor organization designated by the employee."  5 ILCS 365/4(3).  Further, the State of Illinois is bound by the State Salary and Annuity Withholding Act to make withholdings "for payment to any labor organization designated by the employee."  5 ILCS 365/2.

88.     Accordingly, the State of Illinois is bound by its current collective bargaining agreement, which requires the State of Illinois to deduct union dues and initiation fees from personal assistants who have voluntarily joined the union.

89.     Therefore, CMS commentary that personal assistants are not State employees is not applicable in Illinois.

**G.     Federal Regulations**

90.     In 2014, CMS issued added an additional subsection to regulations implementing Section (a)(32) that provided that "[i]n the class of practitioners for which the Medicaid program

21

is the primary source of service revenue, payment may be made to a third party on behalf of the individual practitioner for benefits such as health insurance, skills training and other benefits customary for employees." 42 C.F.R. § 447.10(g)(4).  In issuing this regulation, CMS stated that deductions used to pay "costs customary for employees" fall within the scope of this addition. *See* 79 Fed. Reg. 2948-1, 3001 (Jan. 16, 2014).  Union dues are never mentioned in the regulation, nor were they addressed specifically by CMS at any point in the rulemaking process.

91.     In its notice of final rulemaking, CMS reiterated that the purpose of Section (a)(32) "was to prohibit factoring arrangements, and not to preclude a Medicaid program that is functioning as the practitioner's primary source of revenue from fulfilling the basic responsibilities that are associated with that role." 79 Fed. Reg. 2948-01, 2949 (Jan. 16, 2014); 77 Fed. Reg. 26362, 26381 (May 3, 2012) (proposing rule and noting that purpose of Section (a)(32) was to prohibit factoring).  According to CMS, direct payments of customary employee benefits, remitted to third parties on behalf of the Medicaid practitioner for a stated purpose, was "not contemplated" under the Medicaid Act.  79 Fed. Reg. at 2949.

92.     The homecare workers described in paragraphs 42-89 are a class of Medicaid practitioners whose primary source of service revenue is the Medicaid program.

## II.   DEFENDANTS' 2019 ILLEGAL RULE CHANGE

93.     On July 12, 2018, Defendants proposed a new rule, "Reassignment of Medicaid Provider Claims," 83 Fed. Reg. 32252, rescinding subsection 447.10(g)(4).  The proposed rule provided a thirty-day public comment period, rather than the more typical sixty-day period for public comment.  Notwithstanding the absence of any mention of unions or union dues in the 2014 regulation or the statute, Defendants suggested that the impact of the proposed rule would be to prohibit states from "reassigning homecare workers' dues to unions."  83 Fed. Reg. at 32254.

94.     Shortly after release of this proposed rule, Plaintiffs wrote to Defendants expressing deep concern about the proposed rule.  They explained that a sixty-day comment period was needed "in order to allow affected parties to weigh in and provide information to HHS on the many aspects where the agency says it lacks information."  Defendants effectively denied

1   these requests.  In the following weeks, thousands of interested parties submitted comments

2   opposing the proposed rule.

3          95.     On May 6, 2019, Defendants published the final Rule.  84 Fed. Reg. 19718.

4          96.     The Rule itself does nothing more than rescind subsection 447.10(g)(4).  The

5   preamble makes clear, however, that Defendants have fashioned a novel interpretation of

6   Section (a)(32) in order to try to prohibit states from making ordinary payroll deductions or

7   contributions on behalf of Medicaid providers, including those who provide homecare.

8          97.     The Rule offers no coherent explanation why Section (a)(32)'s rule that payments

9   "for any care or service provided to an individual shall [not] be made to anyone other than such

10  individual or the person or institution providing such care or service, under an assignment or

11  power of attorney or otherwise" should suddenly be interpreted to apply to ordinary, voluntary

12  payroll deductions and contributions.

13         98.     Defendants concede, as they must, that Congress' purpose in enacting

14  Section (a)(32) was to prohibit factoring and similar fraudulent practice, yet suggest, without

15  citation to the legislative history or other relevant evidence, that "we do not believe that this was

16  necessarily Congress' only concern."  84 Fed. Reg. at 19723.  They offer no evidence that

17  Congress was concerned about state payments of ordinary payroll deductions, or that such

18  payments are in anyway similar to factoring or other practices with a potential for abuse.

19         99.     The Rule relies on the phrase "or otherwise" to suggest that Congress intended the

20  statute to be broadly applied to "situations that did not involve factoring."  *Id*.  Because that

21  phrase comes after more specific words ("under an assignment or power of attorney"), however,

22  established canons of statutory interpretation dictate that the more general "or otherwise" should

23  be construed to embrace concepts similar to those described in the more specific preceding list.

24         100.    At the time when Congress amended Section (a)(32) in 1977, the statutory

25  authorities for consumer-directed Medicaid home and community-based services had not yet been

26  enacted.

27         101.    Instead of explaining why Congress would have decided to shoehorn a ban on

28  states making ordinary payroll deductions and contributions into an anti-fraud statute using a

23

phrase like "or otherwise," or making clear why this legal interpretation was recognized only many decades later, Defendants focus on Section (a)(32)'s enumerated exceptions (e.g., permitting Medicaid providers to assign payments to a governmental agency or to appoint an agent for billing purposes), arguing that the fact that these exceptions speak to certain employer-employee relationships, but not to ordinary payroll deductions, is evidence that Congress intended to disallow such deductions.  This focus is a red herring, because exceptions are irrelevant if Section (a)(32) does not apply in the first place.

102.    Even so, the Rule's analysis of Section (a)(32)'s exceptions is deeply flawed.  On the one hand, Defendants seek to strictly limit interpretation of Section (a)(32)'s exceptions to those expressly stated by Congress, in order to claim that Congress has spoken "to 'the precise question at issue'" and prohibited state withholding of ordinary payroll deductions.  84 Fed. Reg. at 19719.  Yet Defendants conclude, again with no explicit textual support or other evidence, that "[b]ecause Congress recognized the employer-employee relationship in its list of exceptions," they will not interpret Section (a)(32) to prohibit "employee payroll deductions that are made by a bona fide employer."  *Id*. at 19720.  The Rule does not explain or define the term "bona fide employer."  And Defendant simply ignore the existence of other non-enumerated exceptions to Section (a)(32) that similarly would seem to fall outside the anti-reassignment statute.  *See id.* (concluding, without analysis, that CMS' prior recognition of an implied exception for payments to health maintenance organizations is "outside the scope of this rulemaking").

103.    A much more plausible—indeed, the only plausible—interpretation of Section (a)(32) is that ordinary payroll deductions "were not contemplated" under the Medicaid Act's anti-reassignment statute, as HHS concluded in 2014.  79 Fed. Reg. 2948-01, 2949 (Jan. 16, 2014).

104.    Defendants do not explain what, exactly, motivated the rule change, apart from unnamed stakeholders and the agency "engaging in a review of the statutory support."  84 Fed. Reg. at 19719.  Some of the materials cited in the Rule may provide insight into Defendants' motives.  For example, the so-called "Dues Skimming FAQ," urges HHS "through administrative action" to "stop the deduction of dues from Medicaid" payments, indicating that the Rule may be

1  motivated by false characterizations of union dues deductions as fraudulent "skimming" of

2  Medicaid funds.  *Id*. at 19726, n.2.

3       105.    The Rule disclaims any serious attempt at fact-finding or weighing of the

4  advantages or disadvantages for Medicaid beneficiaries or other stakeholders.  Instead, the "new

5  policy rests upon […] solely a new legal analysis."  *Id*. at 19720.

6       106.    Nevertheless, the Rule throughout displays a lack of understanding of the

7  programs it purports to regulate as well as the agency's responsibilities under the Administrative

8  Procedure Act to engage in reasoned decision-making.

9       107.    The Rule displays a lack of understanding of the complicated and varied joint or

10  shared relationships that exist between states or counties, Medicaid beneficiaries, and workers in

11  the context of consumer-directed Medicaid homecare programs, despite many commenters' focus

12  on those programs in their objections to the Rule.  For example, the Rule asserts that "home

13  health workers […] are not employees of the state.  As non-employees, such practitioners do not

14  receive salaries and wages from the state."  *Id*. at 19721.  This summary fails to grasp complex,

15  carefully crafted relationships in which workers are the employee of an individual Medicaid

16  beneficiary, sometimes jointly employed by the Medicaid recipient and the state or a local

17  governmental entity, and paid wages by States or their fiscal intermediaries.  (The exact specifics

18  vary by jurisdiction and are described in paragraphs 42-90 above.)  The Rule's suggestion that

19  subsection 447.10(g)(4) "was specifically applicable to Medicaid enrolled individual practitioners

20  who provided services on a contractual basis," *id*. at 19723, is similarly off base.

21       108.    To the extent that the Rule contemplates that Medicaid beneficiaries with

22  disabilities who are the employers of Medicaid homecare workers are just like any other

23  "employers" who "may withhold taxes and other voluntary deductions for benefits like health

24  insurance through the payroll process" to remain outside the scope of Section (a)(32), *see, e.g*., *id*.

25  at 19720, Defendants likewise show a lack of understanding of Plaintiffs' programs and their

26  participants.  Medicaid beneficiaries who receive homecare in the Medicaid programs at issue are

27  allowed to direct their own care, but they have been relieved of responsibility for processing

28  payroll and/or establishing many of the terms and conditions of employment, including

25

1   negotiating wages.[1]  And for good reason—managing payroll, withholding taxes and voluntary

2   deductions, and negotiating wages would require Medicaid recipients to shoulder additional

3   burdens that would be onerous and unreasonable for most.

4          109.    The Rule suggests that an individual provider who is harmed by an inability to pay

5   for items like health insurance through payroll deductions can "seek employment with home

6   health agencies or other employers that offer benefits." *Id*. at 19722.  This ignores the strong

7   public policy reasons that federal and state governments have for creating consumer-directed

8   programs as an alternative to agency-based health care.

9          110.    The preamble states that the Rule "will not impact a state's ability to perform

10  Financial Management Services (FMS) or secure FMS through a vendor arrangement." *Id*. at

11  19719.  Yet the definition of FMS functions listed do not include either negotiating wages,

12  deducting voluntary employee deductions like health insurance or union dues, or making

13  contributions to benefit trusts on behalf of the providers.  *Id*.; *see also id*. at 19724 (stating that

14  state agencies are "not permitted to 'pass through' Medicaid reimbursement for healthcare

15  services to third parties not recognized under the Medicaid statute").   Many of Plaintiffs'

16  programs provide payroll support for Medicaid beneficiary-employers yet do not otherwise fit the

17  FMS description.  The Rule makes no effort to apply its reasoning to any of the actual state

18  programs that were described in public comments.

19         111.    The Rule dismisses any reliance interests as "not serious." *Id*. at 19720.  In doing

20  so, the Rule ignores substantial evidence of serious reliance interests articulated by numerous

21  States and stakeholders, including by representative of some of the hundreds of thousands of

22  Medicaid homecare beneficiaries. *See, e.g*., Aug. 13, 2019 Letter from Justice in Aging,

23  Disability Rights Education & Defense Fund, and Disability Rights California (noting that the

24  proposed rule "harms consumers and providers without offering any countervailing benefits").

25         112.    Defendants incorrectly attribute Plaintiffs' reliance interests to subsection

26  447.10(g)(4), promulgated in 2014.  But Plaintiffs' reliance interests stretch back at least to the

---

27  [1] There are some Medicaid homecare programs that do give beneficiaries this type of budgetary
28  authority, but they are relatively small and are not the subject of Plaintiffs' comments or
    complaint.

early 1990s, when California started authorizing direct deduction of union dues and other

voluntary benefits, and thus cannot be pegged to the 2014 regulations.  Prior to 2014, CMS for

years approved state plans, conducted audits and reviews, conducted discussions with states and

stakeholders, and approved invoices and payments that reflected state-level deductions for union

dues (and other items).

113.     At various points in the Rule, Defendants claim that they cannot make factual

findings or provide an impact analysis of the Rule because the thousands of comments received

during rulemaking lacked "substantive analysis" or "documentation."  84 Fed. Reg. at 19724-26.

Yet it was Defendants who failed to reach out to states for more information prior or after to

promulgating the proposed rule, and who ignored Plaintiffs' requests to extend the comment

period.  Moreover, Defendants largely ignore the substantial comments that they did receive,

relying instead on a few newspaper articles and websites for basic information about the scope of

the Medicaid programs that they administer.

114.     Most egregiously, Defendants complain that commentators failed to "explain how

or why alleged harms would occur," *id*. at 19721, and come to the conclusory finding that

elimination of payroll deductions "in no way prevents health care workers from purchasing health

insurance, enrolling in trainings, or paying dues to a union," *id*., and thus there is no reason to be

concerned about the impact of the Rule on access to or quality of care.  *Id*. at 19724.  Yet as

Plaintiffs' and other stakeholders' comments laid out in detail, there is as a direct relationship

between maintaining adequate wages and benefits and the ability to attract and retain a qualified

workforce.  *See, e.g.*, Aug. 9, 2018 Letter from U.C. Berkeley Center for Labor Research and

Education (describing research regarding the benefits of strong unions in the context the home

and community services workforce and concluding that "making it more difficult for homecare

workers to voluntarily contribute to their union […] could result in lower worker wages, higher

worker turnover, greater worker shortages, poorer quality of care, and an increase in the overall

cost of long-term care); Aug. 13, 2018 Letter from SEIU (explaining that ending members' ability

to "conveniently and securely" contribute to a union "threatens both the progress made in

improving workforce standards as well as the ability of these workers to make further gains in the

27

future"); Aug. 13, 2018 Letter from the State of California (citing research showing that worker organization "has led to increased retention and training among workers, helping to create a more stable, efficient and high quality provider workforce").

115.    And Defendants disregarded comments from administrators of health and retirement programs indicating that there is no adequate substitute for direct payroll deductions and contributions, especially for this population of workers.  Defendants' conclusion that individual Medicaid homecare providers "remain free to purchase health insurance" and other benefits after receiving payment thus fails to address an important aspect of the problem.  *See, e.g.*, Aug. 13, 2018 Letter from Health Care Employees/Employer Dental & Medical Trust ("[w]ithout the automatic deduction through payroll, many workers would find it difficult to maintain the payments for coverage[.]"); Aug. 13, 2018 Letter from Healthy San Francisco (noting that elimination of a payroll deduction option would cause health plan to incur extra costs for mailing and billing as well as an increase in uninsured workers that would in turn cause a "steep rise in administrative costs" to the plan).

116.    The Rule also incorrectly concludes that the costs of payments for those with bank accounts or debit cards are "negligible since deductions can be set up through financial institutions and can often easily be set up online."  84 Fed. Reg. at 19727.  This ignores abundant evidence in the record that bank account debits are not an adequate replacement for payroll deductions and contributions, especially for low-wage workers.  Indeed, despite a multi-year effort, California has direct deposit only for approximately 40 percent of all providers.  The suggestion that workers should simply buy stamps and envelopes to mail their contributions for voluntary health, retirement, and union dues on a monthly basis is unreasonable; no other type of worker is expected to go without the convenience and reliability of direct payroll debits.

117.    Moreover, while the Rule appears to suggest that assignments would be permissible if "made to a governmental agency or entity," 85 Fed. Reg. at 19720, and addresses permissible assignments for "withholding Federal, state, and local tax and making tax payments to appropriate tax authorities," *id.* at 19719, there is no reference to similar assignments for workers' compensation insurance coverage.  The Rule, instead, creates ambiguity by stating that

28

"whether a particular assignment is permitted… will depend on the particular facts of the arrangement." *Id*. at 19720.

118.    The Rule constitutes a final agency action for purposes of judicial review. 5 U.S.C. § 704.

### III.    DEFENDANTS' FINAL RULE HARMS THE INTERESTS OF PLAINTIFF STATES AND THEIR RESIDENTS

#### A.    The Final Rule Undermines Collective Bargaining Relationships and Harms State Medicaid Programs and Beneficiaries

119.    The Secretary's restriction on the withholding of union dues and other benefits from provider paychecks would harm the integrity of the States' Medicaid programs and millions of state Medicaid beneficiaries and workers.

120.    The States have each decided to authorize direct payroll deductions for the purpose of enabling workers' payment of voluntary union dues. Direct payroll deductions are a reliable and well-established method for making these payments, especially for a diffuse workforce. Direct payroll deductions avoid the unnecessary hardships that may be caused by direct debits from the bank accounts of homecare workers who have such accounts, as well as the unnecessary administrative challenges involved in payment by check or cash.

121.    Overall, automatic payroll deductions and trust contributions on behalf of workers have facilitated the emergence of stable collective bargaining relationships that have improved the quality of the provider workforce and reduced provider turnover. The Final Rule would weaken those relationships and make it harder for the States to maintain an adequate homecare workforce in an already challenging labor market.

122.    The States have a strong interest in permitting union members' payment of their voluntary dues through payroll deduction. Unreliable payments of union dues would reduce the strength and stability of funding available for workforce representation, impairing unions' ability to serve their members. Unions would likely have to reduce the technical advice and training they provide to homecare workers, as well as curtail participation in stakeholder activities. The States have sovereign interests in the public policy-making process, and that process is improved

1   when official representatives of the Medicaid personal care workforce have necessary resources

2   to participate in a range of stakeholder activities.

3        123.   Implementation of the Final Rule and Defendants' new interpretation of the

4   Medicaid Act would disrupt a myriad of reliance interests embodied in existing collective

5   bargaining agreements, all of which assume the availability of direct deductions and contributions

6   as a way to pay for union dues and other voluntary, bargained-for benefits.

7        124.   The Final Rule will allow Medicaid providers who work for homecare agencies—

8   but not providers hired directly by Medicaid beneficiaries via the Independent Provider mode to

9   do identical work—to avail themselves of payroll deductions and contributions for union dues

10   and other voluntary, bargained-for benefits.   This unfairly burdens beneficiaries who prefer to

11   hire providers directly.

12        125.   Finally, any changes to the States' Medicaid personal care services program that

13   reduce the quality or stability of providers create real human costs for the beneficiaries of those

14   programs, as well as undermine their *Olmstead* rights to receive services in the most integrated

15   setting.  Individuals who are aged, blind and disabled and need assistance to perform activities of

16   daily living are better served by consistent and well-trained caregivers.

17        126.   Alternatively, if the States choose to forego federal matching funds for these

18   programs in order to avoid Defendants' Final Rule, that decision would cause other serious harms

19   to the States.  Because federal funds provide more than half of all funding for Medicaid

20   consumer-directed personal care services, loss of these dollars would have devastating budgetary

21   impacts on the States' ability to provide Medicaid services to seniors and persons with

22   disabilities.  The Final Rule would force States into a choice between limiting access to these vital

23   services, harming both Medicaid recipients and workers, or risk foregoing all of the interests that

24   the States have determined are furthered by their authorization of payroll deductions for homecare

25   worker dues and contributions for other benefits.

26      **B.**   **The Final Rule Imposes Unnecessary and Burdensome Costs Upon States**

27        127.   Implementation of the Final Rule would unnecessarily increase the administrative

28   burdens on and costs to State agencies and broader health care delivery systems.

128.     For example, many counties in California offer Medicaid homecare providers the option to enroll in local healthcare coverage through community-based, not-for-profit health plans.  To the extent that the Final Rule purports to prohibit providers from electing to have their premiums paid through their paycheck, health plans will have to establish a significant new administrative structure to bill, account manage enrollment for thousands of individuals on a monthly basis.  And Washington has negotiated with SEIU 775 to contribute to a health benefits trust which provides health care to eligible individual providers who choose to enroll and authorize deduction of health care premiums.  The Final Rule arbitrarily removes a convenience that is enjoyed by the vast majority of Americans with employer-based health insurance.

129.     By increasing the likelihood that providers in many instances could lose health insurance due to failure to pay required monthly contributions, the Rule places the health insurance of providers at risk and undermines the overall financial health and stability of such benefit programs, and of providers themselves.

**C.     The Final Rule Impermissibly Intrudes Upon State Sovereign Interests**

130.     As described above, the Medicaid Act provides no authority for Defendants to impose their new interpretation of the Medicaid Act to prohibit deductions and contributions of voluntary union dues and other benefits.

131.     In addition to harms to the States' personal care services programs, beneficiaries and workers, the Final Rule interferes with the States' exercise of their inherent, traditional police powers, including their ability to regulate employment relationships.

132.     When Congress enacted Section (a)(32) of the Medicaid Act, it did not intend to interfere with state labor laws, let alone make its intent to do so "unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)).

133.     Defendants' change in interpretation of the Medicaid Act further interferes with the States' authority to enact and enforce laws that promote the health and safety of their residents, especially the States' most vulnerable residents.  If States do not accept such conditions for their federal Medicaid programs, or if Defendants withhold funding from States on the basis

31

1   of these requirements, the States could collectively lose $6 billion in critical funds that would

2   otherwise go to healthcare services for State residents.

3         134.    The States will all have to change their state laws and policies in order to comply

4   with Defendants' new interpretation Section (a)(32), and any enforcement thereof.  84 Fed. Reg.

5   at 19723 ("if state law(s) and/or regulation(s) conflict […] the state Medicaid agency will need to

6   take corrective action to comply").  This would involve unnecessary changes to an approach to

7   service delivery that States have found to be an effective tool to deliver needed services to seniors

8   and persons with disabilities through a stable, trained workforce.  It would also compromise

9   States' and localities' abilities to adhere to collective bargaining agreements that provide for

10  direct debits and contributions on behalf of individual providers of union dues and other

11  negotiated benefits.

12        135.    The States should not be faced with the impossible choice of agreeing to an

13  unlawful new requirement for their Medicaid home and community-based services programs, or

14  foregoing Medicaid funds and losing critical public healthcare dollars that could result in the

15  elimination of these optional services from the States' Medicaid programs, all to the detriment of

16  the States' residents.

17                            **FIRST CAUSE OF ACTION**

18        **(Violation of APA; 5 U.S.C. § 706—Not in Accordance With Law)**

19        136.    Paragraphs 1 through 135 are realleged and incorporated herein by reference.

20        137.    Defendants' interpretation of the Medicaid Act, on which the Final Rule is

21  premised, is not in accordance with law.  Section (a)(32) of the Medicaid Act does not prohibit

22  the voluntary deduction of union dues from personal care services provider paychecks.  These

23  type of deductions clearly do not involve payments "under an assignment or power of attorney or

24  otherwise"; automatic deductions and contributions are simply a convenient means for paying

25  voluntary union dues and other customary benefits such as health, dental, and vision insurance.

26        138.    Because Defendants' new Rule is not in accordance with the Medicaid Act, the

27  Rule is invalid**.**

28

**SECOND CAUSE OF ACTION**

**(Violation of APA; 5 U.S.C. § 706-Arbitrary and Capricious)**

139.    Paragraphs 1 through 138 are realleged and incorporated herein by reference.

140.    By promulgating this new Rule, Defendants have acted arbitrarily and capriciously and abused their discretion.  Defendants have relied on factors that Congress did not intend them to consider, failed to consider important aspects of the program the agency is addressing, and have offered no explanation for the new Rule that is consistent with the evidence before the agency.  *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

141.    Moreover, CMS failed to consider serious reliance interests engendered by decades of practice permissible under the governing statute, without any sufficient explanation for its novel interpretation of a 1970s-era prohibition on assignment of provider claims.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (declining to defer to agency provided insufficiently reasoned explanation for "why it deemed it necessary to overrule its previous position").

142.    Because Defendants' new Rule is arbitrary, capricious, and an abuse of discretion, the Rule is invalid.


**THIRD CAUSE OF ACTION**

**(Violation of APA; 5 U.S.C. § 706-Exceeds Statutory Authority)**

143.    Paragraphs 1 through 142 are realleged and incorporated herein by reference.

144.    Article I, Section I of the United States Constitution enumerates that "[a]ll legislative Powers herein granted shall be vested in [the] Congress."

145.    Defendants' Rule is unconstitutional because Defendants overstepped their powers by exercising lawmaking authority that is solely reserved for Congress under Article I, Section I of the U.S. Constitution.

146.    Article I, Section VIII of the United States Constitution vests exclusively in Congress the spending power to "provide for … the General Welfare of the United States."

33

147.    Defendants have exceeded congressional authority by purporting to add substantive new requirements to state Medicaid programs that are not authorized by the Medicaid Act or any other federal law.  The Rule therefore unlawfully exceeds the Executive Branch's powers and intrudes upon the powers of Congress.

148.    For the reasons herein, the Rule is unlawful, unconstitutional, and should be set aside under 28 U.S.C. § 2201.

## PRAYER FOR RELIEF

WHEREFORE, the States respectfully request that this Court:

1.  Issue a declaratory judgment that the Rule, including Defendants' new interpretation of Section (a)(32), is arbitrary and capricious, not in accordance with law, and that Defendants acted in excess of statutory authority in promulgating it;

2.  Issue a declaratory judgment that the Rule, including Defendants' new interpretation of Section (a)(32), is unconstitutional and invalid;

3.  Issue an injunction prohibiting the implementation of the Rule, including Defendants' enforcement of its new interpretation of Section (a)(32);

4.  Postpone the effective date and/or set aside the Rule, including Defendants' new interpretation of Section (a)(32), pursuant to 5 U.S.C. § 705, 706(2);

4.  Award the States' costs, expenses, and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412; and,

5.  Award such other relief as the Court deems just and proper.

1   Dated:  August 22, 2019                         Respectfully Submitted,

2                                                   XAVIER BECERRA
                                                    Attorney General of California
3                                                   KATHLEEN BOERGERS
                                                    Supervising Deputy Attorney General
4                                                   NIMROD P. ELIAS

5                                                    _/s/ Anna Rich_____
                                                    ANNA RICH
6                                                   Deputy Attorneys General
                                                    *Attorneys for Plaintiff the State of California*
7

8                                                   WILLIAM TONG
                                                    Attorney General of Connecticut
9
                                                     _/s/ Margaret Q. Chapple_____
10                                                  MARGARET Q. CHAPPLE (*pro hac vice*)
                                                    Deputy Attorney General
11                                                  55 Elm Street
                                                    Hartford, CT 06106
12                                                  Telephone: (860) 808-5316
                                                    Margaret.chapple@ct.gov
13                                                  *Attorneys for Plaintiff State of Connecticut*

14                                                  KWAME RAOUL
15                                                  Attorney General of Illinois

16                                                  */s/ Elizabeth Morris_____*
                                                    ELIZABETH MORRIS (*pro hac vice*
17                                                  forthcoming)
                                                    Assistant Attorney General
18                                                  100 West Randolph Street, 11th Floor
                                                    Chicago, IL 60601
19                                                  (312) 814-3000
                                                    emorris@atg.state.il.us
20                                                  Attorney for Plaintiff State of Illinois

21

22                                                  MAURA HEALEY
                                                    Attorney General for the Commonwealth of
                                                    Massachusetts
23
                                                     _/s/ Cynthia Mark_____
24                                                  CYNTHIA MARK (*pro hac vice*)
                                                    Chief, Fair Labor Division
25                                                  Massachusetts Office of the Attorney
                                                    General
26                                                  One Ashburton Place
                                                    Boston, MA 02108
27                                                  (617) 963-2626
                                                    Cynthia.Mark@mass.gov
28                                                  *Attorneys for the Commonwealth of*

                                         35

Amended Complaint for Declaratory and Injunctive Relief (Case No. 3:19-cv-02552-VC)

*Massachusetts*

ELLEN F. ROSENBLUM
Attorney General for the State of Oregon

*/s/ J. Nicole DeFever*
J. NICOLE DEFEVER SBN #191525
Senior Assistance Attorney General
Oregon Department of Justice
Tel (971) 673-1880
Fax (971) 673-5000
Nicole.DeFever@doj.state.or.us
*Attorneys for the State of Oregon and*
*Governor Kate Brown*

ROBERT W. FERGUSON
Attorney General of Washington

*/s/ Alicia O. Young*
ALICIA O. YOUNG, WSBA No. 35553
Senior Counsel
J. PAUL DESJARDIEN, WSBA No. 31614
Assistant Attorney General
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470
Alicia.Young@atg.wa.gov
Paul.DesJardien@atg.wa.gov
*Attorneys for Plaintiff State of Washington*
*Pro Hac Vice*

SA2018100401
91144718.docx

36

# CERTIFICATE OF SERVICE

| Case Name: | **State of California by and through Attorney General Xavier Becerra et al v. Azar** | Case No. | **3:19-cv-02552** |
|---|---|---|---|

I hereby certify that on <u>August 22, 2019</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>August 22, 2019</u>, at Oakland, California.

<table>
<tr><td>Kelinda Crenshaw</td><td>/s/ Kelinda Crenshaw</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2018100401
91144719.docx