JOSEPH H. HUNT
Assistant Attorney General
JEAN LIN
Special Counsel, Federal Programs Branch
CAROL FEDERIGHI
Senior Trial Counsel
SOPHIE KAISER
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 307-2092
Fax: (202) 616-8470
Email: sophie.b.kaiser@usdoj.gov

*Attorneys for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No. 3:19-cv-02552-VC |
| *Plaintiffs*, | DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| v. | |
| ALEX M. AZAR II, et al., | Date: February 12, 2020 |
| *Defendants*. | Time: 10:00 a.m. |
| | Courtroom: 4, 17th Floor |
| | Judge: Hon. Vince Chhabria |

## <u>NOTICE OF MOTION AND MOTION</u>

**PLEASE TAKE NOTICE** that on February 12, 2020, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 4 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendants Alex M. Azar II, Secretary of Health and Human Services, and the U.S. Department of Health and Human Services ("HHS") (collectively, the "Defendants"), by and through undersigned counsel, will move to dismiss the claims against them in Plaintiffs' Amended Complaint ("Am. Compl."), ECF No. 78, and in the Complaint-in-Intervention ("Interv. Compl."), ECF No. 73, for the reasons more fully set forth in the accompanying Memorandum of Points and Authorities.

Dated:  September 27, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JEAN LIN
Special Counsel, Federal Programs Branch

/s/ *Sophie Kaiser*
CAROL FEDERIGHI
Senior Trial Counsel
SOPHIE KAISER
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Washington, DC 20005
Phone: (202) 307-2092
Fax: (202) 616-8470
Email: sophie.b.kaiser@usdoj.gov

*Attorneys for Defendants*

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ............................................................ 2

ARGUMENT ..................................................................................................................... 3

I.    Standards of Review ................................................................................................. 3

II.   Plaintiffs Lack Standing ........................................................................................... 6

   A.   The States Lack Standing ..................................................................................... 6

     1.   The States fail to allege an injury to their own interests and cannot pursue this litigation on behalf of the purported interests of their citizens ...................................... 6

     2.   The States' allegations of injury are too speculative and conclusory. ........................... 9

     3.   The States' alleged injuries are not fairly traceable to the challenged action. .............. 11

   B.   The Intervenors Lack Standing ............................................................................ 12

     1.   The Intervenors' allegations of injury are too speculative and conclusory. ................. 12

     2.   The Unions are not within the zone of interests protected by the Medicaid Act .......... 13

III.  Plaintiffs Fail to State an APA Claim Against Defendants Because HHS's Interpretation Is Supported By the Plain Language, Structure, Context, and Legislative History of the Statute. ................................................................................................................ 14

   A.   The Plain Text of the Statute Supports HHS's Interpretation. .......................................... 15

   B.   The Legislative History Supports HHS's Interpretation. ................................................. 20

   C.   HHS Did Not Exceed its Authority in Providing a Different Interpretation of 42 U.S.C. § 1396a(a)(32) than Its Prior Regulation ....................................................... 25

IV.   Intervenors Fail to State an Equal Protection Claim ............................................... 25

IV.   Intervenors Fail to State a First Amendment Claim. ............................................... 28

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO,*
 498 U.S. 517 (1991) .................................................................................................... 14

*Alaska v. U.S. Dep't of Transp.,*
 868 F.2d 441 (D.C. Cir. 1989) .............................................................................. 6, 7

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
 458 U.S. 592 (1982) ............................................................................................... 6, 8

*Amgen, Inc. v. Scully,*
 234 F. Supp. 2d 9 (D.D.C. 2002) ...................................................................... 13, 14

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ............................................................................................ 25, 26

*Ass'n of Data Processing Serv. Orgs. v. Camp,*
 397 U.S. 150 (1970) .................................................................................................. 13

*Barr v. United States,*
 324 U.S. 83 (1945) .............................................................................................. 19, 20

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007) ............................................................................................. 5, 25

*Bldg. & Const. Trades Council v. Assoc. Builders & Contractors,*
 507 U.S. 218 (1993) .................................................................................................... 7

*Boy Scouts of America v. Dale,*
 530 U.S. 640 (2000) .................................................................................................. 29

*Cal. Advocates for Nursing Home Reform, Inc. v. Chapman,*
 No. 12-6408, 2013 WL 5946940 (N.D. Cal. Nov. 5, 2013), *amended on other grounds by*
 2014 WL 2450949 (N.D. Cal. June 2, 2014). ........................................................ 12

*California v. United States,*
 No. C 05-00328, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) ................................. 7

*Carroll v. DeBuono,*
 998 F. Supp. 190 (N.D.N.Y. 1998) ........................................................................ 28

*Cedars–Sinai Medical Ctr. v. Nat'l League of Postmasters of U.S.*,
  497 F.3d 972 (9th Cir. 2007) ............................................................... 5

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ........................................................... 5, 6, 14, 15

*City & Cty. of San Francisco v. U.S. Postal Serv.*,
  546 F. App'x 697 (9th Cir. 2013) ...................................................... 27

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ...................................................................... 26, 27

*City of Dallas v. Stanglin*,
  490 U.S. 19 (1989) .............................................................................. 27

*City of Los Angeles v. Cty. of Kern*,
  581 F.3d 841 (9th Cir. 2009) ............................................................ 13

*City of Toledo v. Beazer Materials & Servs., Inc.*,
  912 F. Supp. 1051 (N.D. Ohio 1995) ................................................ 17

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................... 9, 10, 11

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ........................................................................... 15

*Ctr. for Competitive Politics v. Harris*,
  784 F.3d 1307 (9th Cir. 2015) .......................................................... 28

*Danvers Pathology Assocs., Inc. v. Atkins*,
  757 F.2d 427 (1st Cir. 1985) ....................................................... 16, 24

*Davis v. Mich. Dep't of Treasury*,
  489 U.S. 803 (1989) ........................................................................... 20

*DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*,
  384 F.3d 338 (7th Cir. 2004) ............................................ 15, 16, 21, 22

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
  485 U.S. 568 (1988) ........................................................................... 18

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005) ................................................................................. 21

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ................................................................................. 25

*FCC v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993) ................................................................................. 27

*Fla. Gulf Coast Bldg. & Const. Trades Council v. N.L.R.B.*,
   796 F.2d 1328 (11th Cir. 1986) ............................................................. 18

*FW/PBS, Inc. v. Dallas*,
   493 U.S. 215 (1990) ................................................................................... 4

*Garcia v. United States*,
   469 U.S. 70 (1984) ................................................................................. 20

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) ................................................................................... 7

*Gooch v. United States*,
   297 U.S. 124 (1936) ............................................................................... 17

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
   530 U.S. 1 (2000) ................................................................................... 16

*Havasupai Tribe v. Provencio*,
   906 F.3d 1155 (9th Cir. 2018) ............................................................... 13

*Hawaii v. Trump*,
   859 F.3d 741 (9th Cir. 2017) ................................................................... 7

*Hearn v. W. Conference of Teamsters Pension Tr. Fund*,
   68 F.3d 301 (9th Cir. 1995) ............................................................. 20, 21

*Helvering v. Stockholms Enskilda Bank*,
   293 U.S. 84 (1934) ........................................................................... 17, 19

*Hodges v. Abraham*,
   300 F.3d 432 (4th Cir. 2002) ................................................................... 8

*Illinois Dep't of Transp. v. Hinson*,
   122 F.3d 370 (7th Cir. 1997) ................................................................... 8

*In re Riefberg*,
58 N.Y. 2d 134 (1983) ................................................................................................ 17

*Johnson v. Rancho Santiago Cmty. Coll. Dist.*,
623 F. 3d 1011 (9th Cir. 2010) ...................................................................... 26, 27, 28

*Kahawaiolaa v. Norton*,
386 F.3d 1271 (9th Cir. 2004) .............................................................................. 26, 28

*Lamie v. U.S. Trustee*,
540 U.S. 526 (2004).......................................................................................................... 15

*Lewis v. Hegstrom*,
767 F.2d 1371 (9th Cir. 1985) .............................................................................. 18, 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)................................................................................................ 13, 14

*Louisiana ex rel. Guste v. Verity*,
853 F.2d 322 (5th Cir. 1988) ...................................................................................... 26

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).......................................................................................... *passim*

*Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*,
485 U.S. 360 (1988)........................................................................................................ 29

*Magwood v. Patterson*,
561 U.S. 320 (2010)........................................................................................................ 19

*Marshall Cty. Health Care Auth. v. Shalala*,
988 F.2d 1221 (D.C. Cir. 1993) .................................................................................... 5

*Massachusetts v. Mellon*,
262 U.S. 447 (1923)........................................................................................................... 8

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) ...................................................................................... 4

*Moran v. Screening Pros, LLC*,
923 F.3d 1208 (9th Cir. 2019) .................................................................................... 15

*N. Cal. River Watch v. Wilcox*,
  633 F.3d 766 (9th Cir. 2011) ...................................................................... 5

*NAACP v. Alabama ex. Rel. Patterson*,
  357 U.S. 449 (1958) ................................................................................. 29

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,
  Inc.*, 545 U.S. 967 (2005) ......................................................................... 25

*Navarro v. Block*,
  250 F.3d 729 (9th Cir. 2001) ...................................................................... 5

*New York v. U.S. Dep't of Labor*,
  363 F. Supp. 3d 109 (D.D.C. 2019) ............................................................ 7

*Nordlinger v. Hahn*,
  505 U.S. 1 (1992) ..................................................................................... 27

*Norfolk & Western R. Co. v. Train Dispatchers*,
  499 U.S. 117 (1991) ................................................................................. 17

*Oregon v. Ashcroft*,
  192 F. Supp. 2d 1077 (D. Or. 2002) ............................................................ 6

*Pile Drivers Local Union No. 2375 v. Lujan*,
  No. 88-5905, 1989 WL 30254 (9th Cir. Mar. 23, 1989) ............................... 14

*Prof'l Factoring Serv. Ass'n v. Mathews*,
  422 F. Supp. 250 (S.D.N.Y. 1976) ............................................... 21, 22, 23

*Regan v. Taxation With Representation of Wash.*,
  461 U.S. 540 (1983) ................................................................................. 29

*Rel. Patterson*,
  357 U.S. 449 (1958) ................................................................................. 29

*Renne v. Geary*,
  501 U.S. 312 (1991) ................................................................................... 3

*Resident Councils of Wash. v. Leavitt*,
  500 F.3d 1025 (9th Cir. 2007) .................................................................... 5

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ................................................................................. 29

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997) .............................................................................. 15, 18

*S.D Myers, Inc. v. City & Cty. of San Francisco*,
  253 F.3d 461 (9th Cir. 2001) ........................................................................ 28

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ........................................................................ 4

*Sierra Forest Legacy v. Sherman*,
  646 F.3d 1161 (9th Cir. 2011) ........................................................................ 8

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ...................................................................................... 11

*Small v. United States*,
  544 U.S. 385 (2005) ................................................................................ 16, 17

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ...................................................................................... 8

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) .................................................................................. 9

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ...................................................................................... 9

*Syed v. M-I, LLC*,
  853 F.3d 492  (9th Cir. 2017) ....................................................................... 18

*Toor v. Lynch*,
  789 F.3d 1055 (9th Cir. 2015) ....................................................................... 19

*Trump v. Hawaii*,
  138 S. Ct. 377 (2017) .................................................................................... 7

*U.S. ex rel. Lujan v. Hughes Aircraft Co.*,
  243 F.3d 1181 (9th Cir. 2001) ........................................................................ 4

*United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*,
  837 F.3d 1055 (9th Cir. 2016) .................................................................. 20, 21

*United States v. Chhun*,
    744 F.3d 1110 (9th Cir. 2014) ............................................................ 19, 20, 23, 24

*United States v. Culbert*,
    435 U.S. 371 (1978) .......................................................................... 16

*United States v. Johnson*,
    529 U.S. 53 (2000) ............................................................................ 19

*United States v. Monsanto*,
    491 U.S. 600 (1989) .......................................................................... 16

*United States v. Salerno*,
    481 U.S. 739 (1987) .......................................................................... 28

*United States ex rel. Forcier v. Computer Scis. Corp.*,
    No. 12-cv-1750, 2017 WL 3616665 (S.D.N.Y. Aug. 10, 2017) .............................. 20

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) .......................................................................... 18

*Valentine v. Mobil Oil Corp.*,
    789 F.2d 1388 (9th Cir. 1986) ............................................................. 6, 20

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ........................................................................... 4

*Virginia ex rel. Cuccinelli v. Sebelius*,
    656 F.3d 253 (4th Cir. 2011) ................................................................. 7

*Warren v. Fox Family Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003) ............................................................... 5

*Warth v. Seldin*,
    422 U.S. 490 (1975) ....................................................................... 4, 11

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ........................................................................... 9

*Wyoming ex rel. Sullivan v. Lujan*,
    969 F.2d 877 (10th Cir. 1992) ............................................................... 8

**Statutes**

5 U.S.C. § 706(2)(A) .................................................................................................... 5

42 U.S.C. § 1396-1 ................................................................................................... 2,14

42 U.S.C. § 1396a(a)(32) ...................................................................................... *passim*

42 U.S.C. § 1396a(b) .................................................................................................. 3

Pub. L. No. 92-603, 86 Stat. 1329 (1972) ................................................................ 22

Pub. L. No. 95-142, 91 Stat. 1175 (1977) ................................................................ 22

Pub. L. No. 101-508, 104 Stat. 1388 (1990) ............................................................ 19

Pub. L. No. 103-66, 107 Stat. 312 (1993) ................................................................ 19

**Federal Rules**

Federal Rule of Civil Procedure 12(b)(1) .................................................................. 3

Federal Rule of Civil Procedure 12(b)(6) .................................................................. 5

**Federal Regulations**

42 C.F.R. § 430.10 ...................................................................................................... 2

42 C.F.R. § 447.10 .................................................................................................... 20

42 C.F.R. § 447.10(g)(4) ............................................................................................. 3

42 C.F.R. § 447.10(h) ............................................................................................... 23

Medicaid Program Proposed Rule, 77 Fed. Reg. 26 (May 3, 2012) ........................... 18

Medicaid Program Final Rule, 79 Fed. Reg. 2948 (Jan. 16, 2014) ....................... 3, 18

Medicaid Program Proposed Rule, 83 Fed. Reg. 32,252 (July. 12, 2018) .................... 3

Medicaid Program Final Rule, 84 Fed. Reg. 19,718 (May 6, 2018) .................... *passim*

**Other**

2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 47:11 (7th ed. 2007) .......... 21

1972 U.S.C.C.A.N. 4989 ................................................................................ 21

1977 U.S.C.C.A.N. 3039 ................................................................................ 21

Black's Law Dictionary 475 (11th ed. 2019).............................................. 16

Merriam-Webster's Collegiate Dictionary 822 (10th ed. 2001).................. 17

# INTRODUCTION

Plaintiffs States of California, Connecticut, Illinois, Oregon and its Governor Kate Brown, Massachusetts, and Washington ("States") challenge HHS's interpretation of the anti-reassignment provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(32), which prohibits Medicaid payments to third parties absent an express statutory exception. They seek judicial review of the Medicaid Program Final Rule ("2019 Final Rule"), 84 Fed. Reg. 19,718 (May 6, 2018), effective July 5, 2019, that rescinded a portion of an HHS regulation that incorrectly interpreted § 1396a(a)(32) to authorize states to redirect portions of individual providers' Medicaid payments to third parties on behalf of those individual providers for benefits such as health insurance, skills training, and other benefits customary for employees. The States ask this Court to declare that the 2019 Final Rule is contrary to statute in violation of the Administrative Procedure Act ("APA"); to enjoin the implementation of the Rule; and to set aside the Rule.

Plaintiff-Intervenors ("Intervenors") are two unions, the Service Employees International Union Local 503 and the United Domestic Workers, AFSCME Local 3930 (the "Unions"), and nine individuals who provide home health care in various states (the "Individuals"). Intervenors similarly challenge HHS's interpretation of the anti-reassignment provision of the Medicaid Act and seek judicial review of the 2019 Final Rule. They assert that the 2019 Final Rule violates the APA, targets a politically disfavored group without a legitimate purpose, in violation of the Equal Protection Clause of the Fifth Amendment, and infringes on Intervenors' and Union members' First Amendment rights to freedom of speech and free association. They seek relief similar to that sought by the States.

Both complaints should be dismissed. As explained below, the States and Intervenors (collectively "Plaintiffs") have failed to establish Article III standing necessary to invoke this Court's jurisdiction because their claimed injuries from the 2019 Final Rule are too speculative and insufficiently concrete, and in any event would not be fairly traceable to the challenged decision, but would be attributable to the independent actions of third parties. In addition, the

States fail to assert a cognizable interest to their sovereign, quasi-sovereign, or proprietary interests, and the Unions are not within the zone-of-interests of the Medicaid statute.  Even if Plaintiffs have standing to sue, they fail to state any claims upon which relief can be granted.  The Medicaid Act's anti-reassignment provision is clear that payments to third parties are prohibited absent an express statutory exception and therefore forecloses the interpretation advanced by Plaintiffs.   Given the statute's unambiguous language, the Court should uphold HHS's interpretation in the 2019 Rule.  Even if the Court were inclined to look beyond the actual language of the statute, the specific context in which the language is used, the broader context of the statute as a whole, and the statute's legislative history support HHS's interpretation.  Moreover, HHS provided a reasoned explanation for rescinding the prior regulation: it was in conflict with the express language of the statute.

Because HHS's interpretation is neither contrary to statute nor in excess of statutory authority, it does not violate the APA, and this Court should accordingly dismiss the States' and Intervenors' APA claims.  The Court should also dismiss Intervenors' Equal Protection and First Amendment claims.  They fail to state such claims because they make blanket assertions of entitlement to relief without the required factual enhancement.  In addition, their Equal Protection claim fails because the 2019 Final Rule does not implicate a fundamental right or discriminate against a suspect class, does not draw distinctions between classes of people, and survives rational basis review.  The Rule also does not plausibly implicate Intervenors' First Amendment rights to free speech and free association.

## STATUTORY AND REGULATORY BACKGROUND

Medicaid is a system of cooperative federalism through which the federal government helps fund approved state programs that provide medical assistance to individuals "whose income and resources are insufficient to meet the costs of necessary medical services."  42 U.S.C. § 1396-1; *see id.* §§ 1396 *et seq.*  To obtain federal funding, a state must submit its "plan for medical assistance" for review and approval by the Secretary of HHS.  *Id.* § 1396a(a); *see also* 42

C.F.R. § 430.10.  The Secretary "shall approve" any plan that satisfies the statutory criteria.  42 U.S.C. § 1396a(b).  The Secretary may also disallow funding for state programs that the Secretary finds not to comply with myriad statutory requirements.  *Id.* § 1396c.

One such requirement is that a state plan must "provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise," subject to certain specified exceptions.[1]  *Id.* § 1396a(a)(32).  This is often called the "direct payment rule" or the "anti-reassignment provision."  Despite this prohibition, in 2014, HHS promulgated a regulation that allowed state programs to "claim as a provider payment amounts that are not directly paid to the provider, but are withheld and [paid] on behalf of the provider, [such as] for health and welfare benefit contributions, training costs, and other benefits customary for employees."  Medicaid Program Final Rule ("2014 Final Rule"), 79 Fed. Reg. 2948, 2949 (Jan. 16, 2014) (codified at 42 C.F.R. § 447.10(g)(4)); *see id.* at 3001.

Upon revisiting the 2014 Final Rule, however, HHS determined that 42 C.F.R. § 447.10(g)(4) is not authorized by the statutory provision because it does not fit within one of the exceptions identified by the statute.  *See* 2019 Final Rule, 84 Fed. Reg. at 19,719, 19,725; *see also* Medicaid Program Proposed Rule ("2018 Proposed Rule"), 83 Fed. Reg. 32,252, 32,253 (July 12, 2018).  After going through notice-and-comment rulemaking, HHS rescinded the 2014 Final Rule, with an effective date of July 5, 2019.  2019 Final Rule, 84 Fed. Reg. at 19,718.

## ARGUMENT

### I.   Standards of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests the subject matter jurisdiction of the court.  Courts should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record."  *Renne v. Geary*, 501 U.S. 312, 316 (1991) (internal quotation marks and citations omitted).  "A Rule 12(b)(1) jurisdictional attack may be facial or

---

[1] The full text of 42 U.S.C. § 1396a(a)(32) is set out in the Appendix.

factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Id*.  When considering such a facial attack, the Court "must accept as true the allegations of the complaint."  *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001).

The doctrine of constitutional standing, an essential aspect of the Article III case-or-controversy requirement, demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "'fairly traceable to the challenged action of the defendant'"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted).  Where a plaintiff does not establish each of the elements of standing, a court must dismiss that claim for lack of subject matter jurisdiction.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475-76 (1982).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing the required elements of standing "with the manner and degree of evidence required at the successive stages of the litigation."  *Defs. of Wildlife*, 504 U.S. at 561.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice."  *Id*.  But "[t]his is not to say that plaintiff may rely on a bare legal conclusion to assert injury-in-fact, or engage in an 'ingenious academic exercise in the conceivable' to explain how defendants' actions caused his injury."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011); *see also FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) ("[I]t is the burden of the 'party who seeks the exercise of

jurisdiction in his favor,' … 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'") (citation omitted).

A motion to dismiss pursuant to Federal Rule 12(b)(6) tests the legal sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When reviewing such a motion, the Court accepts all allegations of material fact in the complaint as true and construes them in the light most favorable to the non-moving party. *Cedars–Sinai Medical Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). But the Court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint," and does "not … necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

Under the APA, a reviewing court may set aside an agency's action only if it is beyond the agency's statutory authority or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Because the entire case on review under the APA is a question of law, "there is no inherent barrier to reaching," under a Rule 12(b)(6) motion to dismiss, the merits of a plaintiff's claim that the agency acted contrary to law. *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). Statutory interpretation challenges in the APA review context are decided under the familiar framework set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). First, a court must evaluate whether congressional intent regarding the meaning of the text in question is clear from the statute's plain language. *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 772 (9th Cir. 2011). In making this determination, courts "engage in a textual analysis of the relevant statutory provisions … read[ing] the words of the statutes in their context and with a view to their place in the overall statutory scheme." *Resident Councils of Wash. v. Leavitt*, 500 F.3d 1025, 1031 (9th

Cir. 2007) (citation omitted).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842-43.  Only if the statute's language cannot "be construed in a consistent and workable fashion" should a court turn to extrinsic evidence such as legislative history.  *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1391 (9th Cir. 1986).

## II.    Plaintiffs Lack Standing.

### A.  The States Lack Standing

The States lack standing because they fail to allege an injury to their own interests and cannot pursue this litigation on behalf of the purported interests of their citizens.  In any event, the States' allegations of injury to their home health care industry from the 2019 Final Rule are too speculative and conclusory to satisfy the requirement that they present a concrete injury-in-fact. The States also fail the causation prong of the standing inquiry because they have not established that their alleged injuries can be fairly traced to the 2019 Final Rule, rather than to the independent actions of third parties, such as the individual providers and the unions.  For these reasons, the States' Amended Complaint should be dismissed.

### 1.    The States fail to allege an injury to their own interests and cannot pursue this litigation on behalf of the purported interests of their citizens

To establish Article III standing, the States must allege that they have suffered an injury-in-fact to their own interests.  Here, the States assert that they will suffer an injury to their "sovereign, quasi-sovereign, [or] proprietary contract interests."  Am. Compl. ¶ 19.  However, none of these claims gives them standing to proceed here.

First, the States assert no cognizable injury to their sovereign interests.  The Supreme Court has recognized that a state's sovereign interest includes the power to create and enforce its own statutes and an interest in the maintenance or recognition of its borders.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *see also Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989); *Oregon v. Ashcroft*, 192 F. Supp. 2d 1077, 1087 (D.

Or. 2002), *aff'd on other grounds*, 368 F.3d 1118 (9th Cir. 2004), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S. 243 (2006).  The States here have alleged no injuries to such sovereign interests.  *Cf. Alaska*, 868 F.2d at 443 (states alleged that the federal government "claims that its rules preempt state consumer protection statutes").  Rather, they allege only generally that the 2019 Final Rule "interferes with" their "authority to enact and enforce laws that promote the health and safety of their residents," Am. Compl. ¶ 133, and with the "exercise of their inherent, traditional police powers, including their ability to regulate employment relationships." *Id.* ¶ 131.  They thus speak only of generalized "interference" but do not identify specific laws that are in conflict with the 2019 Final Rule or allege that the Rule precludes specific state enforcement actions.  And their reference to their employment relationships goes to their proprietary interest, not their sovereign interest.  *See Bldg. & Const. Trades Council v. Assoc. Builders & Contractors*, 507 U.S. 218, 229 (1993) (distinguishing situations where the state acts more as a regulator from those where it acts more as a private purchaser of services).  The States' generalized allegations here are therefore insufficient to establish a cognizable injury to their sovereign interests.  *See Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) ("[O]nly when a federal law interferes with a state's exercise of its sovereign 'power to create *and enforce* a legal code' does it inflict on the state the requisite injury-in-fact."  (emphasis in original)); *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 123 (D.D.C. 2019) (finding that "the possibility of future preemption is too speculative—and the concern about a possibility of preemption of unidentified non-insurance laws is too nebulous—to constitute an injury-in-fact"); *California v. United States*, No. C 05-00328, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008) (finding no standing where it is "not evident that federal and state law conflicts").  *But see Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017) (in brief alternative holding, finding Executive Order reducing numbers of refugees admitted would sufficiently injure the State's sovereign interest in carrying out its refugee policies), *vacated on other grounds by Trump v. Hawaii*, 138 S. Ct. 377 (2017).

The States also cannot establish standing based on an alleged quasi-sovereign interest in the well-being of their citizens, including Medicaid beneficiaries and home care providers. *See* Am. Compl. ¶¶ 18, 119, 125, 131. The States' interest in their citizens' health and welfare can in some circumstances support State standing as *parens patriae* in a suit against another state or a private entity. *See Snapp*, 458 U.S. at 607. However, such a theory is not available to the States in a suit against the federal government. Under principles of federalism, because a state's citizens are also citizens of the United States, the state cannot enforce their "rights in respect of their relations with the federal government." *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923). As the Supreme Court explained, "it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government. In that field it is the United States, and not the State, which represents them as *parens patriae*." *Id.* at 485–86. The Supreme Court has consistently upheld this principle since *Mellon*, *see Snapp*, 458 U.S. at 610 n.16 ("A State does not have standing as *parens patriae* to bring an action against the Federal Government."); *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (State lacked standing as *parens patriae* to invoke the Due Process Clause or the Bill of Attainder Clause against the federal government to challenge federal law), as has the Ninth Circuit. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) ("California, like all states, does not have standing as *parens patriae* to bring an action against the Federal Government."); *see also Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370, 373 (7th Cir. 1997) (reaffirming the "special rule that a state may not bring a *parens patriae* suit against the federal government"); *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992) (same, quoting *Snapp*, 458 U.S. at 607-08); *Hodges v. Abraham*, 300 F.3d 432, 444 (4th Cir. 2002) ("The Supreme Court has clearly established that a *parens patriae* action cannot be maintained against the Federal Government.").

Finally, the States have not alleged a distinct injury to their alleged proprietary interests in the collective bargaining agreements they have negotiated with the unions. They assert only that implementation of the 2019 Final Rule will "*compromise* States' and localities' abilities to adhere

to collective bargaining agreements." Am. Compl. ¶ 134.  However, the States do not specifically allege that the Rule will require them to violate the terms of the collective-bargaining contracts. In fact, they admit that direct deductions of union dues are not required by the collective bargaining agreements but are merely "authorized" by the agreements and are dependent on the employee's consent.  *Id.* ¶ 38.  The removal of one optional payment mechanism does not, therefore, require the States to break the contracts and therefore does not injure their proprietary interest.

### 2.  The States' allegations of injury are too speculative and conclusory

The States' alleged injuries in any event are too speculative.  The standing requirement of "injury in fact" requires an allegation that the plaintiff "has sustained or is immediately in danger of sustaining a direct injury" as a result of the challenged action.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted).  The injury or threat of injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560).  An alleged future injury must be "certainly impending"; "'[a]llegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

The States' claimed injuries of future adverse impacts on the home health care industry in their States are too speculative and conclusory to satisfy the above standard.  The States claim that the removal of the ability to make deductions for home health care workers "would undermine laws and agreements [including collective bargaining agreements] that have improved the provision of homecare to the States' residents," Am. Compl. ¶ 6, and predict a host of possible cascading effects that would eventually dismantle the home health care industry in the respective states, increasing costs to both the state and federal governments.  *See id.* ¶¶ 67, 119-125.

But the States have not sufficiently alleged a connection between the inability to make deductions for health insurance, union dues, and other purposes with the collapse of a viable

workforce in the home health care industry in their state.  Washington's choice of language in the Amended Complaint is telling.  Washington alleges that the feared harm "could" occur, not that it will occur imminently.  Am. Compl. ¶ 67.  Such conjecture about what "could" happen at some indeterminate time in the future is insufficient to establish an injury-in-fact.  Washington, and the other states as well, are postulating a contingent chain of events that in effect relies on assumptions about "the unfettered choices made by independent actors not before the court," *Clapper*, 568 U.S. at 415 n.5 (quoting *Defs. of Wildlife*, 504 U.S. at 562), specifically, the unions and the individual providers.  But one cannot reliably predict what these independent actors will do if the deductions are eliminated.   Indeed, during the rulemaking for the 2019 Final Rule, commenters did not "explain how or why" the alleged harms are likely to occur.  *See* 2019 Final Rule, 84 Fed. Reg. at 19,721.  It may be that the deductions were helpful in the 1990s and 2000s to foster development of a viable home health care workforce.   *See* Am. Compl. ¶¶ 45-46 (describing California's experience).  But that does not mean that elimination of those deductions now will result in the collapse of the homecare workforce.  Finally, because the State's asserted harm is so speculative, the States do not even quantify the alleged increased cost to their state budgets.  In sum, the States' alleged injuries are dependent on a "highly attenuated chain of possibilities," *Clapper*, 568 U.S at 410, and are insufficient to establish their standing.

The States also allege that the changes made necessary by the 2019 Final Rule will create new administrative burdens.  Am. Compl. ¶ 127.  But their own allegations establish that these burdens (if they exist) will fall on health plans, unions, and the individual providers, rather than on the States.  For example, the States allege that "*health plans* will have to establish a significant new administrative structure to … manage enrollment for thousands of individuals on a monthly basis," and that this will "undermine[] the overall financial health and stability of such *benefits programs and of providers* themselves."  *Id.* ¶¶ 128-129.  Nor can the States establish standing by relying on the "devastating harm to state healthcare budgets," *id.* ¶ 6, that would occur "if the States choose to forego federal matching funds for these programs in order to avoid Defendants'

Final Rule." *Id.* ¶126; *see also id. ¶* 135.  Such harm would be self-inflicted and plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

### 3.   The States' alleged injuries are not fairly traceable to the challenged action

The second prong of the standing inquiry requires a plaintiff to allege a sufficient causal connection between the injury and the challenged conduct, such that the injury is "fairly trace[able] to the challenged action of the defendant." *Defs. of Wildlife*, 504 U.S. at 560 (internal alterations and citation omitted).  In general, courts are reluctant to find standing where the alleged future injury depends on the actions of an independent third party. *Clapper*, 568 U.S. at 414.  "[A] federal court [must] act only to redress injury that fairly can be traced to the challenged [conduct] of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org*., 426 U.S. 26, 41-42 (1976); *see also Warth v. Seldin*, 422 U.S. at 506 (finding standing lacking where alleged injury resulted from outside forces, "rather than … respondents' assertedly illegal acts").

Even if the States' allegations of injury here were not speculative, their claimed injuries rely upon assumptions about the independent acts of individual providers and unions who are beyond the control of this Court (the Complaint-in-Intervention brings in only a few individual providers and two unions).  Specifically, the States do not claim that their threatened injuries— impairment of their Medicaid home health care program—will result *directly* from the Secretary's decision to disallow deductions from Medicaid payments.  In fact, they admit that, under the Final Rule, individual providers can continue to make payments to unions and health insurers "by check or cash."  Am. Compl. ¶ 120.  Rather, they speculate about the indirect effect of the Final Rule on the aggregate behavior of unions and individual providers, and then further hypothesize about the downstream effects on the home health care program.  To create the eventual injury they claim, the States assume that individual providers will be unable to reliably make monthly payments for union dues, health insurance, and other benefits.  They then assume that providers who are not

able to make such payments will drop out of the home health care system, and that the unions will struggle to adequately advocate on behalf of the providers.  But it is a huge leap from such already contingent effects to a conclusion that the home health care industry will suffer.  In sum, the States simply have not provided enough links to establish that the 2019 Final Rule will result in substandard care or any other concrete injury.  *See Cal. Advocates for Nursing Home Reform, Inc. v. Chapman*, No. 12-6408, 2013 WL 5946940, at *8 (N.D. Cal. Nov. 5, 2013) (holding that "conclusory, *ipse dixit* allegation does not establish the required 'causal chain,' because it does not state how the alleged substandard care *results* from the adoption of management agreements") (emphasis in original), *amended on other grounds by* 2014 WL 2450949 (N.D. Cal. June 2, 2014).

Accordingly, the States fail to satisfy this prong of the standing inquiry as well.

### B.  The Intervenors Lack Standing

#### 1.  The Intervenors' allegations of injury are too speculative and conclusory

The Intervenors' allegations of injury suffer from the same problems that infect the States' allegations—their allegations of injury are too speculative.  The Intervenors generally allege that the elimination of the deductions will make it difficult for individual providers to pay their union dues and health insurance premiums and that the unions will lose money and bargaining power as a result.  *See* Interv. Compl. ¶¶ 5, 14-22, 92-96.  They further allege that alternative payment systems "even if available, will be far less reliable, add unnecessary costs, and greatly increase the risk that providers will miss one or more payments and therefore lose their benefits."  *Id.* ¶ 94.

But as with the States, the Intervenors' alleged injuries are based on speculation about a chain of contingent events, which may or may not occur.  Indeed, as the first step in the chain, the Individuals do not allege that they will be unable to make their payments, only citing an unquantified "significant burden" in doing so.  Interv. Compl. ¶¶ 14-22.  Thus, even the first link in the chain is uncertain.  To fill in this gap, Intervenors cite the example of the Commonwealth of Virginia as evidence that union dues payments will fall off under an alternative system.  *Id.* ¶ 93.  However, they do not describe the system developed by Virginia nor indicate whether

improvements or other alternatives are possible.  These vague fears about the future based on limited information about the experience in another state are insufficient to establish a concrete injury in fact.

In addition, Intervenors have not established the necessary causation or redressability. Intervenors are not themselves regulated by the government action they seek to challenge; rather, the 2019 Rule applies only to the States.  When, as here, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,*" "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defs. of Wildlife*, 504 U.S. at 561-62.  "[I]t becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* at 562.  Here, Intervenors have not alleged how they will be injured by HHS's elimination of the ability of States to make deductions, nor will a reversal of the 2019 Final Rule necessarily redress their injuries, as the States will still be free afterwards to eschew the deductions.

### 2.   The Unions are not within the zone of interests protected by the Medicaid Act

In addition to satisfying the Article III standing requirements discussed above, a plaintiff must also be within a statute's zone-of-interests in order to state a claim.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 127 (2014).  The Supreme Court has held that the APA permits a party to challenge agency action only if "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute … in question." *Ass'n of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153 (1970) (interpreting 5 U.S.C. § 702); *accord Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018); *see also City of Los Angeles v. Cty. of Kern*, 581 F.3d 841, 848 (9th Cir. 2009) ("the zone of interests test turns on the interest sought to be protected, not the harm suffered by the plaintiff"). That is, a court "must determine whether the plaintiff … was intended to be protected, benefitted or regulated by the relevant statutory provision," *Amgen, Inc. v. Scully*, 234 F. Supp. 2d 9, 18 (D.D.C. 2002), here, the anti-assignment provision.  Although the zone-of-interests test is not

meant to be demanding, a court must find that a plaintiff lacks a cause of action if his interest is related only marginally to the statute. *Lexmark*, 572 U.S. at 130.

The Unions fail this zone-of-interests test. Health care workers' unions were not "intended to be protected, benefitted or regulated by," *Amgen, Inc.*, 234 F. Supp. 2d at 18, the anti-assignment provision of the Medicaid Act, or by any part of the Act. Medicaid is a program through which the federal government helps fund approved state programs that provide medical assistance to needy individuals. 42 U.S.C. § 1396-1. Thus, those intended to be protected, benefitted or regulated by the Act would arguably include needy individuals, medical providers, and the States—but not the unions. *See Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 530 (1991) (holding that the unions fell outside the zone of interests to challenge a Postal Service regulation even though the challenged regulation would have the inevitable effect of eliminating postal jobs); *Pile Drivers Local Union No. 2375 v. Lujan*, No. 88-5905, 1989 WL 30254, at *1 (9th Cir. Mar. 23, 1989) (holding that "[t]he union's interest in local employment opportunities has no connection to either the economic or environmental purposes of the [Outer Continental Shelf Lands] Act"). The Unions therefore lack standing to sue on their own behalf for this reason as well.

## III. Plaintiffs Fail to State an APA Claim Against Defendants Because HHS's Interpretation Is Supported By the Plain Language, Structure, Context, and Legislative History of the Statute

Even if the Court finds that the Plaintiffs have standing (which it should not), the Court should dismiss the Plaintiffs' APA claims against Defendants because Plaintiffs have failed to state a viable claim. Their claims boil down to a challenge to HHS's interpretation of the anti-reassignment provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(32), as set forth in and implemented by the 2019 Final Rule. This interpretation should be upheld under step one of *Chevron* because "Congress has directly spoken to the precise question," 467 U.S. at 842-43, of whether the Medicaid Act allows state plans to make direct "payment[s]" to third parties, and specified that Medicaid payments may be made *only* to the individual receiving such care or the

provider of such care or service.  42 U.S.C. § 1396a(a)(32). The plain meaning of the language, the context in which that language is used, and "the broader context of the statute as a whole" support the agency's statutory interpretation.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Because "the intent of Congress is clear," the Court's inquiry is at an end.  *Chevron*, 467 U.S. at 842-43.

### A.  The Plain Text of the Statute Supports HHS's Interpretation

Any statutory analysis must begin with the text of the statute, which is the best and most reliable expression of Congress's intent.  *See Moran v. Screening Pros, LLC*, 923 F.3d 1208, 1215-16 (9th Cir. 2019).  "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). "[W]hen the statute's language is plain, the sole function of the court[]—at least where the disposition required by the text is not absurd—is to enforce it according to its terms," even if that court believes "some other approach might accord with good policy."  *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (citations omitted).

The anti-reassignment provision requires State Medicaid plans to "provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise."  42 U.S.C. § 1396a(a)(32).  Congress specified only four exceptions to the provision's broad prohibition.  Appendix (quoting *id.* § 1396a(a)(32)(A)-(D)). Plaintiffs effectively concede that none of the exceptions applies to their deductions.  *See generally* Am. Compl.; Interv. Compl.

Rather than being "silent or ambiguous[,]" Congress has addressed the "specific issue" of how and to whom state Medicaid plan payments may be made.  *Chevron,* 467 U.S. at 842-43. Congress expressly stated that Medicaid payments may only be made to the "individual" receiving such care or "the person or institution providing such care or service[,]" and to no one else, absent an exception.  42 U.S.C. § 1396a(a)(32); *see DFS Secured Healthcare Receivables Trust v.*

*Caregivers Great Lakes, Inc.*, 384 F.3d 338, 350 (7th Cir. 2004) ("*On its face*, [a similarly worded anti-reassignment provision in the Medicare statute] stands only for the proposition that . . . funds cannot be paid directly by the government to someone other than the provider[.]") (emphasis added); *Danvers Pathology Assocs., Inc. v. Atkins*, 757 F.2d 427, 430 (1st Cir. 1985) ("The statute [§ 1396a(a)(32)] … *prohibit[s]* payment to those who are *not* providers.") (emphases in original). Its sweeping language that "*no* payment under the plan . . . *shall* be made *to anyone other than*[,]" those listed unless an exception applies, 42 U.S.C. § 1396a(a)(32) (emphases added), must be "enforce[d] … according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotations and citation omitted).  This is because "[n]othing on the face of the statute suggests a congressional intent to limit its [scope]," *United States v. Culbert*, 435 U.S. 371, 373 (1978), and the result of the agency's interpretation is far from "absurd[.]" *Hartford Underwriters*, 530 U.S. at 6.  The provision does not purport to restrict what Medicaid providers may do with their Medicaid reimbursement once it is paid to them, but funds must "first flow through the provider." *DFS Secured,* 384 F.3d at 350 (interpreting similarly worded anti-reassignment provision in the Medicare statute and citing § 1396a(a)(32)).  "Congress could not have chosen stronger words" than "shall" or "broader words" than "any" to express its intent that all payments be made only to providers or beneficiaries. *United States v. Monsanto*, 491 U.S. 600, 607 (1989); *see also Small v. United States*, 544 U.S. 385, 388 (2005) ("[T]he word 'any' demands a broad interpretation[.]").

The States contend that their deductions do not fall within the scope of the anti-reassignment provision because the deductions should not be considered "payment[s] for any care or service provided to an individual." Am. Compl. ¶¶ 32, 97.  The common and ordinary meaning of "payment" is "money … delivered in satisfaction of an obligation." *Black's Law Dictionary* 475 (11th ed. 2019).  A Medicaid program's "payment . . . for any care or service provided to an individual," 42 U.S.C § 1396a(a)(32), is therefore the *full* amount of the money delivered by the Medicaid program to satisfy the obligation owed by Medicaid for the care or service provided.

This full amount *includes* the portion the States are withholding as a deduction, which is "[a]n amount subtracted" from the gross. *Black's Law Dictionary* 475 (11th ed. 2019). The States' contrary argument thus fails.

Plaintiffs further contend that the deductions do not fall within the scope of the anti-reassignment provision because the deductions were not made "under an assignment or power of attorney or otherwise," as required by § 1396a(a)(32). Am. Compl. ¶¶ 38, 137; Interv. Compl. ¶ 102. To be sure, the deductions are not made under assignment or power of attorney. However, they are encompassed within the phrase "or otherwise[.]" 42 U.S.C. § 1396a(a)(32). Rather than narrowing the class of payments prohibited "under the plan[,]" *id.*, this additional phrase in the statute clarifies and broadens the scope of the prohibition. "Otherwise" means "anything else" or "in a different way or manner." *City of Toledo v. Beazer Materials & Servs., Inc.*, 912 F. Supp. 1051, 1069 n.4 (N.D. Ohio 1995), *rev'd on other grounds*, 103 F.3d 128 (6th Cir. 1996); *In re Riefberg*, 58 N.Y. 2d 134, 141 (1983) ("The employment of the word "otherwise" … is better taken literally to mean "different from" …."); *see also Merriam-Webster's Collegiate Dictionary* 822 (10th ed. 2001) (defining "otherwise" as "anything else," "to the contrary" and "in a different way or manner"). This broad word therefore confirms that the prohibition *includes* payments made *other* than "under an assignment or power of attorney." 42 U.S.C. § 1396a(a)(32); *see Gooch v. United States*, 297 U.S. 124, 128 (1936).

Relying on the canon of *ejusdem generis*—which provides that "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration," *Norfolk & Western R. Co. v. Train Dispatchers,* 499 U.S. 117, 129 (1991)—Plaintiffs contend that the "or otherwise" language is limited to concepts similar to "an assignment" or "power of attorney." Am. Compl. ¶ 99; Interv. Compl. ¶ 103. However, this cannon of construction applies only "when there is uncertainty" in the text to begin with, which is not the case here. *Gooch*, 297 U.S. at 128. It also is but one canon of statutory construction that must yield when "context" and "the act as a whole" are considered. *Helvering v. Stockholms*

*Enskilda Bank*, 293 U.S. 84, 88-89 (1934).  Considering the words of the provision and with a view to their place in the overall statutory scheme, *Robinson*, 519 U.S. at 341; *see Lewis v. Hegstrom*, 767 F.2d 1371, 1376 (9th Cir. 1985) ("We must not hinge our interpretation of a statute upon a single word or phrase[.]"), Plaintiffs' *ejusdem generis* argument fails.  The "or otherwise" language is not limited to concepts similar to "an assignment or power of attorney[.]"  42 U.S.C. § 1396a(a)(32).  First, the statutory exceptions involve transactions that are different from and broader than payments made "under an assignment or power of attorney[.]"  *Id.*; *see* Appendix.  Congress expressly exempted transactions ranging from "require[ments] as a condition of .… employment" to "agency agreement[s]" to "arrangement[s]" to "voluntary replacement program[s.]"  *Id.*  If Congress did not intend to preclude such a broad range of reimbursement methods to begin with, there would have been no need to specify these exceptions.  *Fla. Gulf Coast Bldg. & Const. Trades Council v. N.L.R.B.*, 796 F.2d 1328, 1341 (11th Cir. 1986) ("[A]n exception exists only to exempt something which would otherwise be covered [by the act.]"), *aff'd sub nom. Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568 (1988).  Accordingly, the States' deductions are not exempt from the express language of the provision.

Plaintiffs' contention that the deductions are implicitly excepted from the provision also fails.  *See, e.g.*, Am. Compl. ¶¶ 101, 103; Interv. Compl. ¶¶ 55, 75, 101.  Only in rare cases will courts find an implied exception to a statute and only if that exception "comports with the basic purpose of the statute[,]" which is not the case here.  *Syed v. M-I, LLC*, 853 F.3d 492 501-02 (9th Cir. 2017).  That these deductions are "a convenient means for paying voluntary union dues and other customary benefits" does not make them permissible forms of reimbursement under the Medicaid Act.  Am. Compl. ¶ 137.  The Act does not authorize the agency to create new exceptions.  *See* Medicaid Program Proposed Rule, 77 Fed. Reg. 26,362, 26,382 (May 3, 2012) (acknowledging that the provision "does not expressly provide for additional exceptions to the direct payment principle"); 2014 Final Rule, 79 Fed. Reg. at 2949; *see also Util. Air Regulatory*

*Grp. v. EPA*, 573 U.S. 302, 325-26, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."). When Congress has provided exceptions from the operation of a statute, "the statute should apply to all cases not specifically enumerated." 2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 47:11 (7th ed. 2007); *see also Helvering*, 293 U.S. at 90-91. In accordance with the maxim *expressio unius est exclusio alterius*, courts will not read in additional exceptions because they presume that Congress knew how to create such an exception when it so intended. *United States v. Johnson*, 529 U.S. 53, 58 (2000). Had Congress intended these deductions to be exempt from the provision's scope, it "would have said so in explicit terms." *Helvering*, 293 U.S. at 93. Congress's additions of exceptions (C) and (D) in the early 1990s "further demonstrate[s] that it knew how to include" exceptions for new developments, "yet did not do so" for the deductions at issue. *Toor v. Lynch*, 789 F.3d 1055, 1061 (9th Cir. 2015); *see* Pub. L. No. 101-508, § 4708, 104 Stat. 1388, 1388-173—1388-174 (1990); Pub. L. No. 103-66, § 13631(e), 107 Stat. 312, 643-44 (1993).

Plaintiffs argue that the deductions fall outside the scope of the anti-reassignment provision because Congress did not contemplate them and because the deductions "bear[] no relationship" to the "fraudulent medical-financing scheme" they allege triggered the amendment. Am. Compl. ¶ 5; *see also id.* ¶ 104; Interv. Compl. ¶ 105. These claims lack merit. Courts have consistently held that when "Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators" at the time of the statute's enactment. *Barr v. United States*, 324 U.S. 83, 90 (1945); *see also United States v. Chhun*, 744 F.3d 1110, 1116 (9th Cir. 2014) ("As we have said before, the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.") (internal quotation marks and citation omitted); *Magwood v. Patterson*, 561 U.S. 320, 334 (2010) ("We cannot replace the actual text with speculation as to Congress' intent."). Here, Congress used general and unambiguous language indicating its intent to prevent all payments to third parties unless a statutory exception

applies.   That prohibition plainly encompasses the deductions at issue.   Thus, it is irrelevant whether Congress specifically contemplated those deductions when enacting the statute.

Nor is it relevant that the deductions purportedly "bear" no "relationship," Am. Compl. ¶ 5, to the specific factoring[2] fraud that Congress sought to address.  *See Chhun*, 744 F.3d at 1116 (upholding statute's application to appellant's conduct "even though much of the impetus behind" the statute was for a different purpose); *United States ex rel. Forcier v. Computer Scis. Corp.*, No. 12-cv-1750, 2017 WL 3616665, at *8-9 (S.D.N.Y. Aug. 10, 2017) (holding that the Medicaid regulation implementing the anti-assignment provision, 42 C.F.R. § 447.10, was not limited solely to factoring); *see also Barr*, 324 U.S. at 90.   In fact, where, as here, the statute is clear, the legislative purpose is "irrelevant[.]"   *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 808-09 n.3 (1989).   Accordingly, because the plain meaning of the language, the context in which it is used, and the statutory scheme all confirm that the anti-assignment provision prohibits the States from redirecting Medicaid payments to third parties, Plaintiffs' challenge to the 2019 Rule fails to state a claim under the APA.

### B.  The Legislative History Supports HHS's Interpretation

Even if the language of the anti-assignment provision were not clear, the legislative history supports the agency's interpretation.  Courts may only turn to extrinsic evidence such as legislative history if the statute's language cannot "be construed in a consistent and workable fashion," *Valentine*, 789 F.2d at 1391; *see also Hearn v. W. Conference of Teamsters Pension Tr. Fund*, 68 F.3d 301, 304 (9th Cir. 1995), and only upon a "most extraordinary showing of contrary intentions[,]" *Garcia v. United States*, 469 U.S. 70, 75 (1984).  Legislative history is the least reliable tool of statutory construction because it is "often murky, ambiguous, and contradictory," with "a tendency to become … an exercise in 'looking over a crowd and picking out your friends.'" *Exxon Mobil Corp. v. Allapattah Servs.*, *Inc.*, 545 U.S. 546, 568 (2005) (citation omitted); *see also*

---

[2] Factoring is the selling of receivables to collection agencies who then present them to the state for payment. *See infra* at 21.

*United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, 837 F.3d 1055, 1063, n.1 (9th Cir. 2016) ("cautiously adher[ing] to the practice of consulting legislative history [because] courts have no authority to enforce a principle gleaned solely from legislative history that has no statutory reference point") (internal quotation marks and citations omitted).   "[L]egislative history—no matter how clear—can't override statutory text."  *Hearn*, 68 F.3d at 304.

Here, the legislative history is consistent with the agency's interpretation.  Prior to 1972, providers often reassigned their right to Medicaid payments "to other organizations or groups," such as factoring companies who would pay the provider at a discounted amount of the face value of the bills in exchange for an assignment of the provider's interest in the payment.  H.R. Rep. No. 95-393, at 43-49, *reprinted in* 1977 U.S.C.C.A.N. 3039, 3051-3052; *see Prof'l Factoring Serv. Ass'n v. Mathews*, 422 F. Supp. 250, 251-52, 254 (S.D.N.Y. 1976).   In such cases, state departments of public aid would reimburse medical providers by sending payment to a third party designated by the provider.  *See* 1977 U.S.C.C.A.N. at 3051-3052; *Prof'l Factoring Serv.*, 422 F. Supp. at 251-52.   In 1972, Congress responded by adding anti-reassignment provisions to the Social Security Act for both Medicaid and Medicare to "ensur[e] that payments would be made directly to healthcare providers."  *DFS Secured*, 384 F.3d at 350.  This was to prohibit the growing practice of reassigning reimbursements "to third parties" who then submitted "incorrect and inflated claims … creating administrative nightmares and overpayments."  *Id.* (citing H.R. Rep. No. 92-231 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5090).   Congress noted that such "reassigned payments" had been "without specific legislative authority."  1972 U.S.C.C.A.N. at 5090.  It therefore created the Medicaid anti-reassignment provision which read:

> A State plan for medical assistance must … provide that no payment under the plan for any care or service to an individual by a physician, dentist, or other individual practitioner shall be made to anyone other than such individual or such physician, dentist, or practitioner, except [under two specified exceptions].

Social Security Amendments of 1972, Pub. L. No. 92-603, § 236(b), 86 Stat. 1329, 1415 (1972). The breadth of the language confirms that Congress intended the provision to be broad in its inception.  Congress explained that the amendment was intended to prohibit payment "to *anyone other than* the patient, his physician or other person who provided the service[.]"   1972 U.S.C.C.A.N. at 5090 (emphases added).  This did not mean that the "'person who provided the services'" could not have his "'payment mailed to anyone or any organization he wishes,'" only that his "'payment would be to him in his name[,]'"" and must "first flow through [him]."  *DFS Secured*, 384 F.3d at 350 (quoting 1972 U.S.C.C.A.N. at 5090).

Despite the provision, third parties resorted to the use of powers of attorneys to evade its prohibition.  H.R. Rep. No. 95-393, at 43-49, 1977 U.S.C.C.A.N. at 3051-3052; *see Prof'l Factoring Serv.*, 422 F. Supp. at 252.  Congress responded again by adding the phrase "under an assignment or power of attorney or otherwise[.]"  Medicaid-Medicare Anti-Fraud and Abuse Amendments, Pub. L. No. 95-142, § 2(a)(3), 91 Stat. 1175, 1176 (1977).  The provision therefore read, as it still does today:

> A State plan for medical assistance must … provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise, except [under specified exceptions].

*Id.*  This amendment confirms Congress's intent to sweep broadly and prohibit any payments to third parties except as specified in the statute.  Therefore, the States' and Intervenors' argument that the prohibition must be read narrowly to include only those "under an assignment or power of attorney" or similar arrangement cannot be correct.  *See*, *e.g.*, Am. Compl. ¶¶ 99, 137; Interv. Compl. ¶¶ 102-104.  The "circumstances surrounding" the amendments "as well as the objectives [Congress] intended to accomplish" confirm that Congress did not intend to limit the scope of the provision by adding the phrase; rather it intended to make it "unmistakably clear" that the already broad prohibition *also prohibited* payments made "under an assignment or power of attorney *or*

*otherwise*[.]"    42 U.S.C. § 1396a(a)(32) (emphasis supplied); *see Lewis*, 767 F.2d at 1378 (rejecting plaintiffs' interpretation of the Social Security Act because they disregarded the circumstances surrounding the enactment and its objectives).

Although the factoring problem may have been the impetus for the 1972 and 1977 amendments, the legislative history demonstrates that the amendments were aimed at reducing opportunities for fraud or other improper activities generally.  *See Prof'l Factoring Serv.*, 422 F. Supp. at 255 (noting "Congressional concern about possible frauds or overbillings"); *see*, *e.g.*, 1977 U.S.C.C.A.N. at 3046-47 ("[T]here exist, to a disturbing degree, fraudulent and abusive practices associated with the provision of health services financed by the medicare and medicaid programs.  The disclosures to date have focused on a *broad range* of improper activities[.]") (emphases added); *Fraudulent Payments in the Medicaid Program: Hearing Before the Subcomm. on Federal Spending Practices, Efficiency, & Open Gov't of the S. Comm. on Gov't Operations*, 94th Cong. 1 (1976) (statement of Sen. Lawton Chiles) ("Congressional committees in both Houses of Congress have spent a lot of time investigating abuses and fraud in the medical programs but new revelations spring up daily."); 1972 U.S.C.C.A.N. at 5090 (noting that payments to outside "organizations or groups" have caused "incorrect and inflated claims for services" and "administrative problems" leading to "[s]ubstantial overpayments to many such organizations"); *id.* at 5173 (on the "[p]rohibition of assignments[,]" seeking to "assure that benefits go to the named payee," not to others).  "[I]t is not absurd for Congress to want to prevent [fraud.]"  *Chhun*, 744 F.3d at 1116.  Even the title of the 1977 amendments ("Medicaid-Medicare Anti-Fraud and Abuse Amendments") reinforces this fact.

That "[f]actoring is not specifically mentioned in the statute and [the agency] found it necessary to subsequently emphasize via regulation that payments to factors are not permitted" underscores that the amendments were created to address more than just factoring.  2019 Final Rule, 84 Fed. Reg. at 19,723 (citing 42 C.F.R. § 447.10(h)).  Just as payments made to factors have no relation to the "care or service" provided, neither do the withholdings made to unions and other third parties.  And Congress clearly contemplated the distinction between a payment made

to a third party "with no accountability for the nature and costs of the services rendered" and one made to "a hospital … furnish[ing] the services[.]"  *Danvers*, 757 F.2d at 430.

This is not to say that all factoring arrangements or deductions to third parties are fraudulent, *see*, *e.g.*, *Medicare-Medicaid Administrative and Reimbursement Reform: Hearings before the Subcomm. on Health of the S. Comm. on Finance*, 94th Cong. 457-60 (1976) (statement of the Professional Factoring Association) (defending factoring arrangements), but the further the payee is away from the actual care or service rendered, the more opportunity there is for fraud. Dues skimming—*i.e.*, the deduction of union dues from providers' paychecks without their consent—undoubtedly is a problem.  *See Aliser v. SEIU*, No. 3:19-cv-426-VC (N.D. Cal.) (related case where homecare providers assert such claims).

The States fault HHS for not offering "evidence that Congress was concerned about state payments of ordinary payroll deductions," but then allege that such deductions began only two decades after the enactment of the anti-assignment provision.  *Compare* Am. Compl. ¶ 98 *with* ¶¶ 5, 112.  In fact, although the States' current homecare services model may not yet have existed, Congress has long been aware of the potential "abuses" that accompany "home health care[.]" *Efficiency of the Medicare Program in Disbursing Funds to Home Health Care Agencies: Hearing Before the Subcomm. on Federal Spending Practices, Efficiency, & Open Government of the S. Comm. on Gov't Operations*, 94th Cong. 1-2, 5 (1976) (statement of Sen. Lawton Chiles) (as to home healthcare agencies, finding that "tremendous profits and tremendous rip-offs [that] can be made in this system" and "trying to determine now … how do we correct the abuses").  Moreover, "'[i]t is not the law that a statute can have no effects which are not explicitly mentioned in its legislative history.'"  *Chhun*, 744 F.3d at 1116 (citation omitted).

In sum, the legislative history makes Congress's overall objective unmistakably clear:  to prevent a broad array of fraud or other improper activities by limiting who can directly receive Medicaid reimbursements.  Because HHS's 2019 Final Rule is fully consistent with Congress' intent, the States' and Intervenors' claims must therefore be dismissed for failure to state a claim.

### C. HHS Did Not Exceed its Authority in Providing a Different Interpretation of 42 U.S.C. § 1396a(a)(32) than Its Prior Regulation

An agency is entitled to change its mind on a statutory question, as long as it offers a reasoned explanation for the change, which HHS did here.  *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., Inc.*, 545 U.S. 967, 981-82 (2005); *F.C.C. v. Fox Television Stations, Inc.* 556 U.S. 502, 514-515 (2009).  Upon revisiting the issue, HHS properly concluded that the regulatory text added in 2014—allowing states to redirect Medicaid payments on behalf of providers for purposes of health and welfare benefit contributions, training costs, or other benefits customary for employees—"is neither explicitly nor implicitly authorized by the statute[.]"  2019 Final Rule, 84 Fed. Reg. at 19,718; *see also id.* at 19,720, 19,721.

HHS recognized its interpretation represented a policy change and provided a reasoned explanation for the rescission of the 2014 Rule, *see* 2019 Final Rule, 84 Fed. Reg. at 19,720, 19721, which was based solely on "a new legal analysis," not "new or differential *factual* findings."  *Id.* (emphasis added).  Therefore, Plaintiffs' claims that the agency abused its discretion by relying on erroneous *facts*, failed to consider serious reliance interests, and failed to meaningfully address "substantial costs and burdens imposed on homecare providers" fails to state a claim upon which relief can be granted.  *See, e.g.*, Am. Compl. ¶ 141; Interv. Compl. ¶¶ 83-90, 116-21.

## IV.  Intervenors Fail to State an Equal Protection Claim

Intervenors' equal protection claim fares no better.  They allege the 2019 Final Rule is "motivated by animus toward unions and unionized workers" and "not rationally related to a legitimate government interest."  Interv. Compl. ¶ 131; *id.* ¶ 128 (alleging incorrectly that the 2019 Final Rule "distinguish[es] union dues deductions from payroll deductions for other purposes").  First, the Intervenors fail to state a claim because they make "blanket assertion[s] of entitlement to relief," *Bell Atl. Corp.*, 550 U.S. at 555 n.3, that are "devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679-80 (2009) (citing *id.* at 557); *id.* at 678 (Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."); *see* Interv. Compl. ¶¶ 58-62, 130-134.  Second, even if their claim were properly pleaded, they cannot state a viable

equal protection claim.  There is no contention that the 2019 Final Rule implicates a fundamental right or discriminates against a suspect class.  *Id.*  Indeed, the Rule draws no distinctions between classes of people.  It merely "removes the regulatory text that allows a state to make Medicaid payments to *third parties* on behalf of an individual provider for benefits such as health, insurance, skills training, and other benefits customary for employees."  2019 Final Rule, 84 Fed. Reg. at 19,718 (emphasis added).  It is facially neutral and treats a state's relationship with all third parties alike.  *See Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 333-34 (5th Cir. 1988) (finding "even-handed regulatory scheme" regulating "shrimpers in the same way" to be "rationally related" to its purpose of preventing sea turtle deaths).  The 2019 Final Rule does not subject unions and unionized workers to differential treatment.  In fact, the Rule makes clear that it "in no way intends to prevent or discourage union membership."  84 Fed. Reg. at 19,724; *see* Interv. Compl. ¶ 80.  HHS made clear that the Rule does not "prevent health care workers from … paying dues to a union or other association."  84 Fed. Reg. at 19,721; *see also id.* at 19,723 ("[P]ractitioners may continue contributing to unions or other organizations."); *id.* at 19,727 ("We also assume that the actual items purchased through third parties (existing union dues, training programs, health premiums) would be unaffected by the regulatory change.").  As Intervenors have failed to identify any way in which the 2019 Final Rule treats them differently than other similarly situated third parties, their equal protection claim cannot go forward.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (Equal protection "is essentially a direction that all persons similarly situated should be treated alike.").

In any event, even if the regulation has a disparate impact on unions and unionized workers—which Intervenors do not allege—the regulation would still survive rational basis review.  *See* Interv. Compl. ¶ 131 (conceding that rational basis review applies because unions and unionized workers are not a suspect class); *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279-80 (9th Cir. 2004); *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F. 3d 1011, 1031 (9th Cir. 2010). Rational basis review is "highly deferential," *Kahawaiolaa*, 386 F.3d at 1279, "a paradigm of

judicial restraint," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993), and "the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause." *City of Dallas v. Stanglin*, 490 U.S. 19, 26 (1989). Government action is "presumed to be valid and will be sustained if [it] … is rationally related to a legitimate [government] interest." *City of Cleburne*, 473 U.S. at 440. "That standard is satisfied if there is '*any reasonably conceivable state of facts that could provide a rational basis for the classification.*'" *City & Cty. of San Francisco v. U.S. Postal Serv.*, 546 F. App'x 697, 698 (9th Cir. 2013) (quoting *Beach Commc'ns*, 508 U.S. at 313)) (emphases added). "[T]o survive rational basis scrutiny, [government] action need not *actually* further a legitimate interest; it is enough that the governing body '*could have rationally decided* that' the action would further that interest." *Johnson*, 623 F.3d at 1031 (citation omitted, emphases in original); *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (The Equal Protection Clause "is satisfied so long as there is a plausible policy reason for the classification."). "When social or economic legislation is at issue," the government is entitled to "wide latitude" because "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Clyburne*, 473 U.S. at 440. Under rational basis review, Defendants have "no obligation to produce evidence to sustain" the 2019 Final Rule's rationality; rather, Intervenors have the burden to negate "every conceivable basis which might support it." *Johnson*, 623 F. 3d at 1031. The Intervenors have not and cannot carry that burden here. *See* Interv. Compl. ¶¶ 130-134.

There are at least two rational bases for the 2019 Final Rule. First, HHS rationally concluded that it was obligated to rescind the 2014 Final Rule because the statute "does not authorize the agency to create new exceptions." 2019 Final Rule, 84 Fed. Reg. at 19,724; *see id.* at 19,718. Second, the 2019 Final Rule is rationally related to the legitimate government interest in "ensur[ing] that Medicaid practitioners [are] paid fully and directly for their services as required by law." *Id.* at 19,724. That is, it is rational for HHS to ensure that federal funds are not being improperly diverted, especially for services unrelated to the care provided. Intervenors fail to

negate the rational relationship between the 2019 Final Rule and these two legitimate bases.  *See Johnson*, 623 F.3d at 1031; *Kahawaiolaa*, 386 F.3d at 1280; *Carroll v. DeBuono*, 998 F. Supp. 190, 198 (N.D.N.Y. 1998) (denying plaintiffs' equal protection claim because the challenged regulation "b[ore] a rationale relationship to the end of thwarting fraud in the Medicaid system").  For all of these reasons, Intervenors fail to state a viable equal protection claim, and that claim should accordingly be dismissed.

## IV.    Intervenors Fail to State a First Amendment Claim

Intervenors also fail to meet the threshold requirements to state a First Amendment claim.  They allege the 2019 Final Rule violates their First Amendment right to free speech by targeting the dues that "unions and their members use to engage in speech and lobbying on matters of important public concern."  Interv. Compl. ¶ 136.  They also allege that, by interfering with providers' ability to support their unions, the Rule deprives union members of the First Amendment right "to associate with each other and their union."  *Id.* ¶ 137.

As a threshold matter, Intervenors have failed to allege the necessary facts to succeed on a facial challenge to the constitutionality of a regulation.  In such a facial challenge, the challenger must establish that "no set of circumstances exists under which the [statute or regulation] would be valid.'"  *S.D Myers, Inc. v. City & Cty. of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1314-15 (9th Cir. 2015) (challenger must show either that "'no set of circumstances exists under which [the challenged law] would be valid,' or that it lacks any 'plainly legitimate sweep'") (quoting *Salerno*, 481 U.S. at 745).  Here, the Intervenors do not allege that there is *no* set of circumstances under which their First Amendment rights to speech and association, even assuming such rights are implicated here, would be unharmed.  In fact, one can readily imagine such circumstances.  As discussed above, both the States and the Intervenors admit that, under the 2019 Final Rule, individual providers can continue to pay their union dues directly, by cash or by check.  In this scenario, the Rule will have minimal impact on the unions and their

members, as the unions will continue to receive the full amount of their dues and the individual providers will continue their union membership.  In such a scenario, the Intervenors would have no claim that their First Amendment rights have been affected.

In addition to failing to allege that there is no set of circumstances that would render the 2019 Final Rule constitutional, the Intervenors also fail to allege sufficient facts to establish that implementation of the Rule even implicates their First Amendment free speech or associational rights.  The 2019 Final Rule simply prohibits one mechanism, a withholding, by which individual providers can pay their union dues, as well as other fees, such as health insurance premiums and training fees.  It does not restrict providers from paying their dues or other charges by any other means, nor does it govern the amount of dues that may be paid or the use that may be made of those dues.  Any reduction in dues received by the Unions is content neutral, and the Unions and their members may continue to exercise their freedom of speech as they see fit.  *See Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550 (1983) ("Although TWR does not have as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like, the Constitution does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom.") (internal quotation marks and citation omitted); *see also id*. at 549 ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right").

The 2019 Final Rule also imposes no direct effect on Intervenors' right to free association because it does not compel them to accept members who would compromise their message, meddle in their internal affairs, or expose them to reprisals.  *See Boy Scouts of America v. Dale*, 530 U.S. 640 (2000); *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984); *NAACP v. Alabama ex. Rel. Patterson*, 357 U.S. 449 (1958).  Nor does it impose any indirect burden on that right.  "It does not 'order' [employees] not to associate together for the purpose of [pursuing grievances], or for any other purpose, and it does not 'prevent' them from associating together or burden their ability to do so in any significant manner."  *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement*

*Workers of Am.*, 485 U.S. 360, 366 (1988).  Intervenors have therefore failed to state a claim that the Final Rule implicates their First Amendment rights and their First Amendment claim should be dismissed.

## <u>CONCLUSION</u>

For these reasons, the States' Amended Complaint and the Intervenors' Complaint-in-Intervention should be dismissed for lack of subject-matter jurisdiction and for failure to state a claim.

Dated:  September 27, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JEAN LIN
Special Counsel, Federal Programs Branch

/s/ *Sophie Kaiser*
CAROL FEDERIGHI
Senior Trial Counsel
SOPHIE KAISER
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Washington, DC 20005
Phone: (202) 307-2092
Fax: (202) 616-8470
Email: sophie.b.kaiser@usdoj.gov

*Attorneys for Defendants*

## APPENDIX

42 U.S.C. § 1396a(a)(32) provides as follows:

A State plan for medical assistance must--

   (32) provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise; except that—

   (A) in the case of any care or service provided by a physician, dentist, or other individual practitioner, such payment may be made (i) to the employer of such physician, dentist, or other practitioner if such physician, dentist, or practitioner is required as a condition of his employment to turn over his fee for such care or service to his employer, or (ii) (where the care or service was provided in a hospital, clinic, or other facility) to the facility in which the care or service was provided if there is a contractual arrangement between such physician, dentist, or practitioner and such facility under which such facility submits the bill for such care or service;

   (B) nothing in this paragraph shall be construed (i) to prevent the making of such a payment in accordance with an assignment from the person or institution providing the care or service involved if such assignment is made to a governmental agency or entity or is established by or pursuant to the order of a court of competent jurisdiction, or (ii) to preclude an agent of such person or institution from receiving any such payment if (but only if) such agent does so pursuant to an agency agreement under which the compensation to be paid to the agent for his services for or in connection with the billing or collection of payments due such person or institution under the plan is unrelated (directly or indirectly) to the amount of such payments or the billings therefor, and is not dependent upon the actual collection of any such payment;

   (C) in the case of services furnished (during a period that does not exceed 14 continuous days in the case of an informal reciprocal arrangement or 90 continuous days (or such longer period as the Secretary may provide) in the case of an arrangement involving per diem or other fee-for-time compensation) by, or incident to the services of, one physician to the patients of another physician who submits the claim for such services, payment shall be made to the physician submitting the claim (as if the services were furnished by, or incident to, the physician's

services), but only if the claim identifies (in a manner specified by the Secretary) the physician who furnished the services; and

(D) in the case of payment for a childhood vaccine administered before October 1, 1994, to individuals entitled to medical assistance under the State plan, the State plan may make payment directly to the manufacturer of the vaccine under a voluntary replacement program agreed to by the State pursuant to which the manufacturer (i) supplies doses of the vaccine to providers administering the vaccine, (ii) periodically replaces the supply of the vaccine, and (iii) charges the State the manufacturer's price to the Centers for Disease Control and Prevention for the vaccine so administered (which price includes a reasonable amount to cover shipping and the handling of returns);