STACEY M. LEYTON (SBN 203827)
sleyton@altshulerberzon.com
P. CASEY PITTS (SBN 262463)
cpitts@altshulerberzon.com
STEFANIE L. WILSON (SBN 314899)
swilson@altshulerberzon.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151 – Phone
(415) 362-8064 – Fax

*Attorneys for Plaintiff-Intervenors*
*(additional counsel listed below signature)*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*; <br><br> Plaintiffs, <br><br> and <br><br> SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 503; *et al.*; <br><br> Plaintiff-Intervenors. <br> v. <br><br> ALEX M. AZAR II, *et al.*, <br><br> Defendants. | Case No. 3:19-cv-02552-VC <br><br> **PLAINTIFF-INTERVENORS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Date: Feb. 12, 2020 <br> Time: 10:00 AM <br> Courtroom: 4, 17th Floor <br> Judge: Hon. Vince Chhabria <br><br> Complaint Filed: May 13, 2019 <br> Trial Date: Not yet set |

## Table of Contents

TABLE OF AUTHORITIES ................................................................................................. ii

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ................................. 1

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

    I.      Factual Background ................................................................................ 3

    II.     Statutory and Legal Background ............................................................ 5

    III.    Procedural History................................................................................. 8

ARGUMENT .................................................................................................................... 9

    I.      Intervenors Have Standing to Challenge Defendants' Final Rule .......................... 9

    II.     Intervenors Are Within the Zone of Interests of the Medicaid Act ...................... 11

    III.    The Final Rule Must Be Set Aside Because It Is Based on an Erroneous Legal
          Premise................................................................................................. 12

    IV.    The Final Rule Must Be Set Aside Because CMS Failed to Consider the Serious
          Reliance Interests Engendered by Its Prior Interpretation or to Justify Its Policy
          Change, and Because CMS's Stated Rationale Is Arbitrary and Capricious ......... 13

    V.     The Motion to Dismiss Intervenors' Equal Protection Claim Should Be
          Denied ................................................................................................. 18

    VI.    The Motion to Dismiss Intervenors' First Amendment Claim Should Be

          Denied ................................................................................................. 19

CONCLUSION................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*AFSCME v. Woodward*,
   406 F.2d 137 (8th Cir. 1969) ................................................................................19

*Air Courier Conf. of Am. v. Am. Postal Workers Union*,
   498 U.S. 517 (1991)............................................................................................11

*Ala. Educ. Ass'n v. State Superintendent of Educ.*,
   746 F.3d 1135 (11th Cir. 2014) ..........................................................................20

*Bennett v. Spear*,
   520 U.S. 154 (1997)............................................................................................10

*Cal. v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ..............................................................................10

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)......................................................................................18, 19

*Data Processing Serv. Orgs. v. Camp*,
   397 U.S. 150 (1970)..............................................................................................9

*Davenport v. Wash. Educ. Ass'n*,
   551 U.S. 177 (2007)............................................................................................20

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019).............................................................................13, 15, 18

*Dragovich v. U.S. Dep't of Treasury*,
   848 F.Supp.2d 1091 (N.D. Cal. 2012) ...........................................................18, 19

*East Bay Sanctuary Cov. v. Trump*,
   932 F.3d 742 (9th Cir. 2018) ..............................................................................10

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016)...................................................................................13, 14

*FEC v. Citizens United*,
   558 U.S. 310 (2010)............................................................................................20

*Fed. Baseball Club v. Nat'l League of Prof. Baseball Clubs*,
   259 U.S. 200 (1922)............................................................................................12

*Gallarde v. I.N.S.*,
   486 F.3d 1136 (9th Cir. 2007) ..........................................................................12

*Greene v. United States*,
   996 F.2d 973 (9th Cir. 1993) ..............................................................................9

*Harris v. Bd. of Supers.*,
   366 F.3d 754 (9th Cir. 2004) ........................................................................9, 10

*Harris v. Quinn*,
   573 U.S. 616 (2014) ..........................................................................................19

*Healy v. James*,
   408 U.S. 169 (1972) ..........................................................................................20

*Hensala v. Dep't of Air Force*,
   343 F.3d 951 (9th Cir. 2003) ............................................................................19

*Janus v. AFSCME Council 31*,
   138 S. Ct. 2448 (2018) ......................................................................................19

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ......................................................................................12

*Lexmark Int'l v. Static Ctrl. Components*,
   572 U.S. 118 (2014) ..........................................................................................11

*Linmark Assoc. v. Willingboro*,
   431 U.S. 85 (1977) ............................................................................................20

*Missionary Baptist Found. v. First Nat'l Bank*,
   796 F.2d 752 (5th Cir. 1986) ..............................................................................5

*Mo. Pub. Serv. Comm'n v. FERC*,
   337 F.3d 1066 (D.C. Cir. 2003) ........................................................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ......................................................................................15, 17

*NAACP v. Alabama*,
   357 U.S. 449 (1958) ..........................................................................................20

*Nat'l Fed'n of Indep. Businesses v. Sebelius*,
   567 U.S. 519 (2012) ..........................................................................................11

*Nat'l Parks Conserv'n Assoc. v. EPA*,
   788 F.3d 1134 (9th Cir. 2015) ......................................................................15, 17

*New York v. HHS*,
   ---F.3d---, 2019 WL 5781789 (S.D.N.Y. Nov. 6, 2019)................................12, 14, 16

*Oster v. Lightbourne*,
   2012 WL 691833 (N.D. Cal. Mar. 2, 2012)...................................................9, 10, 11

*Pile Drivers Local Union No. 2376 v. Lujan*,
   1989 WL 30254 (9th Cir. Mar. 23, 1989)...............................................................11

*Prill v. NLRB*,
   755 F.2d 941 (D.C. Cir. 1985)................................................................................12

*Safe Air for Everyone v. EPA*,
   488 F.3d 1088 (9th Cir. 2007)................................................................................12

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943)...........................................................................................11, 12

*State v. Ross*,
   358 F.Supp.3d 965 (N.D. Cal. 2019)................................................................15, 18

*United States v. Windsor*,
   570 U.S. 744 (2013)................................................................................................19

*United Steel v. Mine Safety & Health Admin.*,
   925 F.3d 1279 (D.C. Cir. 2019)..............................................................................14

*USDA v. Moreno*,
   413 U.S. 528 (1973)................................................................................................19

*Valentini v. Shinseki*,
   860 F.Supp.2d 1079 (C.D. Cal. 2012)......................................................................9

*Ysursa v. Pocatello Educ. Ass'n*,
   555 U.S. 353 (2009)................................................................................................20

**State Cases**

*Dallman v. Ritter*,
   225 P.3d 610 (Colo. 2010)......................................................................................20

**Federal Statutes**

5 U.S.C. §706(2)(A).......................................................................................................1

42 U.S.C. §1396a(a)(32)........................................................................................*passim*

42 U.S.C. §1396a...........................................................................................................5

42 U.S.C. §1396b ........................................................................................................5

**State Statutes**

Cal. Gov't Code §12301.6 .........................................................................................5

5 ILCS 365/4(3) ........................................................................................................5

5 ILCS 365/2 ............................................................................................................5

Or. Rev. Stat. §292.055 .............................................................................................5

Wash. Rev. Code §74.39A.270 .................................................................................5

**Rules and Regulations**

42 CFR § 447.10(g)(3) .......................................................................................5, 8, 14

42 CFR § 447.10(g)(4) .................................................................................2, 6, 7, 17

Ninth Circuit Rule 36-3(c) ......................................................................................11

**Administrative Materials**

Administrative Record ...................................................................................... *passim*

Press Release, CMS Proposes Rule Change to Protect Medicaid Provider
    Payments (July 10, 2018) ...................................................................................7

Vikki Wachino, CMCS Informational Bulletin, *Suggested Approaches for
    Strengthening and Stabilizing the Medicaid Home Care Workforce* (Aug. 3,
    2016) ...................................................................................................................4

**Legislative Materials**

H.R. Rep. 92-231, 1972 U.S.C.C.A.N. 4989 (1971) ................................................5

H.R. Rep. 95-383, 1977 U.S.C.C.A.N. 3039 (1977) ................................................5

**Secondary Source**

Restatement (1st) Contracts ....................................................................................16

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**PLEASE TAKE NOTICE** that on February 12, 2020 at 10:00 a.m. in Courtroom 4, 450 Golden Gate Avenue, San Francisco, CA, Plaintiff-Intervenors will and hereby do move this Court for summary judgment on their first through fourth claims for relief, on the grounds that in issuing the final rule at issue, Defendants violated the Administrative Procedure Act, 5 U.S.C. §706(2)(A).  This Motion is based on this Motion; the Memorandum of Points and Authorities in support thereof; the Declarations and Supplemental Declarations of Stefanie L. Wilson, Renee M. Gerni, David Broder, Matthew A. Maldonado, Melissa Unger, Debra Howze, Lesley Forsythe, and Sherleen Bright; the Administrative Record; this Court's file, including the evidence in support of Plaintiff-Intervenors' Motion to Intervene; the Plaintiff-States' Motion for Summary Judgment and materials in support thereof; and all other matters before the Court.

## INTRODUCTION

The challenged regulatory action imposes serious, unwarranted burdens on the ability of homecare providers—workers who assist disabled or elderly Medicaid beneficiaries with personal care and other basic needs—to pay for employment benefits and to organize collectively.  *See, e.g.*, Administrative Record ("AR") 11327 (Declaration of Stefanie L. Wilson ("Wilson Decl."), Ex. D).  Departing from decades of practice, in the 2019 Final Rule challenged here Defendants adopted an unprecedented new construction of the Medicaid Act's "anti-reassignment provision" that would prohibit homecare providers from voluntarily authorizing payroll deductions for union dues and other important benefits like health insurance.  AR16686-97.  This arbitrary and capricious action must be set aside.

The anti-reassignment provision, Section 1902(a)(32) of the Medicaid Act, 42 U.S.C. §1396a(a)(32), generally prohibits the reassignment to third parties of the right to collect Medicaid payments owed to providers (*e.g.*, hospitals or clinics) for care or services.[1]  For years prior to 2018, the Centers for Medicare & Medicaid Services ("CMS") and Health & Human

---

[1] This practice is known as "reassignment" because the entitlement to payment is initially assigned by the beneficiary to the Medicaid provider.

Services ("HHS") understood §1902(a)(32) as inapplicable to states' common practice of processing homecare providers' voluntarily authorized payroll deductions for health insurance, trainings, and other customary employee benefits.  *See, e.g.*, AR11869-78.  In 2014, CMS promulgated a regulation reflecting this longstanding understanding, 42 CFR 447.10(g)(4) (the "2014 Rule").  AR1-9, 50-58.

In 2017, however, anti-union groups began a campaign attacking homecare provider unions, falsely claiming that such unions were "skimming" Medicaid funds.  AR16698-722.  Relying *solely* on these sources rather than on any independent fact-finding regarding the payroll deductions at issue, CMS reversed its decades-old policy and in 2018 announced in a notice of proposed rulemaking ("2018 NPRM") that it now interpreted §1902(a)(32) to prohibit payroll deductions voluntarily authorized by homecare providers to pay for employment benefits and union dues.  Consistent with the anti-union animus behind the change, in making its announcement, CMS focused almost exclusively on deductions for voluntary union dues.  AR59-63.  CMS proposed to withdraw the 2014 Rule, which CMS mischaracterized as having created a "new exception" to §1902(a)(32) when instead it had simply recognized that §1902(a)(32) was inapplicable to such deductions.  *Id.*  CMS also mischaracterized these payroll deductions as "diversions" of Medicaid payments.  *Id.*  In 2019, CMS issued its Final Rule, withdrawing the 2014 Rule and adopting its new position (contrary to decades of past practice and understanding) that §1902(a)(32*) unambiguously* prohibits Medicaid-funded providers from utilizing voluntary payroll deductions for common employment benefits.  AR16686-97.

In reversing its decades-old policy, CMS acted arbitrarily, capriciously, and contrary to law:  It misconstrued the statute (as explained in Plaintiff-States' summary judgment brief and herein), failed to consider serious reliance interests engendered by its prior interpretation, and failed adequately to explain its policy change.  The Final Rule is also arbitrary and capricious because it rests on erroneous and incoherent rationales and was motivated by improper bias against homecare provider unions.  Because homecare providers and their unions are directly harmed by CMS's regulatory action, Defendants' challenge to Intervenors' standing fails.

2

Intervenors' complaint also states valid constitutional claims.  Defendants' motion to dismiss should be denied and summary judgment should be granted on Plaintiff-States' and Intervenors' (together, "Plaintiffs") APA claims.

## BACKGROUND

### I.    Factual Background

Medicaid provides coverage for health care and long-term care services, including homecare, to low-income individuals.  Homecare allows elderly and disabled individuals to remain in their own homes rather than being forced into institutions, which leads to better health outcomes at lower cost.  AR5677.  Under the "consumer-directed" or "individual provider" model for homecare, individual Medicaid beneficiaries hire, fire, and supervise their providers, but the states that administer the Medicaid program determine and pay providers' wages, benefits, and other employment terms.  AR8973.[2]  Plaintiff-States each operate under this model as joint employers (with Medicaid beneficiaries) of homecare providers, either for collective bargaining purposes or more broadly.  AR13743; 11128.  Plaintiff-States deduct from providers' wages federal, state, and local employment taxes; court-ordered garnishments; and payments for matters such as training, benefits premiums, and voluntary union dues; they also issue W-2s.[3]

The consumer-directed homecare model has existed under Medicaid for decades, *see, e.g.*, AR13737, and has helped states improve their Medicaid programs through better health outcomes and more efficient use of funds, AR3.  Nonetheless, because of the historic low pay

---

[2] By contrast, in the "agency model" the state pays private agencies for Medicaid-eligible services, and those agencies employ homecare providers, including by hiring them, assigning them to beneficiaries, supervising them, and determining their pay and paying them.  AR11327.

[3] *See, e.g.*, AR5835 ("[L]ong before … 2014 …Washington has been facilitating deductions from provider payroll for things like healthcare premium cost shares, union dues, and [other] payroll taxes"); 11489 (Oregon is the "employer of record" for consumer-directed homecare providers); 13733 (Oregon provides workers' compensation, withholds taxes, and processes overpayments, court-ordered deductions, child support, and benefits); 13737 ("Payroll functions have been performed by the [California] on behalf of consumers since … 1974 … includ[ing] … issuing paper checks or making direct deposits, and withholding state, federal, local employment and other taxes, as well as other employment-related costs and health insurance premiums."); *see also* AR11153, 11158, 11477 (homecare providers' paystubs showing deductions from earnings); Declaration of Bill Moss ¶15; Declaration of Susana Mendoza ¶¶3-4; Declaration of Debbi Thomson ("Thomson Decl.") ¶16; Declaration of Jose Espinosa ¶¶3, 11.

and conditions of homecare work, which is physically difficult and emotionally draining, states

have struggled to recruit and retain enough qualified providers to meet demand.  AR8, 5678.

Before forming unions, homecare providers were generally paid at poverty rates—as low

as $3.72 per hour in California—and largely lacked access to basic benefits like paid sick leave

or health insurance.  *See, e.g.*, AR15-16, 10261.  Beginning in the early 1990s, consumer-

directed homecare providers in some states won the right to organize and bargain collectively

with the state as an employer.  *See, e.g.*, AR10501.  In those states, unions have helped stabilize

and grow the homecare workforce by increasing recruitment, reducing turnover, improving

training, and establishing benefits.[4]  Negotiating with the representative democratically chosen

by homecare providers has given states insight and understanding of these workers' needs.

Declaration of Ken Jacobs ("Jacobs Decl.") ¶¶44-45; Thomson Decl. ¶25.  Homecare providers'

unions have negotiated higher wages, paid time-off, sick leave, and premium holiday pay.  *E.g.*,

AR11331; 11430; 11475.  Tens of thousands of homecare providers also now have access to

health insurance through union-negotiated and sponsored programs.  *Id.*; *see also* AR5390, 5777,

11899.  Some unions offer or are negotiating with states to provide retirement benefits.  *See, e.g.*,

AR11431, 11489.  And unions, often jointly with the state, provide free or paid training.  *See,

e.g.*, AR5578-79; AR11127; AR10500.  Many homecare providers have access to additional

benefits, such as life insurance, through their union membership.  *See, e.g.*, AR10500.  Like most

other employees, homecare providers pay their share of these benefits through payroll

deductions.  *Id.*[5]

---

[4] AR13734 ("[the organizing] of the homecare workforce in Oregon has resulted in a higher
quality and more stable workforce"); 14098 ("Washington has worked closely with … the union,
to recruit, train, and retain this workforce."); 3092-93 (national survey of homecare providers
finding that collective bargaining is correlated with less turnover, greater retention, overtime pay,
higher wages, and benefits); Vikki Wachino, CMCS Informational Bulletin, *Suggested
Approaches for Strengthening and Stabilizing the Medicaid Home Care Workforce* (Aug. 3,
2016) ("unions can also help support homecare worker training and development" and states
may make authorized deductions for voluntary dues payments) (Wilson Dec. Ex. E).

[5] Under their laws, Plaintiff-States must honor homecare providers' voluntary union dues
deduction authorizations.  Cal. Gov't Code §12301.6(i)(2); Or. Rev. Stat. §292.055; Wash. Rev.
Code §74.39A.270; 5 ILCS 365/4(3), 365/2; *see also* AR11429-30, 10486, 11128, 10501, 11399.

## II.     Statutory and Legal Background

To qualify for federal funds, states must submit to CMS a state Medicaid plan that meets certain requirements.  42 U.S.C. §§1396a, 1396b.  Section 1902(a)(32), enacted in 1972 and amended in 1977, provides:  "[N]o payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise."  *Id.*  Its purpose was to address the practice of "factoring," when providers sold their Medicaid receivables at a discount to third parties who in turn "submitted claims [to the government] and received payments in their [own] name[s]."  H.R. Rep. 95-383, 1977 U.S.C.C.A.N. 3039, 3051 (1977); *see also* H.R. Rep. 92-231, 1972 U.S.C.C.A.N. 4989, 5090 (1971).  "Factoring" led to fraudulent and inflated claims, triggering Congress' adoption of the anti-reassignment provision.  *See Missionary Baptist Found. v. First Nat'l Bank*, 796 F.2d 752, 757 n.6 (5th Cir. 1986).

CMS's implementing regulation for §1902(a)(32) tracks the statute's enumerated exceptions and identifies some additional practices that fall outside its scope.  42 CFR §447.10.  Since its adoption in 1978, for example, the regulation has recognized that §1902(a)(32) does not apply to payments to "[a] foundation, plan, or similar organization operating an organized health care delivery system, if the practitioner has a contract under which the organization submits the claim," *id.* §447.10(g)(3), although the statute does not address such payments.

In 2012, CMS proposed a rule confirming that, in line with its longstanding interpretation and states' existing practices, the anti-reassignment provision did not contemplate, and therefore could not have prohibited, payroll deductions  for "health and welfare benefits, training costs, and other [customary employee] benefits" on behalf of providers whose primary source of income is Medicaid.  AR5-6.  States had administered such deductions for decades, based on this understanding, with CMS's knowledge and approval.  *See, e.g.*, AR5778-79.

CMS explained that Medicaid-funded homecare services had greatly expanded since Congress had last amended §1902(a)(32) in 1977, and so Congress could not have intended to address payment structures for consumer-directed homecare providers when it enacted and

amended the law. AR5. CMS also recognized that §1902(a)(32)'s purpose "was to prohibit factoring arrangements"; that prohibiting homecare providers' voluntarily elected contributions for employment benefits "would contravene the fundamental purpose of the provision"; and that this purpose and legislative history supported its interpretation that such deductions are not "within the scope of 'assignments' or 'powers of attorney'" that Congress intended to prohibit, nor "even of the same nature." AR6-8. "Instead, such payments are more of an ordinary arrangement to further workforce stability and quality." AR8. After receiving exclusively supportive comments, CMS finalized 42 CFR §447.10(g)(4) in the 2014 Rule. AR50-58.

The administrative record shows that in 2017 anti-union advocates began spreading the false narrative—using articles, policy papers, and websites—that homecare provider unions were "skimming" Medicaid funds. This false narrative was then used to urge Defendants to end this purported "diversion" of Medicaid money.[6] The lobbying campaign specifically targeted the 2014 Rule and falsely characterized it as having purported to create a new exception to the anti-reassignment provision to authorize union dues deduction. *Supra* note 6. In actuality, as described above, voluntary deductions for common employee benefits, including union dues, had been in place under some states' homecare programs for decades before the 2014 Rule, which merely clarified the scope of §1902(a)(32). Indeed, as late as June 2018, in response to inquiries challenging subsection (g)(4), CMS maintained its longstanding position by explaining that such deductions were "an administratively convenient way to pay for customary [and voluntary] employee benefits," and that it had no evidence of diversions of Medicaid funds.[7]

---

[6] AR16698-706 (Mackinac Center falsely claiming that union dues "result in the misuses of millions of dollars" of Medicaid funds and that HHS should regulate to prohibit dues deductions); 16709-13 (Washington Examiner baselessly claiming abuse of dues deductions by homecare provider union); AR16714-20 (State Policy Network website falsely claiming that union dues deductions were "skimming" Medicaid funds and suggesting that unions would force elderly and disabled Medicaid beneficiaries to negotiate providers' terms and conditions of employment); 16721-22 (Fairness Center baselessly claiming that many homecare providers who pay union dues do not want membership); 16723-724 (Letter from Congressman Ron Johnson to CMS stating that union dues "skim" Medicaid money); *see also* Maxford Nelson, Freedom Foundation, *Getting Organized at Home* at 4 (July 2018) (Wilson Decl. Ex. G).

[7] AR16734 (quoted text); 16735-36 (lack of evidence of Medicaid fund diversion).

In July 2018, CMS abruptly reversed its position and began referring to these same deductions as "divert[ing]" and "siphon[ing]" Medicaid funds.[8]  CMS issued the 2018 NPRM, stating—for the first time—the same position advanced by anti-union groups: that §1902(a)(32) prohibits payroll deductions that enable homecare providers to pay for voluntary employment benefits or union dues.  AR59-63.  CMS incorrectly characterized §447.10(g)(4) as a "new" non-statutory exception to §1902(a)(32) and proposed to withdraw it.  AR61.  Although CMS did not mention union dues in the 2014 Rule, the *only* regulatory impact the 2018 NPRM discussed was on the collection of voluntary union dues, which CMS said would need to cease.  AR62 n.1 (relying exclusively on anti-union policy organizations referring to voluntary union dues deductions as Medicaid "skimming").[9]  Despite the proposed rule's significant impacts, and over numerous objections, CMS curtailed the public's opportunity to comment to just 30 days.  *See, e.g.*, AR1081-82 & 3166-71.

In May 2019, CMS published its Final Rule withdrawing §447.10(g)(4) (effective July 5, 2019).  AR16686-97.  CMS adopted the NPRM's conclusions without change, produced no new data or analysis, and again relied on the same anti-union sources.  AR16695 & n.2.  It again mischaracterized the 2014 Rule as having impermissibly created a "new exception" to the statutory prohibition, though subsection (g)(4) had merely confirmed the long-recognized understanding that the statute permits payroll deduction practices.  *See* AR50-58, 11872-74.  The Final Rule's *only* rationale for withdrawing the 2014 Rule was that CMS "lack[s] … express or implied authority to implement new exceptions to [§]1902(a)(32)."  AR16688.  CMS took the position that §1902(a)(32) can *only* be interpreted to broadly prohibit states "from making *any payment*" to anyone other than the provider, even if the payment is not made by assignment,

---

[8] Press Release, CMS Proposes Rule Change to Protect Medicaid Provider Payments (July 10, 2018), https://www.cms.gov/newsroom/press-releases/cms-proposes-rule-change-protect-medicaid-provider-payments (Wilson Decl. Ex. F).

[9] The administrative record now reveals that CMS considered even more anti-union publications—the Mackinac Center Policy Brief, AR16698-16706, and the Fairness Center article on *Smith v. Wolf*, 16721-16722—but did not disclose them in the 2018 NPRM, preventing the public from providing comment.

power of attorney, or similar means, and even if it involves a voluntarily authorized deduction out of money already earned by the provider. *Id.* (emphasis added).[10]  Strikingly, in contrast with public comments' extensive documentation of harm that CMS's new policy would cause to providers, states' programs, and homecare consumers, CMS had zero evidence to support its claims that voluntary union dues deductions were "diverting" or "siphoning" Medicaid funds.[11]

## III.   Procedural History

California, Washington, Oregon, Massachusetts, and Connecticut filed this lawsuit on May 13, 2019, and Illinois later joined.  Dkt. 1, 78.  Two unions ("Unions") and nine individual union member homecare providers ("Providers") intervened (collectively "Intervenors").  Dkt. 72.  Defendants have moved to dismiss Intervenors' complaint for lack of standing and on the ground that the complaint fails to state plausible APA, First Amendment, or Equal Protection claims.  Dkt. 84.  As stipulated and ordered, this brief combines Intervenors' opposition to the motion to dismiss and Intervenors' motion for summary judgment on the APA claims.  Dkt. 73.[12]

### ARGUMENT

---

[10]  In other words, CMS's new position is that it lacks authority to identify *any* types of transactions that are outside the scope of the anti-reassignment provision, other than exceptions enumerated in the statute.  The regulation, however, contains another such "exception" that appears nowhere in the statute, for payments to HMOs under contracts with Medicaid-enrolled providers, §447.10(g)(3). CMS did not propose to withdraw this regulatory subsection.

[11] Gerni Decl. ¶6b & Ex. C (internal CMS email stating, "if asked to produce … evidence [of "dues skimming"], I'm not sure what we would produce.  The only thing I've ever seen was the original report from the think tank …. We surveyed states in preparation for this NPRM and did not find such evidence."); *see also infra* note 12.

[12] Defendants initially produced an incomplete administrative record.  After Intervenors inquired about missing items, Defendants produced some omitted materials.  Wilson Decl. ¶¶2-5.  These additional records reveal that CMS had no evidence of any misuse of Medicaid funds when it promulgated the Final Rule.  *See, e.g.*, AR16736 (CMS, on June 13, 2018, stating that it had no information about "Medicaid funds diverted for union dues"); 16748-49 (internal notes revealing that multiple states informed CMS that they had received *no* complaints regarding voluntary dues deductions).  Despite this additional production, the administrative record remains incomplete, excluding, at a minimum, records relating to communications between CMS and states regarding the agency action at issue, records relating to an interpretive guidance that was an alternative considered in CMS's decisional process culminating in the Final Rule, and *all* purportedly privileged materials.  Wilson Decl. ¶4; *see also* Gerni Decl. ¶ 6 & Exs. C-H (examples of redacted internal emails related to 2018 NPRM, and drafts of communications related to 2018 NPRM obtained via FOIA request).  Intervenors reserve the right to move to compel production of the complete administrative record or for extra-record discovery.

Defendants' motion to dismiss should be denied and Plaintiffs' motions for summary judgment granted because (1) Intervenors have standing and have pleaded plausible APA and constitutional claims; (2) as explained in the States' brief, the Final Rule is contrary to law; and (3) as explained herein, the Final Rule is arbitrary and capricious and must be set aside under the APA because it is based on the erroneous legal premise that the statute compels CMS's new interpretation; because CMS failed to consider serious reliance interests or to explain adequately its policy change; and because the Final Rule is based on erroneous facts, contradicted by record evidence, and motivated by anti-union animus.

## I.   Intervenors Have Standing to Challenge Defendants' Final Rule

Intervenors demonstrated standing in moving to intervene, which this Court granted on permissive grounds.  *See* Dkt. 8 at 21-22; Dkt. 72; *Greene v. United States*, 996 F.2d 973, 978 (9th Cir. 1993) (permissive intervention requires independent jurisdiction).  Nonetheless, Defendants assert that Intervenors' injuries are "speculative" and that demonstrating a "significant burden" on homecare providers' ability to pay for union dues and other benefits is insufficient.  Dkt. 84 at 12-13.  However, Defendants do not dispute that homecare providers rely on deductions to maintain their union memberships and benefits, that terminating these deductions will impose economic costs and barriers (particularly on "unbanked" providers without bank accounts or credit cards), or that the resulting nonpayment of dues or premiums will result in loss of union memberships or health insurance.[13]  *See Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 154 (1970) (economic costs establish injury-in-fact); *Valentini v. Shinseki*, 860 F.Supp.2d 1079, 1092 (C.D. Cal. 2012) ("lost access" to government-conferred conveniences and benefits establishes injury-in-fact).  Therefore, the Providers and the Unions' members have standing.[14]  *See Harris v. Bd. of Supers.*, 366 F.3d 754, 762 (9th Cir. 2004)

---

[13] Howze Supp. Decl. ¶¶3-5; Unger Decl. ¶¶26, 28 (Dkt. 8-9); Maldonado Decl. ¶¶41-43 (Dkt. 8-8); *see also* Dkts. 8-2 to 8-7, 8-10 to 8-12 (Providers' declarations in support of intervention); AR4354-55, 5843-44, 5391, 11899 (comments explaining that providers would lose access to health insurance without payroll deductions).

[14] Defendants do not contest that the Unions have representational standing to pursue this action on behalf of their members.  *See Oster v. Lightbourne*, 2012 WL 691833, at *11 (N.D. Cal. Mar.

(patients had standing where hospital closures would burden their access to health care). Defendants' claim that Intervenors' injuries are "speculative" is also undermined by CMS's own estimate that its Final Rule will impact "$71 million in union dues payments" and that Providers will incur costs to mail payments.  AR16695-96; *see Cal. v. Azar*, 911 F.3d 558, 571-2 (9th Cir. 2018) (injury established when agency's own regulatory analysis estimated economic costs).

The Unions will also suffer direct harm from the Final Rule and thus have standing in their own right.[15]  Defendants assert that the Unions' harm is speculative.  Dkt. 84 at 12.  To the contrary, specific declarations by union officials as well as historical experience establish that without payroll deduction some individuals will cease paying dues and the Unions will lose revenue.  *Supra* note 15.  The evidence also shows that the Unions have already been forced to divert staff time and funds towards developing and implementing alternative systems of dues payment in response to the 2018 NPRM and Final Rule and will be forced to continue diverting resources if Defendants' action is not set aside and enjoined.  *Id.*  This diversion of funds and lost revenue will harm the Unions' ability to bargain collectively, respond to grievances, offer benefits and services to members, and engage in other advocacy and support for homecare providers and consumers, *id.*, which establishes their organizational standing. *See East Bay Sanctuary Cov. v. Trump*, 932 F.3d 742, 766 (9th Cir. 2018).

Defendants object that the Final Rule regulates the states, not providers or unions.  Dkt. 84 at 13.  But where an asserted injury arises from a third party's response to a defendant's actions, causation is satisfied if the defendant has a "determinative or coercive effect" upon that third party.  *Bennett v. Spear*, 520 U.S. 154, 169 (1997).  The threat of losing federal Medicaid funding is "coercive," satisfying the causation requirement; and the states where the Providers work are committed by statute and by contract to honor homecare providers'

---

2, 2012) (homecare provider unions had representational standing to challenge changes to state's Medicaid plan affecting their members).  If one plaintiff (including any State) has standing, the Court need not decide whether any other plaintiff does.  *See Harris*, 366 F.3d at 761.

[15] Dkt. 8-8 ¶42-51; Dkt. 8-9 ¶29-36; Maldonado Supp. Decl. ¶¶3-7; Unger Supp. Decl. ¶¶3-9. *See also generally* Declaration of David Broder ("Broder Decl."); Jacobs Decl. ¶42.

voluntary union dues deductions, *supra* note 5, establishing redressability.  *See, e.g.*, Thomson Decl. ¶30; *Nat'l Fed'n of Indep. Businesses v. Sebelius*, 567 U.S. 519, 582 (2012).

**II.      Intervenors Are Within the Zone of Interests of the Medicaid Act**

Defendants concede that "medical providers" are within the zone of interests of the Medicaid Act and thus effectively admit that the Providers and the Unions' members, who are providers of Medicaid services, satisfy this requirement.  Dkt. 84 at 14.  Indeed, this Court has held that homecare providers and their unions are within the Medicaid Act's zone of interests "because the services they provide are a critical component of the mandates and benefits established by those laws" and because the unions represent the interests of their members. *Oster*, 2012 WL 691833, at *11 (collecting authorities).

Defendants' authorities are readily distinguishable.  In *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 524-30 (1991), the unions did not claim associational standing, and the only interest asserted was in job opportunities with the U.S. Postal Service, which fell outside the zone of interests of a statute protecting federal revenues by limiting private postal services.[16]  Here, by contrast, the Unions have standing on behalf of their members, and their interests are premised not on lost job opportunities but on protecting homecare providers' statutory and contractual rights and maintaining a stable, quality provider workforce for Medicaid beneficiaries.  Dkt. 8-9 ¶32; Dkt. 8-8 ¶52.  Because the zone of interests depends on the statute at issue, *Lexmark Int'l v. Static Ctrl. Components*, 572 U.S. 118, 130-31 (2014), Defendants' cases addressing other statutes are inapposite.  Dkt. 84 at 13-14.  Defendants cite no authority holding that Medicaid providers fall outside the Medicaid Act's or anti-reassignment provision's zone of interests.

**III.     The Final Rule Must Be Set Aside Because It Is Based on an Erroneous Legal Premise**

"[I]f [agency] action is based upon a determination of law … [it] may not stand if the

---

[16] Similarly, in *Pile Drivers Local Union No. 2376 v. Lujan*, 1989 WL 30254, at *1 (9th Cir. Mar. 23, 1989) (non-citable under Ninth Circuit Rule 36-3(c)), the union's interest was only in job opportunities, which fell outside the environmental protection law's zone of interests.

agency has misconceived the law."  *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007) (setting aside agency action based on "legally erroneous" premise); *Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985) ("An agency decision cannot be sustained … where it is based … on an erroneous view of the law.").  Here, the Final Rule is premised entirely on CMS's erroneous "new legal analysis" that §1902(a)(32) unambiguously prohibits payroll deductions for common employee benefits. AR16688-89.  As explained in the States' brief, however, §1902(a)(32) prohibits only payment diversions that, like assignments, give the assignee the right to submit claims to the government, which Congress found susceptible to fraud—as CMS itself recognized for years prior to 2018.  Like the agency in *Prill*, CMS based its action on its incorrect belief that §1902(a)(32) speaks "to the precise question at issue," that it prohibits all payroll deductions, and that no other interpretation is "explicitly or implicitly authorized," AR16688-89 (internal quotations omitted); *see Prill*, 755 F.2d at 947-48 (setting aside rule because agency erroneously believed that statute unambiguously compelled reversal of its prior policy).  Even if the plain meaning of the statute were not contrary to CMS's new interpretation (which it is, as demonstrated in the States' brief), the statute would at minimum be ambiguous with respect to that issue.  In that case, CMS's belief that its action was *compelled* by §1902(a)(32) would be an erroneous legal premise that renders its rulemaking invalid.[17]

## IV.   The Final Rule Must Be Set Aside Because CMS Failed to Consider the Serious Reliance Interests Engendered by Its Prior Interpretation or to Justify Its Policy Change, and Because CMS's Stated Rationale Is Arbitrary and Capricious

Although an agency may change its interpretation of a statute it is charged with

---

[17] Context and legislative intent must be considered when construing a statute unless the interpretation at issue is compelled by statutory language.  *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015); *id.* at 2492-96 (finding ambiguity in statutory provision based on context, and rejecting statutory interpretation based on plain text, because of its practical consequences on health insurance market and legislative intent); *Fed. Baseball Club v. Nat'l League of Prof. Baseball Clubs*, 259 U.S. 200, 208 (1922) (holding that, considering "nature of the business involved," Congress could not have intended Sherman Act to cover professional baseball, despite lack of express exemption); *Gallarde v. I.N.S.*, 486 F.3d 1136, 1141-42 (9th Cir. 2007) (holding, based on historical context, that statute foreclosed agency's construction).

administering, in doing so it must account for "serious reliance interests" engendered by its "longstanding policies." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (internal quotations omitted). Failure to adequately consider those interests is arbitrary and capricious. *Id.* at 2126-27. Addressing serious reliance interests and providing a reasoned explanation for policy changes are procedural requirements of rulemaking, which must be satisfied regardless of the merits of the agency's position. *See id.* at 2125.[18] CMS's rulemaking did not satisfy those requirements.

*Failure to Consider Reliance Interests.* The record is replete with evidence of significant reliance interests threatened by CMS's action, including evidence of stakeholders' longstanding use of payroll deductions to facilitate the payment of union dues and other important employee benefits like health insurance.[19] CMS dismissed these interests as "not serious" based on its incorrect assertion that they arose only from the 2014 Regulation. AR16689. CMS also treated providers' reliance interests as insignificant because, it said, they could use other methods to pay for union dues, health insurance premiums, and other benefits, AR16692. But CMS ignored contradictory evidence in the administrative record demonstrating that alternative methods were not viable and that, without payroll deductions, many providers would lose access to these benefits.[20] CMS's failure to consider the serious reliance interests evident in the record renders the Final Rule arbitrary and capricious. *Encino*, 136 S. Ct. at 2126-27; *New York v. HHS*, ---F.3d---, 2019 WL 5781789, at *50 (S.D.N.Y. Nov. 6, 2019) ("HHS's cursory discounting of the reliance issues here was inadequate.… Based on

---

[18] An agency's failure to provide an adequate explanation renders its action procedurally deficient and thus prevents proper judicial review. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573-76 (2019).

[19] *Supra* note 3; *see also* AR4341-42, 4356, 5778-79, 8976, 13890 (comments describing longstanding reliance, before 2014 Rule, on payroll deduction systems to administer health and other benefits to homecare providers).

[20] *See, e.g.*, AR5390-91 (without payroll deduction, providers' costs for benefits would necessarily increase and third-party vendors may refuse to offer benefits); 11175 (many homecare providers lack bank cards and cannot shift to another automatic payment system); AR4354-55, 5391, 5655, 5684, 5843-44, 11431, 10822, 10066-67, 11899 (comments explaining that homecare providers would lose health insurance coverage without payroll deductions).

this lapse, … the promulgation of the 2019 Rule was arbitrary and capricious.").

    ***Failure to Justify Policy Change.***   The Final Rule also does not meet the standard of

reasoned decisionmaking because CMS failed to "show that there are good reasons for the new

policy." *See Encino*, 136 S. Ct. at 2126 (internal quotes omitted).  A more detailed

explanation is required for an agency's new statutory interpretation where, as here, serious

reliance interests are at stake. *FCC*, 556 U.S. at 515.  CMS's prior interpretation of

§1902(a)(32) was supported by historical context, practical realities, and congressional

intent.[21]  But because the Final Rule mischaracterized the 2014 Rule as having added a new

exception to the statute rather than as having interpreted it, CMS failed to acknowledge, let

alone address, the "facts and circumstances that underlay" the 2014 Rule.  *Encino*, 136 S. Ct.

at 2126 (internal quotations omitted); *United Steel v. Mine Safety & Health Admin*., 925 F.3d

1279, 1284-85 (D.C. Cir. 2019) (agency's explanation for changed policy deficient where it

"completely ignored its previous finding" contradicting new policy).  CMS completely failed

to consider the context that informed its prior interpretation of the statute.  *Supra* note 21.

Defendants' argument that CMS supplied "good reasons" because its reversal "was based

solely on a 'new legal analysis,'" Dkt. 84 at 25, does not save the Final Rule because this terse

and conclusory explanation does not meet the standard required by law, *FCC*, 556 U.S. at 515;

*Encino*, 136 S. Ct. at 2126-27 (agency's "summary discussion" of changed interpretation was

arbitrary and capricious); CMS's statutory construction is wrong; and CMS's explanation is

belied by its decision to preserve a different regulatory exception not expressly enumerated at

§1902(a)(32), §447.10(g)(3), which CMS dismissed as "outside the scope of this rulemaking."

---

[21] *See* AR5-8.  CMS found that homecare programs developed after §1902(a)(32) was enacted
and, thus, Congress could not have intended to prohibit any payroll practices in these programs;
programs in which the states function as joint employers to facilitate providers' access to
training, insurance, and other common employee benefits were not "of the same nature" as the
factoring arrangements Congress sought to ban; states' homecare provider workforces suffered
from high turnover and states had trouble meeting demand; enabling customary employment
benefits would solve those problems by stabilizing and professionalizing the workforce, which
would improve outcomes for Medicaid beneficiaries; giving states flexibility to manage their
homecare workforces is consistent with the Medicaid Act's purpose; and the deductions at issue
are only those that providers affirmatively and voluntarily authorize.

AR16689.[22]

*Failure to Consider Important, Relevant Facts*.  CMS also failed to acknowledge or misunderstood several important issues raised by the comments to the 2018 NPRM: first, the employment relationship between homecare providers and states, second, the impact of the Rule on other authorized payroll deductions; third, the operation of fiscal management services ("FMS" or "fiscal intermediaries"); and, fourth, the voluntariness of union dues deductions. Each of these issues is fundamental to understanding both the statutory and practical context for the voluntary payroll deductions at issue.  CMS's failure to acknowledge or respond to the voluminous evidence in the record regarding these issues shows that CMS "entirely failed to consider an important aspect of the problem, [and] offered an explanation for its decision that runs counter to the evidence," such that its rulemaking was arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Initially, CMS mischaracterized the employment relationship between homecare providers and states in consumer-directed systems.  CMS repeatedly asserted that the Final Rule does not affect "bona fide employment" situations and that "[a]s non-employees, such practitioners do not receive salaries or wages from the state."  *E.g.*, AR16690, 16691, 16692, 16689.  In doing so, CMS made clear that its reasoning tracked anti-union sources, which also take the position that consumer-directed homecare providers have no "bona fide" employer since they work directly for Medicaid beneficiaries.  *See supra* note 6.  But the record shows otherwise: states *do* pay wages to homecare providers (from which they deduct employment taxes) and operate as joint employers in many other respects.[23]  Notably, the Final Rule's

---

[22] "[A]n internally inconsistent analysis is arbitrary and capricious."  *Nat'l Parks Conserv'n Ass'n. v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015).  Additionally, this internal inconsistency demonstrates the pretextual nature of CMS's stated rationale.  *See New York*, 139 S. Ct. at 2575 (finding pretext because of "disconnect between" agency's decision and proffered rationale); *State v. Ross*, 358 F.Supp.3d 965, 1040 (N.D. Cal. 2019) (finding pretext where stated reason was contradicted by evidence in record).

[23] *Supra* 3-4 & note 3.  CMS was well aware of this relationship prior to the 2018 NPRM.  *See* AR7 (2012 NPRM finding that each state should enjoy "flexibility in investing in *its* [homecare] workforce." (emphasis added)); 15 (PHI comment in 2012 explaining, "[f]or consumer-directed home care workers, it is even more vital that states assume some of the human resources

failure to acknowledge that states deduct taxes from homecare providers' wages also renders those federally mandated deductions vulnerable to invalidation under CMS's reasoning and shows that the Final Rule was driven by an anti-union agenda, not statutory construction.[24]

CMS responded to comments expressing concern about the loss of voluntary deductions by asserting that "nothing in this rule would interfere with an employer's ability to make payroll deductions that are required by law or voluntary deductions for things like health and life insurance, contributions to charitable cases, retirement plan contributions, and union dues." AR16690. But that is *exactly* what CMS expects the Final Rule to do. *See* AR16694-95. In this manner, CMS misconstrued the many thousands of comments that complained about the loss of payroll deductions for critical benefits as being from homecare providers employed and paid by *agencies* rather than from providers in consumer-directed programs affected by the Final Rule because they are paid wages directly by a state. *See HHS*, 2019 WL 5781789, at *50-51 (although decision was purportedly based on agency's statutory interpretation, "HHS's dismissive treatment of" and "meager and non-committal responses to" public comments raising important practical concerns was arbitrary and capricious).

CMS also justified its Final Rule on the basis of an arbitrary and unexplained distinction between payroll deductions made by the state as a joint employer of homecare providers (which it deemed impermissible) and deductions made by an FMS vendor (which it said were allowed). AR16688. In the latter case, states send monies owed to homecare providers to FMS vendors, which make authorized payroll deductions for taxes, child support, union dues, and benefits, then remit the remaining wages to the homecare providers. *Id.*

---

functions of typical employers."); *see also* AR56 (2014 Rule noting that for consumer-directed homecare providers "the state … has many attributes of an employer").

[24] In response to comments requesting clarification as to whether states would be allowed to continue withholding taxes, CMS stated only that providers could make assignments to governmental agencies. AR16689. But required tax withholdings are not "assignments," which by definition are voluntary. *See* AR16690; Restatement (1st) Contracts §149 ("assignment" is "a manifestation to another person by the owner of the right indicating his intention to transfer … the right to such person or to a third person."). This is yet another example of the arbitrary and capricious nature of CMS's rationale.

CMS's failure to explain why certain deductions are exempt merely because they are made by a third party FMS vendor rather than the state itself also renders the Final Rule arbitrary and capricious.  *See Nat'l Parks*, 788 F.3d at 1143.

CMS also mischaracterized the voluntary nature of the payroll deductions at issue and erroneously treated the deductions as coming from funds that would otherwise be used for Medicaid services rather than from homecare providers' already earned wages—echoing the anti-union campaign materials, *supra* 6 & note 6.  The Final Rule claims to "put[] Medicaid providers *back in control* of their reimbursements," AR16689 (emphasis added), falsely suggesting—contrary to the administrative record—that providers did not control voluntary deductions for union dues, health insurance, and other benefits.[25]  Additionally, CMS repeatedly—and self-servingly—referred to these deductions as "diversions" or "re-direct[ions]" of Medicaid funds, and suggested that they inflated Medicaid rates, *see* AR61-62, 16695.[26]  These characterizations were plainly contradicted by evidence in the record, including CMS's prior rulemaking and comments submitted in response to the 2018 NPRM.[27]

*     *     *

For all of these reasons, CMS's purported rationale cannot pass muster, nor "be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.  Instead, the record shows that the Final Rule was motivated by anti-union bias.  *Supra* 6 & note 6.  CMS's new policy mirrored the (misguided) arguments made by anti-union

---

[25] *See* AR8 (CMS finding that, generally, "the State would only be allowed to deduct amounts …. [w]ith the express permission each individual practitioner, [and therefore, …] the amounts remitted to a third party would be on the behalf of the individual practitioner."); AR16734 (CMS June 2018 letter stating that §447.10(g)(4) "only appl[ied] to voluntary arrangements, where the individual practitioner has expressly elected the benefit and agreed to the state making the third party payment on his or her behalf").  *See also, e.g.*, AR11128-29, 11430-31, 10451.

[26] *See* AR16690, 16691, 16692, 16693, 16694, 16695 (CMS references to "payment diversion" or "redirect[ion]"); CMS Press Release, *supra* note 8.

[27] *See* AR8 (states cannot claim payments for employee trainings and other common benefits as Medicaid expenditures, so §447(g)(4) "would have little to no impact on Federal Medicaid funding levels"); AR5542 (in most states with homecare provider unions, Medicaid spending was *below average*); *supra* note 3 (paystubs showing deductions taken from earnings).

17

organizations in their campaign to disrupt homecare provider unions, most notably by focusing on union dues rather than other commonplace deductions.[28]  The *only* outside sources CMS relied on were articles falsely referring to homecare providers' voluntarily authorized dues deductions as "skimming" and "misuse" of Medicaid funds,  AR16695 n.2, 16698, 16718—assertions refuted by the administrative record, *supra* note 25.  CMS's reliance on such false claims "is the essence of arbitrary and capricious decisionmaking."  *See Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003).[29]

## V.      The Motion to Dismiss Intervenors' Equal Protection Claim Should Be Denied

Government action that targets a particular group violates equal protection if motivated by "a bare … desire to harm" that group.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446-47 (1985) (internal quotations omitted).  Intervenors' Complaint alleges as follows: the Final Rule grew out of an effort by anti-union entities to spread the false narrative that homecare provider unions were "skimming" Medicaid money, Dkt. 73 ¶¶58-62, 87; the Final Rule "was motivated by animus toward" organized labor and "a bare desire to harm a group that is particularly disfavored with the current federal administration and its supporters," *id.* ¶¶131, 133; the Final Rule is supported by no other legitimate rationale, *id.* ¶¶75-90; and the Final Rule has the purpose and effect of harming homecare providers who have chosen to support their unions, *id.* ¶¶91-97.  These allegations plausibly state an equal protection claim. *See Cleburne*, 473 U.S. at 448 (evidence of animus included private parties' negative statements in record of decision); *Dragovich v. U.S. Dep't of Treasury*, 848 F.Supp.2d 1091,

---

[28] *See, e.g.*, AR16694-95 (Final Rule will "stop redirecti[on of] a portion of homecare workers' payments to unions for membership dues"); AR16695 n.2 (citing anti-union publications that falsely referred to providers' voluntary dues authorizations as "dues skimming"); AR16695 (failing to quantify economic impact of Final Rule on *any* payroll deduction except union dues).

[29] Where the record shows that an agency's stated rationale was not the actual reason for its action, the agency's pretext *itself* violates the APA and is grounds for vacating and remanding. *See New York*, 139 S. Ct. at 2573-76; *Ross*, 358 F.Supp.3d at 1040.  Here, CMS had no evidence of misuse of Medicaid funds, *supra* notes 11 & 12, and Defendants produced nothing in in the administrative record—not even in a privilege log—that CMS appears to have directly or indirectly relied on in promulgating its new interpretation *except for* anti-union sources making demonstrably false claims (some of which were not disclosed to the public), *supra* notes 6 & 9.

1098-1104 (N.D. Cal. 2012) (looking to "historical background of the decision and the specific sequence of events leading up to the challenged decision," and holding that plaintiffs stated equal protection claim based on animus (internal quotations omitted)); *United States v. Windsor*, 570 U.S. 744, 770 (2013) ("unusual deviation" from general practice "is strong evidence of" animus).  Even the limited (and incomplete, *supra* note 12) administrative record substantiates these allegations that the Final Rule was actually motivated by animus.[30]

Defendants' motion fails to address Intervenors' allegations of animus.  Other than *Cleburne*, which supports Intervenors, none of Defendants' cases involve claims based on unconstitutional animus.  Dkt. 84 at 26-27.  Defendants' argument that the Final Rule is supported by rational bases is irrelevant because "no legitimate purpose overcomes the purpose and effect to disparage and to injure" a targeted group.  *Windsor*, 570 U.S. at 775; *see also USDA v. Moreno*, 413 U.S. 528, 543 (1973) (government may not "accomplish [a legitimate] purpose by invidious distinctions between classes of its citizens." (internal quotations omitted)).  Intervenors have stated an equal protection claim.

## VI.    The Motion to Dismiss Intervenors' First Amendment Claim Should Be Denied

Finally, Intervenors state a valid claim that the Final Rule violates the First Amendment because it targets unions' and union members' speech and association.  The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect" of liberty and freedom of speech enshrined in the Constitution.  *NAACP v. Alabama*, 357 U.S. 449, 460 (1958).  Union members exercise this First Amendment right when they pay voluntary union dues to support their unions' expressive activities on their behalf.  *Cf. Janus v. AFSCME Council 31*, 138 S. Ct. 2448, 2464 (2018) (payment to union is First Amendment expressive activity); *Harris v. Quinn*, 573 U.S. 616, 647 (2014) (same); *AFSCME v. Woodward*, 406 F.2d 137, 139 (8th Cir. 1969) ("Union membership is protected by the right of

---

[30] *Supra* 6 & note 6.  Discovery on Intervenors' constitutional claims will generate additional evidence of animus.  *See Hensala v. Dep't of Air Force*, 343 F.3d 951, 955 (9th Cir. 2003) (court-ordered discovery taken in case asserting APA and constitutional challenges to agency action).

association under the First and Fourteenth Amendments.").

Intervenors' complaint plausibly alleges that CMS substantially impeded Intervenors' First Amendment rights by denying them an important benefit (use of payroll deductions to pay for common employee benefits, including insurance and voluntary union dues) because of their "association with an unpopular organization"—homecare provider unions. *Healy v. James*, 408 U.S. 169, 186 (1972); *see also* Dkt. 73 ¶¶58-62, 93. Defendants contend that the Final Rule has "no direct effect" on providers' freedoms of speech and association, Dkt. 84, at 29, but that argument is belied by the record evidence. *Supra* 9-10 & note 13. Because of the Final Rule, Providers and other union members will find it far more difficult to maintain their memberships, and the Unions will lose much of the member support on which they rely to engage in protected expressive activities. *Id.*[31] Defendants' argument that Providers may pay union dues through other means is irrelevant because the availability of alternatives "does not ameliorate … the disabilities imposed by the [government's] action." *Healy*, 408 U.S. at 183; *see also Linmark Assoc. v. Willingboro*, 431 U.S. 85, 93 (1977) (limitation on speech does not leave open other channels where those alternatives "involve more cost and less autonomy").[32]

## CONCLUSION

The Court should deny Defendants' motion to dismiss and grant Intervenors' summary judgment motion. Intervenors also join the States' request for a permanent injunction; the evidence demonstrates, *see supra* 9-10 & notes 13, 15, that Intervenors will suffer irreparable harm if Defendants are not enjoined from implementing their new policy.

---

[31] The Supreme Court has approved certain limitations on payroll deduction for payments to unions, but only in cases involving a state's decision not to *subsidize* union speech through *its own* processing of such deductions. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009); *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 184 (2007). Here, by contrast, the Final Rule forces states, *against their will*, to cease such deductions. *Cf. Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1135, 1139 (11th Cir. 2014) (comparing state law to *Ysursa*'s because it did not prohibit certain forms of payment, but rather "decline[d] to promote speech"); *see Dallman v. Ritter*, 225 P.3d 610, 627-28 (Colo. 2010) (distinguishing *Ysursa* because it "addressed] how contributions can be made," not "a complete ban").

[32] Defendants fault Intervenors' Complaint for failing to specifically allege a facial challenge, but the distinction between facial and as-applied challenges "goes to the breadth of the remedy, not what must be pleaded in a complaint." *FEC v. Citizens United*, 558 U.S. 310, 331 (2010).

Respectfully submitted,

Dated: November 15, 2019        By:        /s/ Stacey M. Leyton
                                           STACEY M. LEYTON
                                           P. CASEY PITTS
                                           STEFANIE L. WILSON
                                           Altshuler Berzon LLP
                                           *Attorneys for Plaintiff-Intervenors*

                                           NICOLE G. BERNER
                                           nicole.berner@seiu.org
                                           RENEE M. GERNI
                                           renee.gerni@seiu.org
                                           SERVICE EMPLOYEES INTERNATIONAL
                                           UNION
                                           1800 Massachusetts Ave, NW
                                           Washington DC 20036
                                           Tel: (202) 730-7813
                                           Fax:  (202) 429-5565
                                           *Attorneys for Plaintiff-Intervenor Service*
                                           *Employees International Union Local 503*

                                           JUDITH RIVLIN
                                           jrivlin@afscme.org
                                           TEAGUE P. PATERSON
                                           tpaterson@afscme.org
                                           FERNANDO R. COLÓN
                                           fcolon@afscme.org
                                           AMERICAN FEDERATION OF STATE,
                                           COUNTY, & MUNICIPAL EMPLOYEES
                                           1101 17th St, NW
                                           Washington, DC 20036
                                           Tel: (202) 775-5900
                                           Fax: (202) 452-0556
                                           *Attorneys for Plaintiff-Intervenor United Domestic*
                                           *Workers, AFSCME Local 3930*