UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA BY AND
THROUGH ATTORNEY GENERAL
XAVIER BECERRA, et al.,

        Plaintiffs,

    v.

ALEX M. AZAR, et al.,

        Defendants.

Case No.  19-cv-02552-VC

**ORDER DENYING DEFENDANTS'
MOTION TO DISMISS AND MOTION
FOR SUMMARY JUDGMENT;
GRANTING PLAINTIFFS' CROSS-
MOTIONS FOR SUMMARY
JUDGMENT**

Re: Dkt. Nos. 84, 85, 87, 89, 90, 91, 95,
105

       As part of their Medicaid programs, states offer low-income and disabled residents the option of receiving care at home. To help both the patients receiving this care and the workers providing it, many of these states use a payroll system that processes the workers' voluntary deductions for things like health insurance, union dues, and taxes before sending the workers their paychecks. Some states have done this for nearly three decades. In 2018, however, the federal government banned these payroll practices. It claimed it was required to do so because the practices are unequivocally barred by the Medicaid statute.

       This was legal error. There is no clear prohibition on these payroll practices in the Medicaid statute. At a minimum, the statute is ambiguous regarding their permissibility. In fact, considering the language of the statute as a whole, along with its legislative history and programmatic purpose, arguably the only reasonable interpretation of the statute is that it does not bar the payroll practices. Because the federal government's 2018 action was based on an erroneous interpretation of the Medicaid statute, that action must be vacated.

**I. Background**

A. Medicaid's Anti-Reassignment Provision

Medicaid is a program through which the federal government helps the states ensure that low-income and disabled residents can access health care services. The program is incredibly complicated. How it operates depends on the state, and on the particular services provided. But at the highest level of generality, the federal government and the states work together to ensure that health care providers receive payment for services offered to low-income and disabled patients who qualify for Medicaid assistance. In the typical example, a doctor will provide care to a Medicaid patient and then submit a claim for reimbursement to the state. The state will make the payment so long as the provision of services was consistent with its Medicaid plan. The Medicaid plan is crafted by the state, but must be submitted to the federal government for approval. If the federal government determines that the state plan complies with certain requirements, the federal government approves the plan and makes a major financial contribution to help the state implement it. The federal government also conducts oversight. The federal entity that administers the Medicaid program is the Center for Medicaid Services ("CMS"), which is located within the Department of Health and Human Services.

The dispute in this case involves one discrete portion of Medicaid's vast statutory scheme: 42 U.S.C. § 1396a(a)(32). Section 1396a(a)(32) contains one of the many requirements that state Medicaid plans must follow before receiving federal approval and funds. All parties refer to this section as the "anti-reassignment provision," and they appear to have no disagreement about the purpose of its adoption. After Congress established Medicaid, the program began experiencing an unanticipated problem. Doctors and other health care professionals would provide services to Medicaid patients, but instead of submitting claims to the states for reimbursement themselves, they would sell those claims to companies for a percentage of their value. The companies would then undertake the effort and expense of submitting those claims to the states and would keep the reimbursement payments for themselves. This practice is known as "factoring." Although everyone seems to agree that there is nothing inherently wrong with factoring, the practice often led to the submission of inflated or

2

false claims, raising concerns that the factoring industry was a breeding ground for Medicaid fraud. The anti-reassignment provision was Congress's response to this problem.

The original version of the provision was adopted in 1972. The language was quite broad, appearing to prohibit a vast range of conduct beyond just factoring. It stated: "no payment under the plan for any care or service to an individual by a . . . practitioner shall be made to anyone other than such individual or such . . . practitioner," with a few exceptions discussed below. Social Security Amendments of 1972, Pub. L. No. 92-603, § 236(b), 86 Stat. 1329, 1415 (1972). To be sure, the provision was described throughout the legislative history as a response to the problem of factoring and as a "prohibition against reassignment of claims to benefits." H.R. REP. NO. 92-231, at 104 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5090; S. REP. NO. 92-1230, at 204 (1972). But the actual text did not zero in on factoring or assignments of claims; it focused more broadly on who could and could not receive payments from the state.

In 1977, Congress amended the anti-reassignment provision to close what it perceived to be a loophole that the factoring companies were exploiting. The companies had stopped paying health care providers a fraction of the value of the reimbursement claims in exchange for *assignment* of those claims, and instead had providers give them *power of attorney* to pursue reimbursement claims on the providers' behalf. Although there was no actual assignment, the upshot of the arrangement was the same—the providers would get a percentage of the value of the claim, and the companies would get anything above that in exchange for undertaking the effort of submitting the claims to the state. As with the earlier arrangements, states apparently continued to receive inflated and incorrect reimbursement claims. The purpose of the 1977 amendment to the anti-reassignment provision, as all parties appear to agree, was to close this perceived loophole.[1]

_____

[1] A lawyer today might wonder why Congress and the factoring companies would even have considered this a loophole. After all, the plain language of the original anti-reassignment provision appeared broad enough to prevent far more than payments to companies as a result of "assignment," and would seem to prevent third parties from obtaining payment from states pursuant to a power of attorney arrangement as well. But back in the 1970's, lawyers and judges

To accomplish this goal, Congress added language to specify that a company couldn't get around the anti-reassignment provision simply by avoiding an actual assignment. The amended provision states (again, subject to certain exceptions that will be discussed later) that "no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, *under an assignment or power of attorney or otherwise*." 42 U.S.C. § 1396a(a)(32) (emphasis added). As stated in the House Report, this new phrase was added "to preclude the use of a power of attorney as a device to circumvent the existing ban on the use of 'factoring' arrangements in connection with the payments of claims." H. REP. NO. 95-393(II), at 48 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3051; *see also* S. REP. NO. 95-453, at 6 (1977).

This case is primarily about the meaning of this revised version of the anti-reassignment provision, and whether that provision applies to the system some states use for compensating home care workers who serve Medicaid patients.

B. Compensation of Home Care Workers

Many Medicaid patients need care at home. They receive this care from home care workers who assist patients with things like bathing, eating, dressing, taking medicine, general housekeeping, and going to appointments. According to the undisputed evidence in the record, this kind of home-based assistance helps patients avoid institutional living arrangements that will often cause their heath to deteriorate, and that will end up costing the government more money in the long run. Although the work is physically and psychologically demanding, home care workers can be as poor as the Medicaid patients they serve, with median hourly earnings of $10.49 nationwide. These conditions make it difficult to recruit and retain home care workers despite increasingly high demand for the services that they offer. And the high turnover rate can

---

focused less on statutory language and more on statutory purpose. Regardless of how a court might be required to interpret the broad language of the original provision today, it's not surprising that everyone at the time seemed to understand it as covering nothing more than payments by states to companies who had actually been assigned reimbursement claims. After all, everyone involved called it the "anti-reassignment provision."

affect the quality of care that Medicaid patients receive.

Some states have attempted to address these recruitment and retention problems by designing systems to improve conditions for home care workers, thus improving the quality of care Medicaid patients receive. California's system provides an illustrative example. In California, a person who qualifies as a Medicaid patient can choose to hire a home care worker, often from a registry of workers maintained by the state. The Medicaid patient is responsible for scheduling, supervising, and, if necessary, firing the worker. The patient and home care worker also prepare timesheets documenting the hours of service that the worker provides. But the state of California and its local subdivisions (sometimes the county, sometimes a special entity whose sole purpose is to administer the home care program), facilitate the employment process and serve some of the employer functions as well. For example, the state receives and processes the timesheets submitted by Medicaid patients, and performs other administrative payroll functions such as sending W-2 forms and paychecks to the home care workers. In addition, local government entities are designated as the home care workers' "employers of record" for purposes of negotiating with unions that have been authorized to bargain collectively on home care workers' behalf. The unions and local government entities enter into collective bargaining agreements requiring that the government provide certain wages, training, conditions of employment, and benefits to the home care workers. The home care workers can elect whether to make withholdings from their paycheck for options provided pursuant to these collective bargaining agreements, such as for health insurance or union dues. Before California sends home care workers their paychecks (technically, reimbursement for the provision of services to Medicaid patients), it deducts the amounts that the workers elected to withhold, along with amounts for things like taxes. Other states have similar systems, where Medicaid patients oversee the day-to-day employment of home care workers, but unions representing the workers negotiate wages and benefits directly with the state, and the state performs payroll functions and deducts taxes and voluntary withholdings from workers' paychecks before distributing them.

These payroll practices—by which states make payments to home care workers after

processing their deductions—have been in existence since the early 1990s. It appears that, for the longest time, nobody ever thought there was a legal problem with it. In fact, the federal government consistently approved state Medicaid plans that called for home care workers to be paid in this way. But at some point, the question arose as to whether these payroll practices violated the anti-reassignment provision. Specifically, the question was whether sending a deduction from a home care worker's paycheck to a health insurance company or a union before sending the remainder to the worker constituted a "payment under the plan" for the "care or service provided" to the Medicaid patient to someone "other than" the Medicaid patient or the worker "under an assignment or power of attorney or otherwise." *See* 42 U.S.C. § 1396a(a)(32).

Ultimately, in 2014, CMS addressed this question by amending its regulation implementing the anti-reassignment provision. That regulation, titled "prohibition against reassignment of provider claims," elaborates upon the anti-reassignment provision in the statute itself, and provides additional details about the types of payments that are and are not permitted. *See* 42 C.F.R. § 447.10. In the 2014 amendment to this regulation, CMS added language to clarify that the states' payroll practices for home care workers did not violate the anti-reassignment provision because, under its interpretation, the provision did not apply in those circumstances. *See* 79 Fed. Reg. 2948, 2949, 3001-02 (2014). The new language stated: "In the case of a class of practitioners for which the Medicaid program is the primary source of service revenue, payment may be made to a third party on behalf of the individual practitioner for benefits such as health insurance, skills training and other benefits customary for employees." 42 C.F.R. § 447.10(g)(4).

But in 2018, following a change in presidential administrations, CMS repealed this part of the regulation. CMS claimed that it was legally required to take this action because the 2014 amendment authorizing the payroll practices was in clear violation of the anti-reassignment provision in section 1396a(a)(32). *See* 84 Fed. Reg. 19718, 19718-19721 (2019). CMS noted that section 1396a(a)(32) contained several exceptions to the prohibition against "payment under the plan" to someone other than the provider or patient, and observed that the states' payroll

6

practices for home care workers was not among those exceptions. *See id.* The upshot, according to CMS, was that states may not process deductions for home care workers; instead, the workers must make the payments for health insurance, union dues, and similar benefits on their own, after they receive payment from the state for the full amount of their reimbursement. Following the repeal, CMS has threatened to take enforcement action against states that continue these payroll practices (although it has yet to make good on those threats).

C. The Lawsuit

A group of states, led by California, filed this lawsuit against the federal government, challenging the legality of the decision to ban their payroll practices for home care workers by repealing the 2014 rule authorizing those practices. Several individual home care workers, along with the unions that represent them, intervened as plaintiffs. The plaintiffs contend primarily that CMS's repeal of the 2014 rule violated the Administrative Procedure Act because it was based on the erroneous premise that repeal was legally required. Indeed, not only do the plaintiffs disagree that the anti-reassignment provision unequivocally bars their payroll practices, they argue that the only reasonable interpretation is that it does not apply to their payroll practices at all.

The intervenors have also brought two constitutional claims. They contend that CMS's decision to ban the payroll practices is an equal protection violation because it was the product of anti-union animus. And they contend that the decision violates the First Amendment because it was intended to suppress the political activities of the labor movement. The parties have filed cross-motions for summary judgment.[2]

---

[2] CMS also moved to dismiss the case on the ground that the plaintiffs lack standing to sue. That is clearly wrong, so the motion is denied. The states have demonstrated that if they are required to terminate their longstanding payroll practices for home care workers they will suffer an "injury" within the meaning of Article III, both because they will be forced to spend money changing their practices and because eliminating this benefit for the workers will harm their Medicaid programs. *See, e.g.*, *California v. Trump*, 963 F.3d 926, 935-36, 938-39 (9th Cir. 2020); *see also Alfred L. Snapp & Son, Inc., v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). CMS has threatened enforcement action against the states (indeed, it refused at a case management conference to stay enforcement while this lawsuit was pending), so the threat of this injury is imminent. *See California v. Azar*, 911 F.3d 558, 573-74 (9th Cir. 2018). The individual

## II. Discussion

### A. The Meaning of the Anti-Reassignment Provision

Under the Administrative Procedure Act, a Court must "hold unlawful and set aside agency action" if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency decisions "which rest on an erroneous legal foundation" "must, of course, [be] set aside." *Oregon v. Ashcroft*, 368 F.3d 1118, 1129 (9th Cir. 2004) (quoting *NLRB v. Brown*, 380 U.S. 278, 291-92 (1965)); *see also Mendenhall v. National Transportation Safety Board*, 92 F.3d 871, 874 (9th Cir. 1996). So if an agency makes a decision without exercising any policymaking discretion because it "erroneously believes it is bound to [that] specific decision," that decision must be vacated and remanded so that the agency can properly exercise its discretion. *United States v. Ross*, 848 F.3d 1129, 1134 (D.C. Cir. 2017); *see also Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007); *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

When CMS adopted the policy barring the states' payroll practices, it asserted that it believed it was required to do so. *See* 84 Fed. Reg. at 19718 ("We have concluded that [the 2014] provision is neither explicitly nor implicitly authorized by the statute[.]"); *id.* at 19719 ("The [2014] regulatory provision . . . granted permissions that Congress has not expressly authorized, and in our interpretation, has foreclosed."); *id.* ("[W]e have determined that the [2014] regulatory provision is foreclosed by statute[.]"); *id.* at 19720 ("we have determined that we did not have" the "authority to enact the [2014] exception at § 447.10(g)(4)"); *id.* at 19721 ("As previously discussed, we are removing § 447.10(g)(4) because, after revisiting our previous interpretation, we have determined that we lacked statutory authority to implement [it]."). In

---

home care workers who intervened have standing for similar reasons—enforcement of the new CMS policy will cost them time and money, as CMS's own economic analysis concluded. *See id.* at 572; *Council of Insurance Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008). Although the question of whether the home care workers' unions have standing is more complicated, it doesn't matter because an intervenor need not independently establish Article III standing to pursue relief that is identical to the relief sought by an entity that does have standing. *See Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020).

other words, CMS insisted that it had no discretion to authorize the states' payroll practices because the statute unequivocally barred them. Thus, the question in this case is whether CMS was correct that the anti-reassignment provision of the Medicaid statute clearly and unequivocally barred it from authorizing the states' payroll practices for home care workers. If the answer to that question is no—that is, if the anti-reassignment provision in fact allows the payroll practices or if the provision is ambiguous as to the validity of these practices and subject to more than one reasonable interpretation—then the new CMS policy was adopted on an erroneous legal premise and the decision to adopt it violated the Administrative Procedure Act.

The absolute best that can be said for CMS is that the anti-reassignment provision is ambiguous as it relates to the payroll practices at issue here. The key phrase, as noted in Section I.A., is "under an assignment or power of attorney or otherwise." The full provision states: "A state plan for medical assistance must . . . provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise," with four enumerated exceptions. 42 U.S.C. § 1396a(a)(32). CMS contends that this language bars *any* type of payment for care or service under the plan unless it is to the person receiving the care or the person providing the care. Under that reading, "assignment" and "power of attorney" are two examples of prohibited payments, and the phrase "or otherwise" means any other type of payment. That is perhaps a facially plausible interpretation, at least if you view that language in isolation. But another plausible interpretation is that "or otherwise" references payments pursuant to arrangements that are similar to, or in the same category as, an "assignment" or a "power of attorney." *See Washington State Department of Social & Health Services v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384-85 (2003). And of course, the states' practices of making deductions from the paychecks of home care workers in accordance with their voluntary elections are quite different from payments to a third party pursuant to an assignment or power of attorney. Thus, even viewing this language in isolation does not support the federal government's argument that the statute unambiguously bars the states' payroll

practices.

Viewing the language in context—specifically, the context of the exceptions to the anti-reassignment provision—only weakens the federal government's argument. CMS invokes the familiar principle that if a statute prohibits certain conduct but lists several exceptions to the prohibition, then anything not falling within the list of exceptions is prohibited. *See United States v. Johnson*, 529 U.S. 53, 58 (2000). CMS notes—correctly—that the payroll practices at issue here are not covered by any exception. But that only begs the question of whether the general prohibition is broad enough to apply to the payroll practices in the first place. Although the exceptions are somewhat difficult to decipher, all seem to contemplate payments pursuant to an arrangement where a third party entity—and not the provider or patient—submits claims for reimbursement to the state and the state pays those claims directly to the third party. Thus, the statute allows a physician's employer to submit claims for reimbursement of a physician's fees if the physician's employment is conditioned on turning over these fees to the employer. 42 U.S.C. § 1396a(a)(32)(A)(i).[3] If a physician provides services at a hospital, the hospital can claim payment for the physician's services if the contract between the hospital and physician authorizes it. *Id.* § (a)(32)(A)(ii).[4] A provider can assign Medicaid payments to a government agency, and if the agency submits the provider's claims, the state does not run afoul of the anti-reassignment provision by paying the agency directly. *Id.* § (a)(32)(B).[5] If one doctor provides

---

[3] The full text of this exception states that the anti-reassignment provision does not apply "in the case of any care or service provided by a physician, dentist, or other individual practitioner, such payment may be made [] to the employer of such physician, dentist, or other practitioner if such physician, dentist, or practitioner is required as a condition of his employment to turn over his fee for such care or service to his employer . . . ." 42 U.S.C. § 1396a(a)(32)(A)(i).

[4] Specifically, this provision states that "where the care or service was provided in a hospital, clinic, or other facility," Medicaid payments can be made "to the facility in which the care or service was provided if there is a contractual arrangement between such physician, dentist, or practitioner and such facility under which such facility submits the bill for such care or service." 42 U.S.C. § 1396a(a)(32)(A)(ii).

[5] This exception provides that "nothing in this paragraph shall be construed (i) to prevent the making of such a payment in accordance with an assignment from the person or institution providing the care or service involved if such assignment is made to a governmental agency or entity or is established by or pursuant to the order of a court of competent jurisdiction, or (ii) to preclude an agent of such person or institution from receiving any such payment if (but only if) such agent does so pursuant to an agency agreement under which the compensation to be paid to

treatment to a Medicaid patient that is incidental to treatment being provided by another doctor, that second doctor may submit claims for services provided by the first doctor. *Id.* § (a)(32)(C).[6] And the statute allows states to directly pay the manufacturer of a vaccine given to a child entitled to Medicaid assistance if, among other things, the manufacturer supplies that vaccine to providers who are administering it. *Id.* § (a)(32)(D).[7]

These exceptions tend to support the plaintiffs' interpretation of the anti-reassignment provision: because the only types of transactions excepted are *assignment-type* transactions where a third party submits the claims directly to the state, it makes sense to interpret "under an assignment or power of attorney or otherwise" as only prohibiting payments to a third party that entered into *that type* of arrangement. *See Rancheria v. Jewell*, 776 F.3d 706, 711 (9th Cir. 2015) (noting that a statute's "exception" and "general prohibition" must be read in context). And the payroll practices for home care workers are different enough from the assignment-type transactions contemplated by the exceptions to the anti-reassignment provision as to raise serious questions about whether the language of the general anti-reassignment provision itself could reasonably be construed to cover those practices in the first place. Indeed, although the Court is not sufficiently familiar with the transactions described in the exceptions to say for certain, it

---

the agent for his services for or in connection with the billing or collection of payments due such person or institution under the plan is unrelated (directly or indirectly) to the amount of such payments or the billings therefor, and is not dependent upon the actual collection of any such payment." 42 U.S.C. § 1396a(a)(32)(B).
[6] The text states: "in the case of services furnished (during a period that does not exceed 14 continuous days in the case of an informal reciprocal arrangement or 90 continuous days (or such longer period as the Secretary may provide) in the case of an arrangement involving per diem or other fee-for-time compensation) by, or incident to the services of, one physician to the patients of another physician who submits the claim for such services, payment shall be made to the physician submitting the claim (as if the services were furnished by, or incident to, the physician's services), but only if the claim identifies (in a manner specified by the Secretary) the physician who furnished the services." 42 U.S.C. § 1396a(a)(32)(C).
[7] This final exception provides in full: "in the case of payment for a childhood vaccine administered before October 1, 1994, to individuals entitled to medical assistance under the State plan, the State plan may make payment directly to the manufacturer of the vaccine under a voluntary replacement program agreed to by the State pursuant to which the manufacturer (i) supplies doses of the vaccine to providers administering the vaccine, (ii) periodically replaces the supply of the vaccine, and (iii) charges the State the manufacturer's price to the Centers for Disease Control and Prevention for the vaccine so administered (which price includes a reasonable amount to cover shipping and the handling of returns)." 42 U.S.C. § 1396a(a)(32)(D).

may be that they all involve actual assignments (as opposed to merely assignment-like transactions), where the third party not only submits the claims directly to the state but actually steps into the shoes of the provider or patient and acquires the legal right to reimbursement. If so, that would further distinguish the transactions described in the exceptions from the states' payroll practices at issue here.[8]

CMS also invokes legislative history in support of its "plain meaning" argument. It might be enough to say that if the text of the anti-reassignment provision unambiguously covered the states' payroll practices for home care workers, there would be no need to invoke the legislative history. *See Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). But in any event, that history supports the plaintiffs' narrow reading of the anti-reassignment provision as well. *See Samantar v. Yousuf*, 560 U.S. 305, 316 n.9 (2010).

As discussed in Section I.A, when Congress adopted the original version in 1972, it was focused on the practice of factoring—that is, the practice by which providers sold reimbursement claims for a percentage of their value to companies that would then submit the claims to the state. For example, in connection with the original version, the House Report identified the problem as follows:

> [S]ome physicians and other persons providing services reassign their rights to other organizations or groups under conditions whereby the organization or group submits claims and receives payment in its own name. Such reassignments have been a source of incorrect and inflated claims for services and have created administrative problems with respect to determinations of reasonable charges and recovery of overpayments.

---

[8] Bruckshaw amici's argument—that authorizing deductions for union dues is an "assignment" (or something very close to an assignment) because of the way union dues are described in other contexts—is barely worth mentioning. Unlike the types of assignments involved in factoring and the statute's exceptions, unions cannot step into the shoes of the worker and pursue independent claims against the state for Medicaid reimbursement based on the worker's decision to authorize deductions for union dues. The fact that union dues are sometimes referred to as "assignments" in a few judicial opinions and federal statutes in distinct contexts does not mean that they are "assignments" within the meaning of the anti-reassignment provision and in the context of assigning the right to submit a claim for reimbursement of health services.

H.R. REP. NO. 92-231, at 205, *reprinted in* 1972 U.S.C.C.A.N. at 5090; *see also Professional Factoring Service Association v. Mathews*, 422 F. Supp. 250, 251-52 (S.D.N.Y. 1976).

When Congress amended the anti-reassignment provision in 1977, it reiterated that it understood the provision simply as an attempt to prevent factoring. For example, the House Report described the original provision as a "ban on the use of 'factoring' arrangements in connection with the payment of claims" and an "effort[] to stop factoring of medicare and medicaid [sic] bills." H. REP. NO. 95-393(II), at 48-49, *reprinted in* 1977 U.S.C.C.A.N. at 3051. The House Report further described the original provision as an "action to stop a practice under which some physicians and other persons providing services under medicare and medicaid [sic] reassigned their medicare and medicaid receivables to other organizations or groups" and those organizations or groups "submitted claims and received payments in their name." H. REP. NO. 95-393(II), at 48, *reprinted in* 1977 U.S.C.C.A.N. at 3051. "Although factoring was outlawed under the Social Security Amendments of 1972," the House Report explained, "factoring firms have evaded statutory intent by working under a power of attorney arrangement." H. REP. NO. 95-393(II), at 46, *reprinted in* 1977 U.S.C.C.A.N. at 3048. The amendment thus "clarifie[d] existing law to insure that a power of attorney cannot be used to circumvent the prohibition in existing law against the use of 'factoring' arrangements . . . ." H. REP. NO. 95-393(II), at 43, *reprinted in* 1977 U.S.C.C.A.N. at 3045; *see also* S. REP. NO. 95-453, at 6-8.

Subsequent enactments by Congress can clarify the meaning of earlier statutory language, especially where the subsequent acts provide greater specificity. *Food & Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000); *see also Institute for Fisheries Resources v. Hahn*, 424 F. Supp. 3d 740, 753 (N.D. Cal. 2019). The change in language from the original version of the anti-reassignment provision is thus particularly harmful to CMS's argument. The original language seemed quite broad—it stated (with two exceptions) that "no payment under the plan for any care or service to an individual by a . . . practitioner shall be made to anyone other than such individual or such . . . practitioner." Social Security Amendments of 1972, Pub. L. No. 92-603, § 236(b), 86 Stat. 1329, 1415 (1972). The nature of

the arrangement between the "proper" recipient of payment and the third party was not mentioned at all. Had this language remained in effect, perhaps CMS could make a colorable argument that the legislative history simply does not matter—that regardless of Congress's intent, what controls is the actual language used, and that language is broad enough to cover the states' payroll practices for home care workers. *See Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1749 (2020). But when Congress amended the anti-reassignment provision it added language that evinced the narrow intent that the history shows it had all along. By specifying that states could not make payments to third parties "under an assignment or power of attorney or otherwise," Congress effectively declared that while it understood the original provision as merely banning payment of claims obtained by third parties through "assignment," the amended provision would ban payment of claims obtained through "assignment" or "power of attorney" or "otherwise." This supports the plaintiffs' argument that "otherwise" references a payment received by a third party as a result of a transaction similar to an assignment or power of attorney. It does not support CMS's argument that "assignment" and "power of attorney" are two exceedingly narrow examples of an extraordinarily broad prohibition.

Finally, CMS's interpretation appears contrary to the overall purpose of the Medicaid statute. *See California v. Trump*, 963 F.3d 926, 944 (9th Cir. 2020). The statute's stated purpose is to "furnish [] medical assistance" to people "whose income and resources are insufficient to meet the costs of necessary medical services" and to help those people "attain or retain capability for independence or self-care." 42 U.S.C. § 1396-1; *see also Independent Living Center of Southern California, Inc. v. Kent*, 909 F.3d 272, 276 (9th Cir. 2018). There is abundant evidence in the record explaining how the states' payroll practices directly serve this objective by facilitating an orderly system for the provision of home care and by improving conditions for home care workers, which in turn improves the quality of care those workers provide to Medicaid patients themselves. It is unclear how barring the payroll practices would serve the purposes of the Medicaid program; certainly CMS has not shed any light on the issue in this case.

B. Remedy

When an agency has acted under a mistaken belief that its action was required by statute, the normal remedy is to set aside that action and remand the case to the agency. *See Empire Health Foundation for Valley Hospital Medical Center v. Azar*, 958 F.3d 873, 886 (9th Cir. 2020); *Peter Pan Bus Lines, Inc. v. Federal Motor Carrier Safety Administration*, 471 F.3d 1350, 1354-55 (D.C. Cir. 2006). In such a case, the agency may choose to resolve a statutory ambiguity one way or the other after considering the competing interests at stake and properly applying its expertise. *See Safe Air for Everyone*, 488 F.3d at 1101-02.

Although the best that can be said for CMS is that the text of the anti-reassignment provision is ambiguous as to the types of payment practices it prohibits states from adopting, the plaintiffs appear to have a much stronger statutory interpretation argument. It may even be that the plaintiffs' interpretation is the only reasonable one. The plaintiffs seek a ruling to that effect, which would obviate the need to remand the matter to CMS for further consideration. But the Medicaid statute is exceedingly complicated, and the agency in charge of administering it should have the opportunity to explore and explain the matter fully before a definitive conclusion is reached by the judiciary. *See id.* (remanding to give agency "the first opportunity" to interpret provisions under legally correct premise). This is true even if, as here, the position taken by the agency, along with the motivation behind that decision, is subject to serious doubt. *See Peter Pan Bus Lines, Inc.*, 471 F.3d at 1355 (Tatel, J., concurring); *see also Department of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019).[9]

CMS contends that even if its decision to ban the payroll practices was based on a

---

[9] The intervenors contend that CMS seeks to ban the payroll practices for improper reasons unrelated to the purpose of the Medicaid statute—namely, to undermine labor unions by making it harder for them to collect dues from their members. Indeed, as previously noted, the intervenors have brought an equal protection claim asserting that CMS's actions are motivated by nothing more than anti-union animus, along with a First Amendment claim asserting that CMS is attempting to suppress the political activities of the labor movement. Although these claims seem realistic, the agency should be permitted to explore in the first instance whether it wishes to persist in its current interpretation of the anti-reassignment provision and, if so, to try to articulate a proper justification for it.

mistaken belief that the statute required it, the rule should be vacated only as to the parties in this case and not more broadly. As an initial matter, this seems contrary to the very notion of "vacate," and foreclosed by the Administrative Procedure Act's mandate that courts "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2). This "statutory directive . . . telling a reviewing court that its obligation is to 'set aside' any unlawful action" creates the "presumption . . . in APA cases that the offending agency action should be set aside in its entirety rather than only in limited" ways. *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1094 (9th Cir. 2020). This conflicts with CMS's suggestion that it be permitted to enforce its 2018 interpretation of the anti-reassignment provision—held to be adopted under a legally erroneous basis—except as against the states here.

CMS also makes the related argument that the Court should not vacate the rule but simply remand the matter to the agency to consider whether it wishes to keep the rule in effect. However, courts must generally vacate agency action found to be not in accordance with law; only in rare circumstances should a court remand a matter to an agency without vacating the action that has been deemed invalid. *See Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015); *see also DHS v. Regents of the University of California*, 140 S. Ct. 1891, 1916 (2020). In deciding whether the exception to the regular rule applies, courts must consider how serious the agency's error was, and how disruptive it would be to vacate the action. *See National Family Farm Coalition v. EPA*, 966 F.3d 893, 929 (9th Cir. 2020). As already discussed, the agency's error was quite serious. It struck down a decades-long practice for paying home care workers—a matter of great importance for the home care workers themselves, the Medicaid patients receiving their care, and the states administering elaborate Medicaid and home care worker plans—based on the legally incorrect premise that the statute's text unequivocally barred the agency from authorizing these payments. On the issue of disruption, although CMS adopted its new policy prohibiting the payroll practices in 2018, it has not yet taken action against any of the states who have employed those practices for decades and continue to do so today. Accordingly, vacating the agency's action simply preserves a status quo that has existed

since at least the early 1990's while the agency takes the time it needs to give proper consideration to the matter. Under these circumstances, even if there were a presumption *against* vacating agency action, it would be appropriate to vacate CMS's new policy in this case.

### III. Conclusion

CMS's motion to dismiss the Administrative Procedure Act claim and motion for summary judgment are denied. Summary judgment is granted to the states and the intervenors on their claim that CMS's decision to ban the payroll practices for home care workers violates the Administrative Procedure Act. The 2018 rule is vacated and the question is remanded to the agency for further consideration.

CMS's motion to dismiss the intervenors' equal protection and First Amendment claims is denied as moot. The intervenors' motion to compel at Dkt. No. 95 is denied as moot. CMS's motion to strike at Dkt. No. 105 is denied. The motions to file amicus curiae briefs at Dkt. Nos. 89 and 90 are granted.

**IT IS SO ORDERED.**

Dated: November 17, 2020

VINCE CHHABRIA
United States District Judge